## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| THE GOVERNMENT OF QUÉBEC, | ) |
| *Plaintiff*, | ) |
| and | ) |
| THE GOVERNMENT OF CANADA, | ) **NON-CONFIDENTIAL VERSION** |
| *Plaintiff-Intervenor*, | ) |
| and | ) **Consol. Court No. 20-00168** |
| MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., | ) **Confidential Business Proprietary** |
| *Consolidated-Plaintiffs*, | ) **Information Deleted from Page 17.** |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant*, | ) |
| and | ) |
| WIND TOWER TRADE COALITION, | ) |
| *Defendant-Intervenor.* | ) |

## THE GOVERNMENT OF QUÉBEC'S RESPONSE IN OPPOSITION TO WIND TOWER TRADE COALITION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Matthew J. Clark
Nancy A. Noonan
Jessica R. DiPietro
Aman Kakar

Arent Fox LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6000
*Counsel for Government of Québec*

Dated:  June 10, 2021

AFDOCS/24264707.1

# Table of Contents

I.  RULE 56.2 STATEMENT ...........................................................................................1

  A.  Administrative Determination To Be Reviewed ....................................................2

  B.  Issues Presented And Summary Of Argument .......................................................3

    1.  Did Québec's local content requirements (LCRs) entrust or direct wind turbine original equipment manufacturers ("OEMs") to purchase wind towers from Marmen in an environment of restricted competition such that Marmen extracted more than adequate remuneration from those OEMs and received a benefit whether the benefit is viewed as recurring or non-recurring? ...................3

    2.  Does the LCR Program constitute an import substitution subsidy? ..........4

II.  FACTS .....................................................................................................................5

III.  STANDARD OF REVIEW ........................................................................................8

IV.  ARGUMENT ..........................................................................................................10

  A.  Québec Did Not Entrust Or Direct Wind Turbine Original Equipment Manufacturers ("OEMs") Through Its Local Content Requirements ("LCRs") To Purchase Wind Towers From Marmen In An Environment Of Restricted Competition Such That Marmen Extracted More Than Adequate Remuneration From Those OEMs And Received A Benefit Whether The Benefit Is Viewed As Recurring or Non-Recurring ....................10

    1.  Properly analyzed as an MTAR Program, the alleged benefits are recurring and, therefore, did not provide a countervailable benefit to Marmen during the period of investigation .........................................10

    2.  Québec's local content requirements (LCRs) did not entrust or direct wind turbine original equipment manufacturers ("OEMs") to purchase wind towers from Marmen ......................................................19

    3.  The conduct of the wind tower industry proves that competition is not limited .................................................................................................23

    4.  Québec's local content requirements are not grants and WTTC's contention that they be imagined as such is unfounded ..........................24

  B.  Even If The Alleged Subsidy Is Not Considered A Purchase Of Goods For MTAR, The Local Content Requirements Do Not Provide A Financial Contribution Or Benefit Conferred To Marmen ....................................................25

    1.  There can be no financial contribution because Hydro-Québec is not purchasing wind towers from Marmen ................................................27

    2.  The requirements for establishing entrustment or direction have not been met .................................................................................................28

i

C.    Commerce Properly Did Not Reach A Determination On Specificity And, Even If It Does, Québec's Local Content Requirements Cannot Be Considered An Import Substitution Subsidy ........................................................29

V.    CONCLUSION ............................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Acciai Speciali Terni S.p.A. v. United States*,
350 F. Supp. 2d 1254 (Ct. Int'l Trade 2004) ........................................................... 8

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999) ........................................................................... 28

*Changzhou Trina Solar Energy Co. v. United States*,
264 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) ......................................................... 25

*Changzhou Trina Solar Energy Co. v. United States*,
975 F.3d 1318 (Fed. Cir. 2020) ........................................................................... 29

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ............................................................................................. 9

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ............................................................................................. 8

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ........................................................................... 9

*DuPont Teijin Films USA, LP v. United States*,
407 F.3d 1211 (Fed. Cir. 2005) ........................................................................... 8

*Gov't of Sri Lanka v. United States*,
308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ......................................................... 25

*Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*,
361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) ......................................................... 8

*Hynix Semiconductor Inc. v. United States*,
391 F. Supp. 2d 1337 (Ct. Int'l Trade 2005) ......................................................... 28

*Hynix Semiconductor Inc. v. United States*,
425 F. Supp. 2d 1287 (Ct. Int'l Trade 2006) ......................................................... 21

*Jindal Poly Films Ltd. of India v. United States*,
439 F. Supp. 3d 1354 (Ct. Int'l Trade 2020) ......................................................... 17

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ..................................................................................... 9, 12

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) .................................................................. 8

*Rebar Trade Action Coal. v. United States*,
    335 F. Supp. 3d 1302 (Ct. Int'l Trade 2018), *aff'd* 783 F. App'x 1034 (Fed.
    Cir. 2019) ...................................................................................................... 11

*RZBC Grp. Shareholding Co. v. United States*,
    100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ............................................. 26

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ................................................................. 11

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ................................................................... 9

*Wilmar Trading Pte Ltd. v. United States*,
    466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ....................................... 21, 29

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................ 8

19 U.S.C. § 1677(5)(B)(iii) .............................................................. 20, 26, 28

19 U.S.C. § 1677(5)(D) ................................................................................ 25

19 U.S.C. § 1677(5)(D)(i) ............................................................................... 6

19 U.S.C. § 1677(5)(D)(iv) ....................................................................... 6, 20

19 U.S.C. § 1677(5)(E)(iv) ........................................................................... 20

19 U.S.C. § 1677(5A)(A) ............................................................................. 29

19 U.S.C. § 1677(5A)(C) .......................................................................... 5, 29

**Regulations**

19 C.F.R. § 351.503(b) ................................................................................... 6

19 C.F.R. § 351.504 ..................................................................................... 27

19 C.F.R. § 351.511 ..................................................................................... 12

19 C.F.R. § 351.511(b) ............................................................................ 8, 12

19 C.F.R. § 351.511(c) .................................................................................8, 12

19 C.F.R. § 351.524.....................................................................................8, 12

19 C.F.R. § 351.524(c) .....................................................................................12

19 C.F.R. § 351.524(c)(1)..........................................................................12, 14, 15

19 C.F.R. § 351.524(c)(2).............................................................................11, 13

*Countervailing Duties*, 63 Fed. Reg. 65348 (Nov. 25, 1998) (final rule) .............................*passim*

**Administrative Determinations**

*Biodiesel from the Republic of Indonesia*, 82 Fed. Reg. 53471 (Dep't Commerce
    Nov. 16, 2017) (final CVD determ.), and accompanying Issues and Decision
    Memorandum .......................................................................................28

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea,*
    85 Fed. Reg. 45185 (Dep't Commerce July 27, 2020) (prelim. results 2018
    CVD review, intent to rescind in part), and accompanying Decision
    Memorandum .......................................................................................12

*Certain Softwood Lumber Products From Canada,* 85 Fed. Reg. 7273 (Dep't
    Commerce Feb. 7, 2020) (2017-2018 Prelim CVD Results), and
    accompanying Decision Memorandum...................................................12

*Certain Softwood Lumber Products From Canada*, 85 Fed. Reg. 77163 (Dep't
    Commerce Dec. 1, 2020) (2017-2018 Final CVD Results), and accompanying
    Issues and Decision Memorandum........................................................11

*Certain Steel Grating from the People's Republic of China*, 75 Fed. Reg. 32362
    (Dep't Commerce June 8, 2010) (final affirm. CVD determ.), and
    accompanying Issues and Decision Memorandum ................................29

*Certain Uncoated Groundwood Paper From Canada,* 83 Fed. Reg. 2133 (Dept.
    Commerce Jan. 16, 2018) (prelim. affirm. CVD determ., alignment with final
    AD determ.), and accompanying Decision Memorandum.................................12, 15

*Certain Uncoated Groundwood Paper From Canada,* 83 Fed. Reg. 39414 (Dep't
    Commerce Aug. 9, 2018) (final affirm. CVD determ.), and accompanying
    Issues and Decision Memorandum.....................................................14, 15

*Utility Scale Wind Towers From Canada*, 84 Fed. Reg. 68126 (Dep't Commerce
    Dec. 13, 2019) (prelim. affirm. determ. & alignment of final determ. with final
    AD determ.), and accompanying Decision Memorandum.............................*passim*

*Utility Scale Wind Towers From Canada*, 85 Fed. Reg. 40245 (Dep't Commerce
  July 6, 2020) (final aff. CVD and final neg. det. of crit. circ.), and
  accompanying Issues and Decision Memorandum ...........................................................*passim*

*Utility Scale Wind Towers From Canada, Indonesia, and the Socialist Republic of
  Vietnam*, 85 Fed. Reg. 52543 (Dep't Commerce Aug. 26, 2020) (amended
  final affirm. CVD det. and orders) ...........................................................................................2

**Other Authorities**

*Statement of Administrative Action accompanying the Uruguay Round
  Agreements Act*, H.R. Rep. No. 103–316, vol. 1 (1994), *reprinted in* 1994
  U.S.C.C.A.N. 4040 ...........................................................................................21, 26, 29

*Webster's Third New Int'l Dictionary* (unabridged 1981) ...........................................25

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| THE GOVERNMENT OF QUÉBEC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| and | ) **NON-CONFIDENTIAL VERSION** |
| | ) |
| THE GOVERNMENT OF CANADA, | ) |
| | ) |
| *Plaintiff-Intervenor*, | ) **Consol. Court No. 20-00168** |
| | ) |
| and | ) |
| | ) |
| MARMEN INC., MARMEN ÉNERGIE INC., | ) **Confidential Business Proprietary** |
| MARMEN ENERGY CO., | ) **Information Deleted from Page 17.** |
| | ) |
| *Consolidated-Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) |
| and | ) |
| | ) |
| WIND TOWER TRADE COALITION, | ) |
| | ) |
| *Defendant-Intervenor*. | ) |

**THE GOVERNMENT OF QUÉBEC'S RESPONSE IN OPPOSITION TO WIND TOWER TRADE COALITION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2 of the Rules of this Court, the Government of Québec ("GOQ") files this opposition to the Rule 56.2 motion for judgment on the agency record filed by the Wind Tower Trade Coalition ("WTTC"). *See* Wind Tower Trade Coalition's Memorandum in Support of Its Rule 56.2 Motion for Judgment Upon the Agency Record (Feb. 12, 2021), ECF Nos. 35,

36 ("WTTC 56.2 Br."). As we demonstrate below, Commerce's determination that Québec's Local Content Requirements ("LCR") did not confer a benefit to Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (together, "Marmen") was supported by substantial evidence and otherwise in accordance with law. We respectfully request that the Court sustain Commerce's determination as to the LCR program.

### A.      Administrative Determination To Be Reviewed

The WTTC challenges the final determination by the U.S. Department of Commerce, International Trade Administration ("Commerce") in the countervailing duty investigation of *Utility Scale Wind Towers From Canada* ("Wind Towers from Canada"). The period of investigation is January 1, 2018 through December 31, 2018 ("POI"). On August 26, 2020, Commerce published its amended final affirmative countervailing duty determination. In the amended final determination Commerce calculated a 1.13 percent subsidy rate for Marmen. *Utility Scale Wind Towers From Canada*, 85 Fed. Reg. 40245 (Dep't Commerce July 6, 2020) (final aff. CVD and final neg. det. of crit. circ.) ("*Final CVD Determination*"), P.R. 401, ECF No. 22-4, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 399, ECF No. 22-5, as amended by *Utility Scale Wind Towers From Canada, Indonesia, and the Socialist Republic of Vietnam*, 85 Fed. Reg. 52543, 52545 (Dep't Commerce Aug. 26, 2020) (amended final affirm. CVD det. and orders) ("*Amended CVD Determination & Order*"), P.R. 425, ECF No. 22-6.[1]

---

[1] Unless otherwise specified, "P.R. __" refers to the public document number and "C.R. __" refers to the BPI document number assigned in the indices to the administrative record filed by the United States. *See* ECF No. 22.

### B.        Issues Presented And Summary Of Argument

**1.        Did Québec's local content requirements (LCRs) entrust or direct wind turbine original equipment manufacturers ("OEMs") to purchase wind towers from Marmen in an environment of restricted competition such that Marmen extracted more than adequate remuneration from those OEMs and received a benefit whether the benefit is viewed as recurring or non-recurring?**

No.  The energy policies adopted by Québec, which include the government's purchase of wind energy from wind farm developers, cannot logically act to benefit Marmen's sales of wind towers to wind turbine original equipment manufacturers ("OEMs") who in turn sell completed wind turbines to the wind farms. As stated by Commerce, "the alleged program is the purchase of wind towers for MTAR {more than adequate remuneration}." IDM at 36, P.R. 399. Québec did not purchase wind towers (or wind energy) from Marmen. Commerce correctly focused its analysis on the transactions between Marmen and the wind turbine OEMs for the merchandise under investigation. Commerce determined that the benefit from the alleged subsidy should be considered recurring, and because "Marmen did not make sales during the POI under the Quebec LCR program, . . . {it} did not use or benefit from the program during the POI." *Id.* at 38. This aspect of Commerce's final determination is based on substantial evidence and in accordance with law.

Regardless of whether the alleged benefit is considered recurring or non-recurring, the record does not support a finding of financial contribution or benefit to Marmen.  Hydro-Québec did not purchase wind towers from Marmen and the wind turbine OEMs were not entrusted or directed by Québec to purchase wind towers from Marmen for MTAR.  Marmen did not enjoy an environment of restricted competition allowing it to sell its wind towers for MTAR.  Although Hydro-Québec purchases wind energy from the wind farms, the record demonstrates that Hydro-Québec does *not* purchase wind towers – directly or indirectly. Hydro-Québec is not a party to

the contracts between suppliers like Marmen, the OEMs who build the completed wind turbines, and any other private intermediaries who provide equipment or services to wind farm developers. The only contracts to which Hydro-Québec is a party are with the wind farm developers for the purchase of electricity after the wind farms are completed, tested, and begin generating.

Commerce's analysis of Marmen's sales of wind towers to wind turbine OEMs (the alleged financial contribution) as a recurring measure was consistent with established agency practice. As fully explained by Commerce, "Marmen's sales of wind towers under the Quebec LCR program do not meet the{} {three} criteria" that would require Commerce to consider any potential benefits as non-recurring.  IDM at 37, P.R. 399.  Any subsidy to Marmen could not be exceptional because Marmen sold its wind towers on a regular basis. No express authorization or approval was required for Marmen to sell its wind towers. Marmen receives no benefit under the LCRs that is tied to its capital assets. Because there were no purchases of wind towers during the period of investigation, Commerce correctly determined that there was no benefit conferred during the period of investigation.  It follows that no countervailable financial contribution was provided during the period of investigation. Commerce's determination is supported by substantial evidence and in accordance with law.

> **2.** **Does the LCR Program constitute an import substitution subsidy?**

No. WTTC's arguments are flawed regarding whether the local content requirements meet the statutory definition to be an import substitution subsidy. Whether an alleged subsidy is an "import substitution" subsidy speaks to the specificity of the alleged subsidy and only to specificity as a matter of law.  It is not a device to determine financial contribution or benefit.

On the record, local content requirements cannot be considered an import substitution subsidy because there is no financial contribution or benefit to the producers of utility scale wind towers through the LCRs in Hydro-Québec's calls for tender ("CFTs") for electricity.  There is

no evidence on the record demonstrating a connection between the alleged financial contribution and a contingency "upon the use of domestic {wind towers} over imported goods," as required by the statute.  19 U.S.C. § 1677(5A)(C).  Hydro-Québec's purchase of energy is not connected to and does not have an impact on the purchase of or the price of wind towers.

## II.    FACTS

This appeal arises out of Commerce's final determination in the countervailing duty investigation of the Wind Towers from Canada.  Although Québec challenged certain aspects of Commerce's final determination in its own Rule 56.2 Motion for Judgment on the Agency Record, *see* Plaintiff's Memorandum in Support for Judgment on the Agency Record (Feb. 11, 2021) ("Québec's 56.2 Br."), ECF Nos. 28 & 29, Plaintiff's Complaint (Sept. 4, 2020), ECF No. 2, Québec agrees that the law and record support Commerce's finding that the local content requirements did not confer a financial contribution or benefit to Marmen because there were no sales of wind towers subject to those requirements during the period of investigation.

Commerce investigated whether the Government of Québec provided a financial contribution to producers of utility scale wind towers by purchasing wind towers for more than adequate remuneration.  *See* Initiation Checklist at 22-24 (July 29, 2019), P.R. 50, C.R. 25 (initiating an investigation on "QUEBEC LOCAL CONTENT REQUIREMENTS / PURCHASE OF WIND TOWERS FOR MORE THAN ADEQUATE REMUNERATION (QUEBEC)").  In its Initiation Checklist, Commerce explained that it was initiating an investigation of these programs but recommended separate investigation of the alleged programs "under the titles 'Quebec Local Content Requirements' and 'Purchase of Wind Towers for More Than Adequate Remuneration (Quebec).'"  *Id.* at 22 n.83.  Commerce explained that the "descriptions of these two programs in the petition and supporting evidence are substantially the same; only the petitioner's financial contribution and benefit allegations differ."  *Id.*  In other words, Commerce

not only gave the WTTC exactly what it petitioned for but undertook to examine WTTC's allegation in two different ways. As part of its investigation and collection of information, Commerce analyzed whether "any investigated *Canadian wind tower producer* used the program, and if so, whether purchases under the program constitute direct transfers of funds under 771(5)(D)(i) of the Act or, alternatively, subsidies in the form of purchases of goods for MTAR within the meaning of section 771(5)(D)(iv) of the Act." *Id.* (emphasis added); *see* 19 U.S.C. §§ 1677(5)(D)(i) and (D)(iv); *see also* 19 C.F.R. § 351.503(b) (measuring benefit as "enhanced revenue").

Commerce requested information from the GOQ regarding the "Purchase of Wind Towers for More Than Adequate Remuneration (MTAR) / Québec Local Content Requirements." Government of Québec's Initial Questionnaire Response at 28-47 (Oct. 9, 2019) ("GOQ IQR"), P.R. 113, C.R. 29. The GOQ explained that "it has not and does not purchase wind towers or, for that matter, wind tower arrays (commonly referred to as 'wind farms'). Québec {through} its regulated electricity provider (Hydro-Québec) purchases wind power; electricity produced by wind turbines connected to Hydro-Québec's network (aka 'grid')." *Id.* at 29. The GOQ "provide{d} greater detail and supporting documents explaining {Hydro-Québec Distribution} HQD's purchases of wind power, including the procurement process and the requirements for local and regional content, under those procurements." *Id.* at 31. Hydro-Québec purchases "wind power integrated into its network . . . pursuant to public procurements conducted by Hydro-Québec Distribution (HQD)." *Id.* at 30. The GOQ explained that it "cannot comment on or provide information addressing the specified subject – the purchase of wind towers – because Québec does not purchase wind towers." *Id.* at 31. Once contracts are awarded for the purchase of wind power (a public procurement conducted pursuant

6

to regulatory oversight), "HQD pays the private developers of wind farms for the megawatts of

electricity transferred to HQD at {the} prices set in the contracts" and nothing more. *Id.* at 30.

Separately,

> wind farm developers enter into contracts or agreements with original equipment
> manufacturers (OEMs).  The OEMs in turn enter into contracts or agreements
> with vendors – including those selling wind towers or more typically sections of
> wind towers that the OEM or a general construction contractor will erect—for the
> many different parts, components, and elements that constitute a complete,
> functioning wind turbine.

*Id.* at 30.  There is no relationship between HQD and the OEMs or their suppliers.  *Id.* at 30-31.

Marmen explained that its "customers – 'turbine OEMs' – purchase wind towers for the

production of wind turbines," the turbine OEMs then "sell wind turbines to private wind farm

developers," and that "{i}f a wind farm project is subject to a provincial local content

requirement, the wind farm developer is responsible for complying with that requirement."

Response of Marmen Inc. and Marmen Énergie Inc. to Questions 2.B and the "local content

requirement" questions of Section III General Questions of the Department's Countervailing

Duty Questionnaire, and Questions l.C, 3, and 8-17 of the Second Supplemental Questionnaire at

LCONTENT-5 (Oct. 15, 2019) ("Marmen Sales and Local Content Response"), P.R. 225, C.R.

168.

In its *Preliminary Determination*, Commerce refined the description of the alleged

program, explaining that it was investigating "an allegation that by imposing the local content

requirements, the GOQ 'entrusted and directed' wind farm developers . . . through the OEMs, to

purchase wind towers manufactured by Marmen in Québec{.}" *Utility Scale Wind Towers From

Canada*, 84 Fed. Reg. 68126 (Dep't Commerce Dec. 13, 2019) (prelim. affirm. determ. &

alignment of final determ. with final AD determ.), P.R. 313 ("*Preliminary Determination*"), and

accompanying Decision Memorandum at 20 ("PDM"), P.R. 308. Commerce stated it was

conducting its investigation as such "{b}ecause the alleged program involves the purchases of goods . . . {it} examined whether benefits under this program were provided for MTAR." *Id.* Commerce preliminarily found that "Marmen did not make sales of wind towers in Québec during the POI." *Id.* Consistent with its established practice and the controlling regulations at 19 C.F.R. §§ 351.511(b) and (c), and 351.524, Commerce determined that any benefits received would be "recurring" and, thus, allocated in the year of receipt. *Id.* Because it made no sales subject to the program during the period of investigation, Marmen could not receive a benefit from the alleged program during the period of investigation. *Id.* Because the program was not used by Marmen, Commerce did not make a determination with respect to countervailability of the local content requirements. Commerce's determination was unchanged in the final determination. *See* IDM at 36-38, P.R. 399.

## III.    STANDARD OF REVIEW

This Court rejects any administrative determination by Commerce that is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing whether Commerce's actions are supported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005), quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938). The Court "may not reweigh the evidence or substitute its own judgment for that of {Commerce}." *Acciai Speciali Terni S.p.A. v. United States*, 350 F. Supp. 2d 1254, 1267 n.14 (Ct. Int'l Trade 2004); *see also Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 361 F. Supp. 3d 1314, 1319 (Ct. Int'l Trade 2019) ("The court may not 'reweigh the

8

evidence or . . . reconsider questions of fact anew.'") (quoting *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)).

Commerce has "significant leeway to say what its own rules mean." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019). When reviewing Commerce's statutory interpretations (*i.e.*, matters of law), the Court applies the two-part test set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106-07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). Under *Chevron*, to determine whether an agency's interpretation of a statute is entitled to deference, the Court conducts a two-part inquiry. Under the first prong, where Congress has spoken directly to the question at issue, the Court and agency "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If the statute is vague or silent on an issue, the Court will uphold Commerce's interpretation, but only so long as the interpretation is permissible. *See id.,* 467 U.S. at 843; *see also Kisor*, 139 S. Ct. at 2416 (requiring review of interpretative tools before dubbing regulation "truly ambiguous.").

As explained below, Commerce's determination as to Québec LCRs was supported by substantial evidence and in accordance with law. Accordingly, Commerce's determination on this program should be affirmed.

IV.   **ARGUMENT**

A.   **Québec Did Not Entrust Or Direct Wind Turbine Original Equipment Manufacturers ("OEMs") Through Its Local Content Requirements ("LCRs") To Purchase Wind Towers From Marmen In An Environment Of Restricted Competition Such That Marmen Extracted More Than Adequate Remuneration From Those OEMs And Received A Benefit Whether The Benefit Is Viewed As Recurring Or Non-Recurring**

1.   **Properly analyzed as an MTAR Program, the alleged benefits are recurring and, therefore, did not provide a countervailable benefit to Marmen during the period of investigation**

WTTC argues that "Commerce failed to take into account material record evidence that detracted from its conclusion, and moreover deviated from its regulations without an explanation of why its analysis was reasonable." WTTC 56.2 Br. at 12. To the contrary, Commerce properly analyzed the alleged subsidy as an MTAR program which means, under controlling regulations and established agency practice, whether the alleged benefits were recurring. The transactions that give rise to both the alleged financial contribution and benefit to Marmen are the sales of wind towers from Marmen to the wind turbine OEMs. Because there were no such sales during the POI, Commerce properly determined that Marmen did not use the program.

WTTC also argues that Commerce did not address the criteria outlined in its regulations to determine whether any benefits conferred by the LCRs are recurring or non-recurring. *See id.* at 9. To the contrary, Commerce explained that it considered:

(i)  Whether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year;

(ii)  Whether the subsidy required or received the government's express authorization or approval (*i.e.*, receipt of benefits is not automatic), or

(iii)  Whether the subsidy was provided for, or tied to, the capital structure or capital assets of the firm.

10

IDM at 37, P.R. 399, quoting 19 C.F.R. § 351.524(c)(2).  Section 351.524(c)(2) of Commerce's

regulations is the relevant standard.  Commerce's determination that "Marmen's sales of wind

towers under the Quebec LCR program do not meet these criteria," *id.*, should be sustained as in

accordance with law and based on substantial evidence.

      Commerce's determination is consistent with its practice.  Commerce routinely analyzes

the purchase of electricity – the only transaction in which Hydro-Québec participates – as an

MTAR program and consistently finds such measures to be recurring.  *See, e.g., Rebar Trade

Action Coal. v. United States*, 335 F. Supp. 3d 1302, 1304-1305 (Ct. Int'l Trade 2018), *aff'd* 783

F. App'x 1034 (Fed. Cir. 2019) (analyzing Commerce's determination that the Government of

Turkey was not involved in the purchase or sale of electricity based on record evidence, in the

context of an MTAR allegation); *Certain Softwood Lumber Products From Canada*, 85 Fed.

Reg. 77163 (Dep't Commerce Dec. 1, 2020) (2017-2018 Final CVD Results), and accompanying

Issues and Decision Memorandum at 232-235 ("*Lumber 2017-2018 Final*") (analyzing a

program where the government authority purchases and sells electricity in the context of an

MTAR allegation).  Here, there is a purchase of goods – wind towers – but Hydro-Québec is not

the entity purchasing or procuring the goods.  *See Countervailing Duties*, 63 Fed. Reg. 65348,

65379 (Nov. 25, 1998) (final rule) ("*CVD Preamble*") (discussing government procurement

subsidies as the genesis for Commerce's forthcoming regulations on the government purchase of

goods).  Commerce reasonably considered whether there were purchases of wind towers during

the period of investigation for MTAR and, consistent with its practice and the law, determined

that any such purchases of wind towers were recurring.

      WTTC provided no evidence that would cause Commerce to change its determination

and depart from its established practice.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382

(Fed. Cir. 2001) (citation omitted) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.").  Commerce has, several times in the last three years made similar determinations with respect to whether benefits received under MTAR programs are recurring or non-recurring.  Each time, Commerce has found that they are recurring.  *See, e.g., Certain Softwood Lumber Products From Canada,* 85 Fed. Reg. 7273 (Dep't Commerce Feb. 7, 2020) (2017-2018 Prelim CVD Results), and accompanying Decision Memorandum at 85-88 (finding that GOQ purchases for of electricity for MTAR under PAE 2011-01 to be recurring under 19 C.F.R. § 351.524(c)(1)), unchanged in *Lumber 2017-2018 Final*; *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea,* 85 Fed. Reg. 45185 (Dep't Commerce July 27, 2020) (prelim. results 2018 CVD review, intent to rescind in part), and accompanying Decision Memorandum at 24 ("In past cases, Commerce generally has treated MTAR benefits as recurring benefits to be allocated in the year of receipt, similar to its treatment of less than adequate remuneration (LTAR) benefits under 19 CFR 351.511(b) and (c) and 19 CFR 351.524."); *Certain Uncoated Groundwood Paper From Canada,* 83 Fed. Reg. 2133 (Dept. Commerce Jan. 16, 2018) (prelim. affirm. CVD determ., alignment with final AD determ.), and accompanying Decision Memorandum at 79-80 (finding GOQ purchases of electricity for MTAR to be recurring under 19 C.F.R. § 351.524(c)(1)) ("*UGW Paper PDM*") These determinations are based on the premise that 19 C.F.R. § 351.524(c), in conjunction with the *CVD Preamble*, *see* 63 Fed. Reg. at 65379 (relying on approach outlined in 19 C.F.R. § 351.511 (government provision of goods or services)), provides that MTAR programs are recurring.  Interpreting this regulation differently would be inconsistent with the law.  *See Kisor*, 139 S. Ct. at 2414-18 (holding that a court should not afford deference to agency interpretation

"unless the regulation is genuinely ambiguous," contemplating "all the 'traditional tools' of construction," including "text, structure, history, and so forth.").

As determined by Commerce, evaluation of factors listed in 19 C.F.R. § 351.524(c)(2) shows that WTTC's analysis must be rejected. First, the wind tower sales between Marmen and the OEMs are not exceptional.  Commerce makes the important and necessary distinction that "the CFTs were for purchases of wind energy, *i.e.*, electricity, not wind towers.  Marmen did not sell wind energy.  Instead, it sold wind towers on a regular basis."  IDM at 37, P.R.399.  WTTC argues that "Marmen's 'sales of wind towers under the Québec LCR program' were explicitly tied to and dependent on the CFTs, and thus that Marmen could not expect to receive subsidized sales based on the CFTs on an ongoing basis from year to year."  WTTC 56.2 Br. at 12.  This conclusion is unsupported by the record evidence.  Marmen sold wind towers on a regular basis pursuant to private negotiations and transactions with OEMs, including prior to Hydro-Québec's CFTs. *See* Marmen Sales and Local Content Response at LCONTENT-5, LCONTENT-6, LCONTENT-10 and LCONTENT-11 (explaining Marmen's sales process, including regular communications to negotiate new orders), P.R. 225, C.R. 168.  Marmen explained that OEMs purchase the wind towers through a series of transactions over years at prices that are negotiated directly with Marmen by the OEMs. *See id.* ("Marmen's process for selling wind towers to turbine OEMs is the same – regardless of whether the wind towers sold are ultimately used by a wind farm developer to satisfy a local content requirement." *Id.* at LCONTENT-5). In addition to recurring local content projects, Marmen also provided evidence demonstrating that it had a large number of sales to turbine OEMs from 2007-2017. *See id.* at Exhibit LCQ-02, P.R. 226-227, C.R. 168.

13

Second, WTTC's argument that Marmen would not have sold its wind towers "*but for* the LCRs in the four-part CFTs" is not supported by the record. WTTC 56.2 Br. at 14-15. Marmen was operating in Québec at its Trois-Rivières facility prior to the first CFT (2003 Tender). *See* Marmen Sales and Local Content Response, Exhibit LCQ-01, at 1-2 ("Marmen began producing and selling wind towers manufactured at its Trois-Rivières facility before Hydro-Québec issued its first call for tender in May 2003 . . . ."), P.R. 226, C.R. 168. The 2003 Tender only mandated a local content requirement with respect to an eligible region, specifically the City of Matane; Gaspésie-Îles-de-la-Madeleine. The city of Trois-Rivières, where Marmen was operating at the time, was not included as an eligible region. *See* GOQ IQR, at Exhibit QC-LC-09, P.R. 123, C.R. 42-43.

WTTC cites *Certain Uncoated Groundwood Paper from Canada* ("*UGW Paper from Canada*") to support its argument that "non-recurring benefits are characteristically not regular or predictable" and that "such benefits include instances where approval has been project specific, as it was here." WTTC 56.2 Br. at 17. WTTC cites to Comment 80 in the *UGW Paper from Canada* Issues and Decision Memorandum, which discusses whether two Emploi-Québec grant programs were recurring.[2] The comment cited by WTTC does not support the proposition that the LCRs are non-recurring because they are "characteristically not regular or predictable," including "instances where approval has been project specific." WTTC 56.2 Br. at 17. The facts are not alike. In *UGW Paper from Canada*, Commerce evaluated grant programs not included on the list of normally recurring programs in 19 C.F.R. § 351.524(c)(1) to determine whether on

---

[2] These grants were provided by the GOQ to support projects related to Workforce Skills Development and Worker Training. *See Certain Uncoated Groundwood Paper From Canada,* 83 Fed. Reg. 39414 (Dep't Commerce Aug. 9, 2018) (final affirm. CVD determ.), and accompanying Issues and Decision Memorandum at 232-236 (Comments 79 and 80) ("*UGW Paper IDM*").

their unique facts they provided non-recurring benefits.  *See UGW Paper IDM* at 234-236

(Comment 80).  Specifically, Commerce found that the grants provided non-recurring benefits

"because separate, project-specific government approval was required to receive benefits and

funding . . . and because funding for projects . . . were limited in duration." *Id.* at 235. Otherwise

in *UGW Paper from Canada*, Commerce examined MTAR programs for which it found the

purchase of electricity to be recurring.  *See UGW Paper PDM* at 79-80. For that analysis

"provisions of goods and services for less than adequate remuneration," which Commerce uses

as its guide for the provision of goods for more than adequate remuneration, *is* included on the

list of measures normally treated as "providing recurring benefits."  *See* 19 C.F.R. §

351.524(c)(1) (including "{d}irect tax exemptions and deductions; exemptions and excessive

rebates of indirect taxes or import duties; provision of goods and services for less than adequate

remuneration; price support payments; discounts on electricity, water, and other utilities; freight

subsidies; export promotion assistance; early retirement payments; worker assistance; worker

training; wage subsidies; and upstream subsidies.").

     Third, the record does not support a claim that the GOQ's express authorization or

approval was required.  To the contrary, no express approval or authorization is required from

Hydro-Québec and the GOQ for the sales between Marmen and the OEM.  The GOQ played no

role in the transactions between the wind farm developers and the OEMs, or between the OEMs

and their vendors.  *See* Marmen Sales and Local Content Response, Exhibit LCQ-01, at 3, P.R.

226, C.R. 168 (showing negotiations are between Marmen and the OEM). Hydro-Québec's only

role is to approve the contract with the wind farm developer to supply energy years before the

wind farms are commissioned and Hydro-Québec begins receiving the electricity for which it

contracted.  GOQ IQR at 39, P.R. 113, C.R. 29.

Hydro-Québec does not play any role in the contract negotiations between the wind farm developers, OEMs, or wind tower vendors; or in the selection of a wind tower vendor. The *Régie de l'énergie*, Québec's independent energy regulator, approves the bidding process for purchases of electricity, the bid evaluation criteria, and the "electricity supply contracts that HQD wishes to enter into under the CFTs" and supervises the "monitoring of the tendering procedure." *Id.* at 34. HQD's procurement then follows:

> the Procedure as approved by the Régie, which can be summarized as a selection process consisting of three (3) steps:
>
> - The first step of the selection process was to eliminate bids that do not meet certain minimum requirements set out in the call for tenders, including compliance with the minimum thresholds for regional and Québec content as specified in the controlling Government decrees;
>
> - The second step was individual evaluation of each bid on the basis of monetary and non-monetary criteria ("Evaluation criteria") and to perform an initial ranking of the bids; and
>
> - The third step is used to analyze the different combinations of bids to determine the ones offering the lowest total price for the quantity and conditions requested.

*Id.* The GOQ does not contract with the wind tower vendors and does not explicitly approve particular vendors.

Last, WTTC's claim that the local content requirements equated to a subsidy which "provided for, and was tied to, {Marmen's} capital assets" also is not supported by the record. WTTC 56.2 Br. at 21. WTTC argues that the *CVD Preamble* supports its position that the "third factor affects not only the creation and expansion of a firm, but also its continued existence." *Id.* at 22. As WTTC notes, the *CVD Preamble* explains that Commerce will consider whether "the subsidy was provided for, or tied to, the capital structure or capital assets of the company." *Id.* quoting, *CVD Preamble*, 63 Fed. Reg. at 65393. However, the *CVD Preamble* also explains that this test "in no way envisions or requires an examination of the effects or uses of the subsidy.

Rather, we will examine whether, at the point of bestowal, the subsidy was provided to, or tied

to, the company's capital structure or capital assets." *CVD Preamble*, 63 Fed. Reg. at 65393.

WTTC is asking Commerce to engage in an analysis which it explicitly says it will not perform

and consistently has avoided. *See, e.g. Jindal Poly Films Ltd. of India v. United States*, 439 F.

Supp. 3d 1354, 1360-1361 (Ct. Int'l Trade 2020) (sustaining Commerce's attribution of benefits

based on, "at the point of bestowal, the amount foregone by the" government. *Id.* at 1361).

Nevertheless, the record supports a finding that the alleged subsidy was not provided for,

or tied to, the capital structure or capital assets of Marmen.  Record evidence cited by WTTC

does not detract from Commerce's determination.  *See* IDM at 37 (explaining that the "old

supply agreement between Marmen and GE . . . does not support finding that the GOQ entrusted

or directed {General Electric ("GE")} to subsidize the construction of Marmen's Matane facility

or to provide any non-recurring subsidies during the AUL period.").  WTTC argues that a

[

                                                                                    ]

WTTC Br. at 23.  WTTC continues, stating that "GE [          ] Marmen [

                              ]. . . . in direct response to

the GOQ's LCR program."  WTTC 56.2 Br. at 23.  But the alleged subsidy in this case is

whether the price paid for wind towers by the wind turbine OEMs was MTAR.  So, at issue is

whether the GOQ entrusted and directed the OEMs to pay more than adequate remuneration for

the wind towers. Again, Hydro-Québec purchases electricity and Hydro-Québec's CFT process

requires third party confirmation that the winning bids in those procurements are offering

electricity at prevailing market prices.

The OEMs pay Marmen directly for the wind towers; OEMs and Marmen contract as they wish and as best suits their economic interests. No evidence supports a finding that Hydro-Québec's purchase of electricity at prevailing market prices from wind farm developers induce specific behaviors by these downstream private parties in their bilateral contracts. *See* Marmen Sales and Local Content Response at Exhibit LCQ-02, P.R. 226-227, C.R. 168; *see also id.* at LCONTENT-11 – LCONTENT-12, P.R. 226, C.R. 168 (explaining that Marmen produced and sold wind towers for GE, REPower Systems, Siemens, and Vestas, with some sold "in connection with wind farm developers' satisfaction of the local content requirements" and others not); IDM at 38, P.R. 399 ("To the extent that petitioner seeks to tie the MTAR benefits to Marmen's Matane capital assets by virtue of that earlier provision of funds, the tying is indirect and retroactive and not consistent with how we determine that a subsidy is tied to capital assets . . . ."). OEMs pay Marmen for a finished product, the wind towers. These payments for the wind towers are not tied to Marmen's capital base. The wind towers will become part of the capital base of the wind farms themselves as part of the wind turbines, but the transaction between Marmen and the OEMs has no impact on the capital structure or capital assets of Marmen. The wind towers are only one part of the entire wind turbine which is used to generate energy on the wind farms. *See* GOQ SFI, Exhibit QC-LC-31 (Figure ES1), P.R. 282, C.R. 251 (showing the components of a wind farm project and their respective percentages of the total). Substantial record evidence shows the transactions between Marmen and its OEM customers for wind towers are recurring.

Finally, we reiterate that WTTC does not focus on the relevant transaction or the relevant Government action. The only Government action is the purchase of electricity by Hydro-Québec. Hydro-Québec awards contracts for the delivery of electricity and "HQD's only

payments under the wind power contracts awarded during the procurement process is through the purchase of electricity (MWh or kWh) delivered to it by the wind producers to whom contracts were awarded." GOQ IQR, Exhibit QC-LC-19, at 3, P.R. 126, C.R. 45.  HQD's contracts are with the wind power producers; there is no contractual relationship with the OEMs or mandatory respondent companies. *Id.* at 39, P.R. 113, C.R. 29. HQD pays the specified contract charge for the volume of *electricity* delivered by the operator. *Id.*  HQD makes no payment to the OEMs or the mandatory respondents. *Id.*  Therefore, the relevant government action for the alleged Purchase of Wind Towers MTAR program is the government purchase of electricity from the wind power producers.  These purchases are not exceptional, payment is automatic, and they are not tied to capital structure or assets of the wind power producers, much less to the OEMs or their suppliers, like Marmen.

### 2. Québec's local content requirements (LCRs) did not entrust or direct wind turbine original equipment manufacturers ("OEMs") to purchase wind towers from Marmen

Commerce investigated precisely the allegation that WTTC's petition asked it to investigate: whether Québec's local content requirements provided a benefit to Marmen by inducing the purchase of wind towers by OEMs for more than adequate remuneration. *See* Petitions for the Imposition of Antidumping and Countervailing Duties, Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam, Vol VI, at 51-52 (July 9, 2019), P.R. 9, C.R. 9, (stating that "owners of the wind farms are essentially directed and entrusted with government functions" allowing for "essentially a direct transfer of funds to wind tower producers."); PDM at 20, P.R. 308 (investigating the WTTC's entrustment and direction allegation).  Phrased more specifically, the question was whether the GOQ purchased wind towers for MTAR by entrusting and directing wind farm developers to further entrust or direct OEMs to purchase wind towers from Marmen for MTAR.  WTTC

19

broadly argues that "through the GOQ's entrustment and direction of private entities, these {local content} requirements in turn provided a financial contribution . . . to manufacturers of wind farm components such as Marmen."  WTTC 56.2 Br. at 12 n.3.  With respect to whether any benefits were conferred by the GOQ's local content requirements, WTTC argues that "the GOQ decrees and regulations that established the process for the four CFTs made clear that the initial CFTs were designed to encourage the construction of facilities for the manufacture of wind turbine components such as wind towers." *Id.* at 22 (arguing that Commerce's determination that the GOQ did not entrust or direct GE is not based on substantial evidence).  The record shows that the GOQ did not induce the purchase of wind towers by OEMs for more than adequate remuneration.

Section 771(5)(D) of the Act states that the government "purchasing goods" is a financial contribution, 19 U.S.C. § 1677(5)(D)(iv), and section 771(5)(E)(iv) of the Act provides that, "in the case where goods are purchased," Commerce will normally find a benefit conferred "if such goods are purchased for more than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  For there to be entrustment or direction, there must be "government action{} that provide{s} inducements, other than upstream subsidies, to a private party to provide a benefit to another party." *CVD Preamble*, 63 Fed. Reg. at 65350.  The statute provides that a government authority may provide an indirect financial contribution when it "entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments."  19 U.S.C. § 1677(5)(B)(iii).

In such a situation where the government is not directly purchasing goods from the respondent, Commerce looks for a clear indication that an intermediary party was entrusted or

directed to make a purchase at more than adequate remuneration on the behalf of the government. *See Statement of Administrative Action accompanying the Uruguay Round Agreements Act* ("*SAA*"), H.R. Rep. No. 103–316, Vol. 1, at 926 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4239 ("Commerce has found a countervailable subsidy to exist where the government took or imposed (through statutory, regulatory or administrative action) a formal, enforceable measure which directly led to a discernable benefit being provided to the industry under investigation."); *see also, e.g.*, *Wilmar Trading Pte Ltd. v. United States*, 466 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2020) (explaining that the tax levy imposed by the Government of Indonesia had the effect of entrusting and directing producers of an input to the subject merchandise to provide their product to producers of the subject merchandise at lower prices); *Hynix Semiconductor Inc. v. United States*, 425 F. Supp. 2d 1287, 1295 (Ct. Int'l Trade 2006) (describing that Commerce's finding of entrustment and direction was supported by "circumstantial and direct evidence of the Korean government's motive, proclivity, opportunity, and capacity to support Hynix through private entities.").

Québec's energy policies describe broad goals for the government to reduce its carbon emissions, including through the development of wind energy in Québec. *See, e.g.,* GOQ IQR at Exhibit QC-LC-04, "2030 Energy Policy," P.R. 121-122, C.R. 41-42. The LCRs relating to Québec's purchase of wind energy from wind farm developers may be satisfied in a number of ways and there is nothing in the language of the requirements targeting wind towers or the production of wind towers. *See, e.g., id.* at Exhibit QC-LC-09, P.R. 123, C.R. 42-43. Wind towers are not even the predominant cost element in wind turbines. *See* Government of Québec Submission of Factual Information at Exhibit QC-LC-31 (Nov. 15, 2019) ("GOQ SFI"), National Renewable Energy Laboratory, 2016 Cost of Wind Energy Review at Figure ES1, P.R. 282, C.R.

21

251 (showing that the tower only accounts for 15.1% of the capital expenditures for land-based

reference wind power plant project.  For context, the turbine accounts for 67.3% of the project,

and the tower is only part of the turbine). A wind power plant project producing the wind energy

purchased by Hydro-Québec consists of numerous capital expenditures including, but not limited

to, the rotors, nacelles, and towers – completing the wind turbines – engineering costs, site

access, electrical infrastructure, construction finance, and more. *See id.*

WTTC argues that Commerce "failed to address the extent to which the Québec LCR

program affected the continued existence of Marmen."  WTTC 56.2 Br. at 22.  Related to

WTTC's arguments that the GOQ local content requirements provided recurring benefits to

Marmen, these arguments are also relevant to whether the GOQ's broad energy programs

entrusted or directed OEMs to purchase wind towers for MTAR. The record evidence shows that

the GOQ did not. Hydro-Québec is not a party to the contracts between suppliers such as

Marmen, the OEMs, and any other private intermediary.  The only contracts to which Hydro-

Québec is a party are with the wind farm developers for the purchase of electricity.  See GOQ

Initial Questionnaire Response, P.R. 113-14, C.R. 29 at 29-34; *see also, e.g*., Letter from the

Department to the File: "Verification of Questionnaire Responses of Marmen Inc., Marmen

Energie Inc., and Gestion Marmen" (Apr. 16, 2020) ("Marmen Verification"), at 19-20, 44-46

(describing Marmen's sales process, including that Hydro-Québec is not a party to contracts

between Marmen and the turbine OEMs). P.R. 374, C.R. 309.

Hydro-Québec must ensure that the prices it pays for wind power are consistent with

prevailing market prices. As part of its contract approval process, Hydro-Québec "mandated an

independent consulting firm . . . to determine if the average price of electricity of the award was

competitive compared to wind energy paid by other utilities" which "demonstrated that the

contract prices . . . were competitive."  GOQ Initial Questionnaire Response at 44, P.R. 113-114,

C.R. 29.  Although Hydro-Québec ensures that suppliers of wind energy with awarded contracts

respect local content requirements, the "only financial transactions in connection with the {Call

For Tenders} CFTs and the contracts awarded pursuant to those CFTs are through the purchase

of electricity at the prices set in the contracts."  GOQ Initial Questionnaire Response at 40, P.R.

113-114, C.R. 29; *see also* PDM at 19-20 (Bidders "had to identify the wind turbine components

that that manufacturer promised to have manufactured in the eligible region or elsewhere in

Québec so as to enable an evaluation of the bidders ability to comply with those requirements.").

The recipients of these financial transactions are also subject to change. "{T}he contracts

concluded also provide for the possibility of substituting one Manufacturer for another," and the

"{r}eplacement of wind turbine components."  GOQ IQR at 40, P.R. 113, C.R. 29.

There is no record evidence that any benefit could pass through these serial, private,

arms-length transactions. All of which begin with an electricity contract that must itself be

confirmed to be at prevailing market prices.

### 3. The conduct of the wind tower industry proves that competition is not limited

There are no barriers to entry in the Québec market to produce wind towers.  Québec's

long-ago stated commitment to the development of wind energy was instead an invitation to

entry.  Unrebutted record evidence demonstrates that the wind power contracts awarded by

Hydro-Québec were consistent with market principles: each contract was the result of a

competitive public bidding process resulting in electricity prices confirmed to be consistent with

prevailing prices for wind energy.  GOQ Initial Questionnaire Response at 4 and 44, P.R. 113-

114, C.R. 29; Government of Québec's Pre-Preliminary Determination Comments (Nov. 27,

2019), at 7-9, P.R. 306. The WTTC's argument that Marmen was the "intended target," of the

GOQ's local content requirements, *see* WTTC 56.2 Br. at 20-21, is not supported by the record and is illogical.

The only government funds that flow to wind power producers are the market-consistent prices paid by Hydro-Québec to the wind farm developers when electricity begins to flow. Years pass between the award of contracts, the erection of complete wind turbines, the commissioning of wind farms, and the onset of power production and payment by Hydro-Québec for that power. GOQ Initial Questionnaire Response at 46, P.R. 113-114, C.R. 29. Marmen sells wind towers to wind turbine OEMs, and is paid near the beginning of this sequence, at tower delivery. The OEMs then sell the wind turbines to the wind farm developers. WTTC's theory seems to be the wind turbine OEMs were captive to Marmen and had no option but to pay MTAR prices to Marmen because Marmen was the "only wind tower producer possessing an established relationship with a turbine producer." WTTC 56.2 Br. at 20. The most compelling evidence to refute WTTC's claim and to demonstrate that Marmen's prices are not at MTAR (and that Québec's local content requirements did not require or induce them to be) is that established, multinational wind turbine OEMs with existing wind tower relationships, did not see an opportunity to bring those relationships into the barrier-free Québec market even knowing of Québec's long-term commitment to developing wind energy. In other words, if sales of wind towers for MTAR were likely, then rational economic behavior would have resulted in other producers starting production of wind towers in Québec. That did not happen because there is no such guarantee of sales at MTAR.

### 4. Québec's local content requirements are not grants and WTTC's contention that they be imagined as such is unfounded

Commerce properly did not analyze the private OEMs' purchases of wind towers as grants. The statute does not define a "grant," stating only that "financial contribution" could

mean "the direct transfer of funds, such as grants."  19 U.S.C. § 1677(5)(D).  The Court therefore

assumes "that the word carries its ordinary meaning, which may be found in a dictionary."  *Gov't*

*of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1383 (Ct. Int'l Trade 2018).  This Court has

accepted the common dictionary definition of "grant," describing the word as "a gift-like

transfer."  *Id.; see also Webster's Third New Int'l Dictionary* (unabridged 1981) (example

sentences omitted) (defining "grant" as "something granted, especially: a gift (as of land or

money) for a particular purpose."); *Changzhou Trina Solar Energy Co. v. United States*, 264 F.

Supp. 3d 1325, 1335 (Ct. Int'l Trade 2017) ("Commerce reasonably concluded here, from the

positive account balances, that these grants had been received.").  Here, there was no gift-like

transfer.  The government does not buy wind towers and there were zero purchases of wind

towers subject to local content from Marmen during the period of investigation.

The record documents pertaining to the Hydro-Québec's "calls for tender" (CFTs)

establish that Québec and Hydro-Québec exerted no influence over the pricing of wind towers or

any other aspect of a wind farm.  There is also no evidence that Québec or Hydro-Québec

directed wind turbine OEMs to purchase any specific towers. The price of the tower is a

negotiation between private parties two steps removed from the contract between Hydro-Québec

and the wind energy producers. *See, e.g.* GOQ IQR at Exhibit QC-LC-09, P.R. 113-114; C.R.

42-43, at Appendix 11, Addendum 5 (Merrimack Study Appendix) (showing Hydro-Québec

selects the lowest bid for power based on various pricing formulae and after the proposed prices

are reviewed by a third-party auditor.).

> **B.**     **Even If The Alleged Subsidy Is Not Considered A Purchase Of Goods For MTAR, The Local Content Requirements Do Not Provide A Financial Contribution Or Benefit Conferred To Marmen**

Focusing, as does Commerce in the final determination, on the benefit determination,

WTTC limits its discussion of financial contribution to a footnote, arguing, in full, that

the GOQ provided subsidies to the domestic industry in Quebec by implementing LCRs and wind energy requirements, and that through the GOQ's entrustment and direction of private entities, these requirements in turn provided a financial contribution, within the meaning of the statute, to manufacturers of wind farm components such as Marmen.

WTTC 56.2 Br. at 11-12 n.3. Because a countervailable benefit cannot exist without a financial contribution, we address WTTC's comments and explain that even if this Court holds Commerce must depart from decades of agency practice and reconsider its MTAR analysis, the local content requirements cannot be a countervailable subsidy because there is no financial contribution to Marmen by an authority, either directly or through a private entity entrusted and directed by the government.

A countervailable subsidy may exist when an authority "makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments." 19 U.S.C. § 1677(5)(B)(iii); *see also SAA*, H.R. Doc. No. 103-316, at 926, 1994 U.S.C.C.A.N. at 4239 (allowing for the indirect provision of a subsidy); *CVD Preamble*, 63 Fed. Reg. at 65349 (stating that "government-provided" allows for indirect subsidy).  Commerce can "countervail contributions from private parties acting at the direction of a public body," including "contributions which originate with the government, but which pass through an intermediary before going to the ultimate user."  *RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1302 (Ct. Int'l Trade 2015).

This is an intensely factual inquiry that Commerce undertakes on a "case-by-case basis." *See CVD Preamble*, 63 Fed. Reg. at 65349 ("{W}e do not believe it is appropriate to develop a precise definition" of "entrusts or directs" but, "{r}ather, we believe that we should follow the guidance provided in the SAA to examine indirect subsidies on a case-by-case basis.").

Québec's local content requirements are not countervailable because there is no financial contribution provided to, or benefit conferred on, Marmen.

### 1. There can be no financial contribution because Hydro-Québec is not purchasing wind towers from Marmen

As explained above with respect to whether the purchase of wind towers may be treated as a grant, there is no direct transfer of funds from Hydro-Québec to Marmen. *See* 19 C.F.R. § 351.504 (describing a grant and the benefits received from grants). WTTC asked Commerce to examine whether wind towers were purchased by Québec for MTAR. Commerce did as WTTC asked and "examined whether benefits under this program were provided for MTAR." PDM at 20, P.R. 308.

The record demonstrates that Hydro-Québec does *not* purchase wind towers – directly or indirectly. *See, e.g.* GOQ IQR at 46, P.R. 113, C.R. 29 ("HQD and Hydro-Québec do not purchase wind towers."). The notion that there is any contribution from Hydro-Québec to Marmen, the producer of wind towers, is tenuous at best.



*See id.* at 30. As this record shows, there is no direct financial contribution from Hydro-Québec to Marmen or any other wind tower supply. In fact, years will pass between the OEMs payments to Marmen for wind towers and Hydro-Québec's first payments for electricity to the wind farm developers.

### 2. The requirements for establishing entrustment or direction have not been met

Despite WTTC's claim, there is no record evidence demonstrating that the GOQ entrusted or directed a private party to provide benefits to the wind power industry and, specifically, wind tower producers. *See* WTTC 56.2 Br. at 11-12 n.3 (stating that the GOQ entrusted and directed private entities to provide a financial contribution).

Consistent with the statute, Commerce has determined that "entrustment or direction entails affirmatively causing or otherwise giving responsibility to a private entity or group of private entities to provide a financial contribution." *Biodiesel from the Republic of Indonesia*, 82 Fed. Reg. 53471 (Dep't Commerce Nov. 16, 2017) (final CVD determ.), and accompanying Issues and Decision Memorandum at 17 (Comment 5) ("*Biodiesel from Indonesia IDM*"); *see also* 19 U.S.C. § 1677(5)(B)(iii) (providing for financial contribution when not directly paid by the Government).  Commerce conducts a "two part-test to determine whether entrustment and direction exists in the context of private parties," *Biodiesel from Indonesia IDM* at 17 (Comment 5), consisting of

> (1) whether the government has in place during the relevant period a governmental policy to support that respondent; and (2) whether evidence on the record established a pattern of practices on the part of the government to act upon that policy to entrust or direct the associated private entity decisions.

*Id.* (citations omitted).  "{I}n the case of an indirect subsidy, evidence of a causal nexus between the program and the benefit is also required."  *AK Steel Corp. v. United States*, 192 F.3d 1367, 1372 (Fed. Cir. 1999); *see also Hynix Semiconductor Inc. v. United States*, 391 F. Supp. 2d 1337, 1349 n.10 (Ct. Int'l Trade 2005) ("This 'pattern of practices' inquiry appears to be similar to the 'causal nexus' between government action and benefits allegedly bestowed by private entities which Commerce was required to establish in order to prove an indirect subsidy under the previous version of the countervailing duty statute.").

28

For Commerce to find entrustment or direction, the record must show that the "formal, enforceable measure . . . directly led to a discernible benefit being provided to" Marmen, which it does not.  *See SAA*, H.R. Doc. No. 103-316, at 926, 1994 U.S.C.C.A.N. at 4239; *see also Wilmar*, 466 F. Supp. 3d at 1349-50 (explaining the "entrust or direct" standard). There is no record evidence demonstrating a causal nexus between the purchase of wind energy by Hydro-Québec and any benefit to Marmen.

### C. Commerce Properly Did Not Reach A Determination On Specificity And, Even If It Does, Québec's Local Content Requirements Cannot Be Considered An Import Substitution Subsidy

The Federal Circuit has confirmed that "{t}o be 'specific' a subsidy must be 'an export subsidy,' 'an import substitution subsidy,' or one of certain 'domestic subsid{ies}.'" *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (quoting 19 U.S.C. § 1677(5A)(A)); *see also id.* at 1329 (discussing that Commerce "must necessarily determine that a subsidy is 'specific' –" *i.e.*, meeting one of the listed criteria – "{b}efore imposing a countervailing duty."). WTTC argues that the "GOQ's LCR requirements constitute an import substitution subsidy" and, thus, must be considered as such when Commerce conducts its benefit analysis.  WTTC 56.2 Br. at 9-10.

An import substitution subsidy may "generally protect domestic input producers by imposing requirements or providing incentives for companies to use these inputs." *CVD Preamble*, 63 Fed. Reg. at 65386.  In the past when Commerce has found import substitution subsidies, it has determined that there was a connection between the financial contribution provided and a contingency "upon the use of domestic goods over imported goods." *See* 19 U.S.C. § 1677(5A)(C); *see also, e.g., Certain Steel Grating from the People's Republic of China*, 75 Fed. Reg. 32362 (Dep't Commerce June 8, 2010) (final affirm. CVD determ.), and accompanying Issues and Decision Memorandum at 14 (Finding that a tax credit for

"Domestically Owned Companies Purchasing Domestically Produced Equipment" was directly connected to the use of a domestic product over imported goods as inputs to the production of subject merchandise.).  There is no such connection between Hydro-Québec's purchase of energy and a purchase of or the price of wind towers.

But if there were such a connection, import substitution is relevant only to determining specificity, it does not speak to the adequacy of remuneration. Québec does not buy wind towers and the only reasonable conclusion based on the record evidence, is that Hydro-Québec's purchases of electricity were consistent with market purchases and at prevailing market prices for wind power. *See* GOQ SFI at Exhibit QC-LC-31, National Renewable Energy Laboratory, 2016 Cost of Wind Energy Review (discussing the levelized cost of energy), P.R. 282-288, C.R. 251-257; Exhibit QC-LC-33, 2018 Wind Technologies Market Report (showing trends in cost and pricing of wind power), P.R. 282-288, C.R. 251-257.

## V.    CONCLUSION

For the reasons set forth above, the Government of Québec respectfully requests that this Court sustain Commerce's determination with respect to its local content requirements (LCRs) relating to the government's purchase of wind energy from wind farm developers.

Respectfully submitted,

  /s/ **Matthew J. Clark**
Matthew J. Clark
Nancy A. Noonan
Jessica R. DiPietro
Aman Kakar

Arent Fox LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 857-6000

Dated: June 10, 2021                          *Counsel for Government of Québec*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that its

Response to WTTC's 56.2 Motion for Judgment on the Agency Record filed on June 10, 2021

complies with the word limitation requirement. The word count for the Response Brief, as

computed by Arent Fox LLP's word processing system is 8,925.


  <u>/s/ **Matthew J. Clark**   </u>
Matthew J. Clark