IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| THE GOVERNMENT OF QUÉBEC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MAMEN INC., MARMEN ÉNERGIE INC., | ) | |
| MARMEN ENERGY CO., | ) | Consol. Ct. No. 20-00168 |
| | ) | |
| Consolidated Plaintiffs, | ) | PUBLIC VERSION |
| | ) | |
| and | ) | Business Proprietary Information |
| | ) | (BPI) Denoted by Brackets [ ] on |
| THE GOVERNMENT OF CANADA, | ) | Page(s) 15, 25. |
| | ) | |
| Plaintiff-Intervenor, | ) | BPI Bracketing Final |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                              JOSHUA E, KURLAND
PAUL K. KEITH                            Trial Attorney
Attorney                                 U.S. Department of Justice
Office of the Chief Counsel              Civil Division
for Trade Enforcement and Compliance     Commercial Litigation Branch
U.S. Department of Commerce              P.O. Box 480, Ben Franklin Station
Washington, D.C.                         Washington, D.C. 20044
                                         Tel: (202) 616-0477
                                         Email: Joshua.E.Kurland@usdoj.gov

June 11, 2021                            *Attorneys for Defendant United States*

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ....................................................................2

    I.      Administrative Determination Under Review ...........................................2

    II.    Issues Presented For Review ....................................................................2

STATEMENT OF FACTS ........................................................................................3

SUMMARY OF ARGUMENT ..................................................................................5

ARGUMENT .............................................................................................................7

    I.      Standard Of Review ................................................................................7

    II.    Commerce's Determination That The Québec Local Content Requirement (LCR) Program Provides Recurring Benefits Is Supported By Substantial Evidence And Otherwise Lawful ...............................................................................9

           A.     Commerce Reasonably Found That The Québec LCR Program Provides Recurring Benefits Because The Benefit Is In The Form Of Sales For More-Than-Adequate Remuneration (MTAR) ...................................9

           B.     WTTC's Arguments Lack Merit ....................................13

    III.   Commerce's Determination Of The Benefit Under The GASPÉTC Program Is Supported By Substantial Evidence And Otherwise Lawful ..........................17

    IV.   Commerce's Determination That Québec's Tax Credit For On-The-Job Training Is De Facto Specific Is Supported By Substantial Evidence And Otherwise Lawful ...............................................................................20

    V.    Commerce's Determination That The Additional Depreciation For Certain Class 1 Assets Conferred A Financial Contribution And Countervailable Benefit Is Supported By Substantial Evidence And Otherwise Lawful ..............................26

    VI.   Commerce's Determination Not To Revise Marmen's Total Sales Denominator Based On An Auditor's Adjustment That Commerce Was Unable To Verify Is Supported By Substantial Evidence And Otherwise Lawful ........................31

    CONCLUSION ................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Archer Daniels Midland Co. v. United States*,
   968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ............................................................. 24

*Atl. Sugar, Ltd., v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)................................................................................. 8

*Bethlehem Steel Corp. v. United States*,
   140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ........................................................... 24

*Changzhou Trina Solar Energy Co. v. United States*,
   195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ........................................................... 24

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................................................................. 8

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007)........................................................................... 7, 13

*Consol. Edison Co. of N.Y. v. NLRB*,
   305 U.S. 197 (1938)................................................................................................. 7

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)................................................................................................. 7

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)........................................................................ 7, 9, 24

*Geneva Steel v. United States*,
   914 F. Supp. 563 (Ct. Int'l Trade 1996) ................................................................. 19

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................... 7

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
   335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ................................................... 13, 24

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992)................................................................................................. 7

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015)............................................................................... 8

*Kajara Iron Castings Pvt. Ltd, v. United States,*
   156 F.3d 1163 (Fed. Cir. 1998) ............................................................... 19

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006) ................................................................. 7

*SeAH Steel VINA Corp. v. United States,*
   269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ..................................... 34, 35

*Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States,*
   268 F.3d 1376 (Fed. Cir. 2001) ............................................................... 35

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
   203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ........................................... 7

*Timken Co. v. United States,*
   354 F.3d 1334 (Fed. Cir. 2004) ................................................................. 8

*Torrington Co. v. United States,*
   68 F.3d 1347 (Fed. Cir. 1995) ............................................................. 8, 24

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) .................................................................................. 8

**Statutes**

19 U.S.C. § 1677(5) ....................................................................... 10, 21

19 U.S.C. § 1677(6) ....................................................................... 18, 19

19 U.S.C. § 1677e ........................................................................ *passim*

19 U.S.C. § 1677m ................................................................... 33, 35, 37

**Regulations**

19 C.F.R. § 351.502(a) .......................................................................... 23

19 C.F.R. § 351.502(b) .......................................................................... 21

19 C.F.R. § 351.503(e) ............................................................... 17, 18, 20

19 C.F.R. § 351.509(a) ..................................................................... *passim*

19 C.F.R. § 351.509(b) .......................................................................... 17

19 C.F.R. § 351.511(b) ................................................................................. 11

19 C.F.R. § 351.524 ..................................................................................... 11

19 C.F.R. § 351.524(a) ................................................................................. 11

19 C.F.R. § 351.524(b) ................................................................................. 11

19 C.F.R. § 351.524(c) ........................................................................ 11, 12, 16

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*,
    85 Fed. Reg. 45,185 (Dep't of Commerce July 27, 2020) (prelim. admin. review) ................ 11

*Certain Uncoated Groundwood Paper from Canada*,
    83 Fed. Reg. 39,414 (Dep't of Commerce Aug. 9, 2019) (final determ.) ............................... 11

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*,
    71 Fed. Reg. 67,098 (Dep't of Commerce Nov. 20, 2006) (final admin. review) .................. 36

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*,
    73 Fed. Reg. 1,202 (Dep't of Commerce Jan. 7, 2008) (final admin. review) ...................... 36

*Countervailing Duties*,
    63 Fed. Reg. 65,348, 65,379 (Dep't of Commerce Nov. 25, 1998) ......................................... 11

*Utility Scale Wind Towers From Canada, Indonesia, and the Socialist Republic of Vietnam*,
    84 Fed. Reg. 38,216 (Dep't of Commerce Aug. 9, 2019) (initiation notice) ............................ 3

*Utility Scale Wind Towers From Canada*,
    84 Fed. Reg. 68,126, 68,127 (Dep't of Commerce Dec. 13, 2019) (prelim. determ.) ............... 4

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 40,245 (Dep't of Commerce July 6, 2020) (final determ.) .................................. 2

*Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*,
    85 Fed. Reg. 52,543 (Dep't of Commerce Aug. 26, 2020) (amended final determ. and ord.) .. 2

**Legislative Materials**

S. Rep. Np. 249, 96th Cong., 1st Sess. (1979),
    *reprinted in* 1979 U.S.C.C.A.N. 381 ..................................................................................... 19

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
    H.R. Doc. No. 103-316 (1994), *reprinted in*  1994 U.S.C.C.A.N. 4040 .................................. 25

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————————

| | |
|---|---|
| THE GOVERNMENT OF QUÉBEC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| MAMEN INC., MARMEN ÉNERGIE INC., | ) |
| MARMEN ENERGY CO., | ) |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| THE GOVERNMENT OF CANADA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| WIND TOWER TRADE COALITION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

Consol. Ct. No. 20-00168

<u>PUBLIC VERSION</u>

Business Proprietary Information
(BPI) Denoted by Brackets [ ] on
Page(s) 15, 25.

BPI Bracketing Final

———————————————————————————

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2**
## **MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Court's Rules, defendant, the United States, respectfully

submits this response in opposition to the motions for judgment on the agency record filed by

plaintiffs, the Government of Québec (GOQ), Marmen Inc., Marmen Energie Inc., and Marmen

Energy Co. (collectively, Marmen), the Wind Tower Trade Coalition (WTTC), and consolidated

plaintiff-intervenor Government of Canada (GOC).  In their motions, plaintiffs challenge various aspects of the Department of Commerce's (Commerce's) final affirmative determination in the countervailing duty investigation of wind towers from Canada.  We demonstrate below that plaintiffs' motions should be denied because Commerce's determination is supported by substantial evidence and otherwise lawful.

## STATEMENT PURSUANT TO RULE 56.2

I.    **Administrative Determination Under Review**

The administrative determination under review is *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,245 (Dep't of Commerce July 6, 2020) (final affirm. countervailing duty determ. and final neg. det. of crit. circ.) (P.R. 401) (Final Determination), and the accompanying Issues and Decision Memorandum (P.R. 399) (IDM), as amended by *Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*, 85 Fed. Reg. 52,543 (Dep't of Commerce Aug. 26, 2020) (amended final determ. and orders) (P.R. 425).  The period of investigation is January 1, 2018, through December 31, 2018.

II.    **Issues Presented For Review**

1.    Whether Commerce reasonably determined that the Québec Local Content Requirement program provided non-countervailable recurring benefits based on the reasonable finding that any benefit was from the sale of wind towers for more-than-adequate remuneration.

2.    Whether Commerce reasonably found Québec's on-the-job training tax credit to be *de facto* specific, when the number of recipients that benefitted from the tax credit was limited relative to the total number of tax filers during the period of investigation.

3.    Whether Commerce reasonably calculated the benefit for the Government of Québec's Tax Credit to Promote Employment in Gaspesie and Certain Maritime Regions of

PUBLIC VERSION
BPI Bracketing Final

Québec program, when Commerce appropriately did not include an offset corresponding to the tax effects of benefits received under the program in prior tax years.

4.      Whether Commerce reasonably determined that the Canadian federal and provincial programs granting an increased depreciation rate for certain Class 1 buildings provide a countervailable benefit and financial contribution.

5.      Whether Commerce reasonably determined not to include Marmen's auditor's foreign exchange adjustment when determining Marmen's sales denominators and to rely on Marmen's information as reported, pursuant to 19 U.S.C. § 1677e(a)(2)(D), when Commerce identified errors in the calculation of the auditor's adjustment at verification.

## <u>STATEMENT OF FACTS</u>

In July 2019, WTTC filed a countervailing duty petition concerning imports of utility scale wind towers from several countries, including Canada.  WTTC Antidumping and Countervailing Duty Petitions, Vol I. at 1 (July 9, 2019) (P.R. 2; C.R. 2).  In August 2019, Commerce initiated a countervailing duty investigation covering those imports.  *Utility Scale Wind Towers From Canada, Indonesia, and the Socialist Republic of Vietnam*, 84 Fed. Reg. 38,216 (Dep't of Commerce Aug. 6, 2019) (initiation notice) (P.R. 52).  Commerce selected Marmen Energie and Marmen Inc. as mandatory respondents because they were the two largest exporters of subject merchandise by volume to the United States during the period of investigation.  Respondent Selection Memo at 4-5 (Aug. 21, 2019) (P.R. 62; C.R. 26).

In December 2019, Commerce issued an affirmative preliminary determination, calculating a countervailable subsidy rate of 1.09 percent for Marmen's cross-owned entity. *Utility Scale Wind Towers From Canada*, 84 Fed. Reg. 68,126, 68,127 (Dep't of Commerce Dec. 13, 2019) (P.R. 313) (prelim. determ.), and accompanying Preliminary Decision Memo (PDM)

3

PUBLIC VERSION
BPI Bracketing Final

(P.R. 308).  Commerce preliminarily found multiple programs countervailable, including several at issue in this case:  (1) Québec's tax credit for on-the-job training; (2) the Government of Québec's Tax Credit to Promote Employment in Gaspesie and Certain Maritime Regions of Québec (GASPÉTC); and (3) Additional Depreciation for Class 1 Assets, at both the federal and provincial level.  PDM at 11-12, 14-16.  Additionally, Commerce preliminarily found that Québec's Local Content Requirements (LCR) program did not confer a benefit to Marmen during the investigation period.

Following the preliminary determination, Commerce conducted verification of information submitted by Marmen.  IDM at 3; *see also* Verification Report (Apr. 16, 2020) (P.R. 374; C.R. 309).  Subsequent to the Marmen verification, Commerce determined not to conduct verification of information provided by the GOC, GOQ, and government of Ontario. IDM at 3-4; Memorandum re: Early Conclusion of Verification (Apr. 1, 2020) (P.R. 373).

In May 2020, Marmen, the GOQ, the GOC, and WTTC filed administrative case briefs, and Marmen, the GOQ, WTTC, and the government of Ontario (GOO) filed rebuttal briefs. Marmen Case Brief (May 6, 2020) (P.R. 380, C.R. 311); GOQ Case Brief (May 6, 2020) (P.R. 378, C.R. 310); GOC Case Brief (May 6, 2020) (P.R. 379); WTTC Case Brief (May 6, 2020) (P.R. 381, C.R. 312); Marmen Rebuttal Brief (May 13, 2020) (P.R. 387, C.R. 316); GOQ Rebuttal Brief (May 13, 2020) (P.R. 386, C.R. 315); WTTC Rebuttal Brief (May 13, 2020) (P.R. 385; C.R. 314); GOO Rebuttal Brief (May 13, 2020) (P.R. 384, C.R. 313).

In June 2020, Commerce issued its affirmative final determination, maintaining its findings regarding Québec's tax credit for on-the-job training program, the GASPÉTC program, and the Additional Depreciation for Class 1 Assets programs, at both the federal and provincial levels.  IDM at 19-26, 50-56.  Commerce likewise continued to find that Québec's LCR program

did not confer a benefit to Marmen during the investigation period.  IDM at 32-38.  Commerce also determined—upon identifying certain errors in an auditor's adjustment at verification—not to rely on Marmen's restated financial statements or to adjust Marmen's sales figures included in the denominator of Commerce's calculations based on the auditor's adjustment.  IDM at 38-44.

Consistent with these determinations, Commerce calculated a final countervailable subsidy rate of 1.18 percent for Marmen and 1.18 percent for the all-others rate.  Final Determination, 85 Fed. Reg. at 40,246.  This action followed.

## SUMMARY OF ARGUMENT

Commerce reasonably found no benefit during the period of investigation for Québec's local content requirement program because, to the extent the program resulted in Marmen's sale of wind towers for more-than-adequate remuneration, the benefits under the program would be recurring and thus would be expensed prior to the period of investigation.  Commerce reasonably found Marmen's local content sales were recurring because Commerce normally treats more-than-adequate-remuneration benefits as recurring, the sales were not exceptional or out of the ordinary, they did not require express government authorization or approval, and they were not tied to Marmen's capital structure or assets.

Commerce reasonably found that Québec's on-the-job tax credit program is *de facto* specific because the number of recipients under the program is limited in number on an enterprise basis.  Because Commerce found specificity under the "limited in number" provision of the statute, Commerce was not required to consider predominant or disproportionate use.  Commerce's finding that the users are limited in number is supported by substantial evidence because, although there are many users of the program, there are vastly more companies that are not recipients.

PUBLIC VERSION
BPI Bracketing Final

Commerce's calculation of Marmen's benefit for the GASPÉTC tax program appropriately did not take into account the tax effects of benefits under the program from prior years.  Reducing the calculated benefit in the period of investigation to account for the tax burden from benefits in prior years would amount to an offset, but the statute does not permit such an offset.  Additionally, Commerce's regulations instruct Commerce not to consider the tax effects of a subsidy.  Therefore, Commerce acted consistently with the statute and its regulations in calculating Marmen's benefit under the program.

Commerce reasonably found that the additional depreciation for certain Class 1 assets (*i.e.*, buildings primarily used for manufacturing) conferred a countervailable benefit to Marmen because it allowed Marmen to claim more depreciation on its buildings than it otherwise could have.  Because Commerce appropriately determined that the base depreciation rate for Class 1 assets for tax purposes is four percent, Commerce's determination that the additional six percent depreciation available for certain buildings used in manufacturing conferred a countervailable benefit is reasonable.  Additionally, whether the actual depreciation rate for such buildings corresponds to their depreciation rates for tax purposes is immaterial to the fact that the program results in additional depreciation above the base rate, thereby conferring a benefit.

Commerce's determination not to rely on Marmen's unverifiable auditor's adjustment is reasonable because Commerce identified errors with the auditor's adjustment during spot checks at verification.  Therefore, Commerce acted consistently with the statute's direction for Commerce to verify the information it relies on and to resort to the facts otherwise available when information cannot be verified.

## ARGUMENT

### I.     Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute that it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. If so, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.* (citation omitted); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted). In that circumstance, "Commerce may perform its duties in the way it believes most suitable." *Id.* Consequently, Commerce receives "tremendous deference"

that is "both greater than and distinct from that accorded the agency in interpreting the statutes it

administers" when it exercises its technical expertise to select and to apply methodologies to

implement the trade statute. *Fujitsu*, 88 F.3d at 1039.

## II. Commerce's Determination That The Québec Local Content Requirement (LCR) Program Provides Recurring Benefits Is Supported By Substantial Evidence And Otherwise Lawful

### A. Commerce Reasonably Found That The Québec LCR Program Provides Recurring Benefits Because The Benefit Is In The Form Of Sales For More-Than-Adequate Remuneration (MTAR)

Commerce reasonably determined that the Québec LCR program provides recurring

benefits because Commerce appropriately analyzed the benefits under the program as sales of

wind towers for more-than-adequate remuneration. *See* IDM at 32-38. Commerce explained

how the program functioned in its preliminary determination. Specifically, under the program,

Hydro-Québec Distribution (a utility wholly owned by the GOQ) launched calls for tender for

the purchase of energy blocks produced by wind farms. *See* PDM at 19 (citing GOQ Initial

Questionnaire Response at 38 (Oct. 9, 2019) (P.R. 113; C.R. 29) (GOQ IQR)). As part of certain

calls for tender, Hydro-Québec Distribution included in its contracts a minimum expenditure

requirement for specific regions of Québec in connection with the manufacture of wind turbines.

*See id.* (citing GOQ IQR at 33 (P.R. 113; C.R. 29)). Bidders responding to calls for tender were

required to submit projects meeting the minimum requirement thresholds. *See id.* (citing GOQ

IQR at 39 (P.R. 113; C.R. 29)). As Commerce explained,

> Bidders were required to attach a joint declaration with their
> designated wind turbine manufacturer to the effect they had
> entered into an agreement for the manufacture and delivery of the
> wind turbines required for the wind farm. They also had to
> identify the wind turbine components that the manufacturer
> promised to have manufactured in the eligible region or elsewhere
> in Québec so as to enable an evaluation of the bidder{'s} ability to
> comply with those requirements.

PUBLIC VERSION
BPI Bracketing Final

*Id.* at 19-20 (citing GOQ IQR at 33 (P.R. 113; C.R. 29)).  Marmen reported sales of wind towers satisfying the Québec local content requirements during the "average useful life" (AUL) period for the physical assets used in production of the merchandise, but before the investigation period. Specifically, Marmen produced wind towers in Québec and sold those towers to wind turbine manufacturers, who, in turn, sold the complete set to wind farm developers, thus meeting local content requirements.  *See id.* (citing Marmen Second Supplemental Questionnaire Response, Part 2, at LCONTENT-05 (Oct. 15, 2019) (P.R. 225; C.R. 168) (Marmen Second SQR)).  The wind farm developers then sold electricity generated from the wind turbines to Hydro-Québec Distribution.  *See id.*

Accordingly, because the program involves the purchases of goods, Commerce explained that it would examine whether the program provided benefits in the form of purchases for more-than-adequate remuneration.  *See id.* at 20.  Commerce further explained that, by imposing local content requirements, the government of Québec "entrusted and directed" wind farm developers within the meaning of 19 U.S.C. § 1677(5)(B)(iii), through the wind turbine manufacturers, to purchase wind towers manufactured by Marmen in Québec.  *See id.*

Importantly, however, Marmen made sales of wind towers satisfying the local content requirements during the "average useful life" period, but *not* during the period of investigation. *See* PDM at 20; IDM at 38.  Therefore, to determine whether Marmen benefitted from the program during the period of investigation, Commerce examined whether benefits under the program were non-recurring such that they would be allocated over the average useful life period, or recurring such that they would be allocated in the year of receipt (which occurred before the period of investigation).  *See* IDM at 36-38.

For subsidies with recurring benefits, Commerce normally allocates (*i.e.*, expenses) the recurring benefit to the year the benefit is received.  19 C.F.R. § 351.524(a).  For subsidies with non-recurring benefits, Commerce normally allocates the benefit over the average useful life period.  19 C.F.R. § 351.524(b).  Commerce's regulations also include an illustrative list stating that Commerce normally will treat subsidies involving provision of goods for less-than-adequate remuneration (LTAR) as recurring benefits.  19 C.F.R. § 351.524(c)(1).  Although Commerce's regulations do not specifically address more-than-adequate remuneration subsidies, Commerce explains in the preamble to its CVD regulations that it intends to follow the same approach in that context as for less-then-adequate remuneration subsidies.  *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,379 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).  Consequently, Commerce's practice is to treat more-than-adequate remuneration subsidies as providing recurring benefits.  *See, e.g.*, *Certain Uncoated Groundwood Paper from Canada*, 83 Fed. Reg. 39,414 (Dep't of Commerce Aug. 9, 2019) (final determ.), at IDM Cmt. 77 (pg. 230); *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 85 Fed. Reg. 45,185 (Dep't of Commerce July 27, 2020) (prelim. admin. review), at PDM at 24 ("In past cases, Commerce generally has treated MTAR benefits as recurring benefits to be allocated in the year of receipt, similar to its treatment of less than adequate remuneration (LTAR) benefits under 19 CFR 351.511(b) and (c) and 19 CFR 351.524."); *cf.* WTTC Br. 10-11 (acknowledging practice).

Commerce's regulations also provide criteria that Commerce will consider in determining whether the benefits from a subsidy should be considered recurring or non-recurring (and that, in theory, could provide an exception for benefits that would otherwise be considered recurring):

> (i) Whether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year;

PUBLIC VERSION
BPI Bracketing Final

        (ii) Whether the subsidy required or received the government's express authorization or approval (i.e., receipt of benefits is not automatic), or

        (iii) Whether the subsidy was provided for, or tied to, the capital structure or capital assets of the firm.

19 C.F.R. § 351.524(c)(2).  Commerce reasonably found that Marmen's wind tower sales under the Québec LCR program did not meet these criteria.

First, Commerce found that Marmen's sales of wind towers were regular, frequent, and did not constitute exceptional events.  *See* IDM at 37.  Commerce explained that, although the calls for tender from Hydro-Québec Distribution were issued in discrete tranches, they were for purchases of electricity produced from wind energy, not wind towers.  *See id.*  Therefore, although the calls for tender ultimately led to the sale of wind towers that satisfied the local content requirements, they did so by creating demand for regular sales of wind towers, not through discrete, exceptional events.  *See id.*  Second, Commerce explained that the certifications Marmen provided to Hydro-Québec Distribution are product specification documents, not sales approval documents that would show that the subsidy required express authorization.  *See id.*  Third, Commerce found no evidence that Marmen's Québec LCR sales benefitted Marmen's capital structure or assets any more than any sale normally benefits a company.  *See id.*

Based on the foregoing, Commerce reasonably concluded that, "{b}ecause Marmen made numerous sales of wind towers throughout the AUL period, its sales did not require approval from the GOQ, and there is no evidence that the sales were tied to Marmen's capital assets, Marmen's sales do not satisfy the conditions for non-recurring benefits{.}"  IDM at 38.  Accordingly, Commerce appropriately found any benefit from wind tower sales for more-than-adequate remuneration under the Québec LCR program are recurring and would be expensed in the year received, *i.e.*, prior to the period of investigation.  *Id.*

### B.  **WTTC's Arguments Lack Merit**

WTTC argues that Commerce erred in its analysis of the three factors used to determine that the benefit under the program is recurring, but its claims amount to disagreement with Commerce's weighing of the record evidence.  *See Cleo*, 501 F.3d at 1296 (citations omitted); *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement with Commerce's weighing of the evidence" insufficient basis for legal challenge); *see also* IDM at 33-34 (documenting Commerce's consideration of WTTC's arguments).

First, WTTC asserts that Commerce erred by not finding that Marmen's sales under the Québec LCR were exceptional.  *See* WTTC Br. 12-15.  Specifically, WTTC asserts that Marmen's sales of wind towers that satisfied the local content requirements were explicitly tied to and dependent upon the calls for tender issued by Hydro-Québec Distribution.  *See id.* at 12. WTTC therefore argues that, because the calls for tender were issued in four discrete tranches, Marmen "could not expect to receive subsidized sales based on the {calls for tender} on an ongoing basis from year to year."  *Id.*  These arguments lack merit.

WTTC's focus on the discrete nature of the calls for tender overlooks the form of the actual subsidy to Marmen—namely, the purchase of wind towers—and the fact that the calls for tender were for wind energy, not wind towers.  As Commerce explained, "Marmen did not sell wind energy.  Instead, it sold wind towers on a regular basis."  IDM at 37.  The record supports Commerce's conclusion, demonstrating that Marmen issued thousands of invoices for wind tower sales subject to the Québec local content requirements from 2007 through 2017.  *See generally* Wind Tower Sales Spreadsheet (Nov. 22, 2019) (C.R. 268).  Moreover, the fact that the calls for tender were for the purchase of wind energy rather than directly for wind towers is

13

PUBLIC VERSION
BPI Bracketing Final

significant because the subsidy only reaches Marmen through the purchase of its goods, which occurred on an ongoing basis and not in discrete tranches.  WTTC's argument amounts to claiming that each purchase of a wind tower under the LCR program was a non-recurring event—a claim plainly undermined by the numerous sales on the record.

Second, WTTC asserts that Commerce erred in finding that subsidies under the LCR program did not require or receive the government's express authorization or approval.  *See* WTTC Br. 15-19.  This argument likewise lacks merit because WTTC continues to overlook the attenuated nature of the subsidy program.  Hydro-Québec Distribution was involved in issuing the calls for tender, but it did not expressly authorize or approve individual sales of wind towers. *See* PDM at 19-20.  WTTC's reliance on various contracts and documentation confirming LCR compliance confuses such compliance with express authorization.  As Commerce explained, "Marmen's certifications are product specification, not sales approval, documents."  IDM at 37. Although Commerce found that the LCR program entrusted or directed parties to purchase Québec-produced wind towers from Marmen, there is no evidence that individual purchases— *i.e.*, the form of the subsidy to Marmen—required government authorization.  That Marmen had to maintain documentation to establish that a sale qualified as a local content sale does not rise to the level of "express authorization or approval" by the government of Québec.

Third, WTTC argues that Commerce erred in finding that the LCR program subsidies were not tied to Marmen's capital structure or assets.  *See* WTTC Br. 19-25.  As with WTTC's other arguments, this argument fails to grapple with the fact that the subsidy at issue is the sale of wind towers for more-than-adequate remuneration.  WTTC thus ignores Commerce's reasonable finding that "there is no evidence that Marmen's Québec LCR sales benefitted Marmen's capital structure or assets any more than any sale normally benefits a company."  IDM at 37.  In other

14

PUBLIC VERSION
BPI Bracketing Final

words, there is nothing tying the revenue Marmen received from its wind tower sales to specific

assets or to Marmen's capital structure.  Moreover, WTTC's claim of a "direct link" between

Marmen's capital assets and the LCR program is merely a loosely attenuated connection.  As

WTTC describes it, "the first {call for tender} led to the creation of demand for wind energy

generation and necessary components manufactured in Québec, and significantly, led to the

production of towers by Marmen and subsequent purchase of those towers from Marmen, the

only wind tower producer in the area."  WTTC Br. 19-20.  Just because an instrument creates

demand does not make it directly *tied* to capital assets ultimately used to meet that demand.

    WTTC's reliance on a supply agreement between Marmen and GE similarly fails to

establish any direct link tying the Québec LCR program to Marmen's capital assets.  WTTC

argues that this agreement establishes a link with Marmen's capital assets because, under the

agreement, [

                        ], "in direct response to the {government of Québec's} LCR

program."  WTTC Br. 23; *see also id.* at 19-21.  This argument fails for several reasons.  First,

[                                        ] is not the alleged subsidy in this case.  As Commerce

explained, "the provision of funds toward the facility is more properly treated as a separate event

far removed in time from the subsequent wind tower sales. . . . {T}hose funds are not themselves

under investigation as a potential subsidy; the petitioner did not make the proper allegation as to

the elements of a subsidy."  IDM at 38.  Second, once again, the connection is attenuated.  GE is

a private company, and although Commerce may have found that the Québec LCR program

entrusted and directed the purchase of wind towers, there is no evidence that the Québec LCR

program entrusted or directed GE [                                        ].

Further, Commerce explained that "it seems clear from the record evidence that those funds were

provided prior to the AUL and thus, even if they could be considered as countervailable subsidies, they fall squarely outside the scope of our analysis."  IDM at 38.

Finally, WTTC's reliance on the CVD *Preamble* to argue that Commerce failed to address the extent to which the Québec LCR program affected Marmen's continued existence is also misplaced.  *See* WTTC Br. 21-22.  The *CVD Preamble* language that WTTC emphasizes states, "it is appropriate to consider the benefit from a subsidy provided for, or tied to, the capital structure or capital assets of a firm to be non-recurring because these types of subsidies generally benefit the creation, expansion, and/or continued existence of a firm."  *Id.* at 22 (quoting *CVD Preamble*, 63 Fed. Reg. at 65,393).  WTTC misinterprets this sentence to mean that Commerce must examine whether a subsidy benefits the continued existence of a firm as part of its analysis of whether the benefit is tied to capital assets.  *See id.* ("In its final determination, however, the agency failed to address the extent to which the Quebec LCR program affected the continued existence of Marmen.").  A plain reading of the sentence, however, shows that it concerns *why* it is appropriate for Commerce to consider the benefit from a subsidy tied to capital assets to be non-recurring, not *how* Commerce will determine whether the benefit is tied to capital assets in the first instance.  There is no dispute that a subsidy that *is* tied to capital assets suggests a non-recurring benefit, but in this case Commerce determined that the Québec LCR program is not tied to Marmen's capital assets.

Accordingly, Commerce reasonably concluded that "Marmen's sales do not satisfy the conditions for non-recurring benefits as provided in {19 C.F.R. § 351.524(c)(2)}."  IDM at 38.  Thus, given Commerce's analysis of these factors and Commerce's practice of treating benefits of more-than-adequate remuneration subsidies as recurring, Commerce reasonably found that any benefits under the Québec LCR program were recurring and not countervailable.

16

III.    **Commerce's Determination Of The Benefit Under The GASPÉTC Program Is
        Supported By Substantial Evidence And Otherwise Lawful**

Under the GASPÉTC program, Marmen received an income tax credit on its 2017

taxable income, which, pursuant to 19 C.F.R. § 351.509(b)(1), provided a benefit during the

2018 period of investigation when Marmen filed its tax return claiming the credit.  *See* IDM at

52.  Marmen does not dispute that Commerce appropriately considered the GASPÉTC tax credit

from the 2017 tax year to be received in 2018.  The GASPÉTC tax credit, however, is considered

taxable income at the federal and provincial levels, and results in additional taxable income in

the year it is received, which is reflected in the tax returns filed the following year.  *See id.*  Thus,

any resulting payments from prior years are not a component or a consequence of the 2017 tax

year credit.  *See id.*

Commerce calculated the program's benefit to Marmen to be the full amount of the 2017

tax year credit that Marmen received in 2018.  *See id.*  Both Marmen and the GOQ, however,

argue that Commerce should have calculated the benefit based on the net effect of the tax

program, *i.e.*, offsetting the tax credit benefit received in 2018 by the amount of additional tax

due in 2017 because of the tax credit Marmen claimed in tax year 2016.  *See* Marmen Br. 28-32;

GOQ Br. 22-27.  Because Commerce acted consistently with its practice, regulations, and the

statute in declining to do so, Marmen's and the GOQ's arguments lack merit.

As Commerce explained, 19 C.F.R. § 351.503(e) provides that, "{i}n calculating the

amount of a benefit, {Commerce} will not consider the tax consequences of the benefit."  IDM

at 53.  Marmen and the GOQ assert that, despite this prohibition, the calculation of the benefit

for tax programs is governed by 19 C.F.R. § 351.509(a)(1), which states that a benefit exists "to

the extent that the tax paid by a firm as a result of the program is less than the tax the firm would

have paid in the absence of the program."  Marmen Br. 28-29; GOQ Br. 25-26.  Marmen and the

GOQ argue that 19 C.F.R. § 351.509(a)(1) applies, rather than 19 C.F.R. § 351.503(e), because section 351.503(a) of Commerce's regulations explains that, if there is a specific rule for measuring a government program's benefit, Commerce will measure the benefit as provided in that specific rule.  *See id.*  Therefore, Marmen and the GOQ assert that 19 C.F.R. § 351.509(a)(1) is a specific rule for tax programs that should control.

These arguments lack merit because they misapply Commerce's regulations.  First, what Marmen and the GOQ advocate amounts to an offset to the gross countervailable subsidy, rather than a measurement of the subsidy's benefit.  *See* IDM at 53-54.  Commerce explained in its determination that "the treatment of income taxes resulting from countervailable tax programs is governed by {19 U.S.C. § 1677(6)}, which limits the subsidy offsets that Commerce may recognize to specific circumstances{.}"  *Id.* at 53.  Specifically, 19 U.S.C. § 1677(6) states:

> (6) Net countervailable subsidy
>
> For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—
>
>> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
>>
>> (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
>>
>> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

None of the three listed offsets applies to an offset for the income tax consequences of receiving a subsidy.  Marmen asserts that 19 U.S.C. § 1677(6) does not apply without explaining why the statute does not apply, other than relying on 19 C.F.R. § 351.509(a)(1).  *See* Marmen Br. 32.

The GOQ recognizes the list of permissible adjustments provided in 19 U.S.C. § 1677(6), but asserts that this list "does not restrict Commerce to only those three adjustments."  GOQ Br. 25.  The GOQ is mistaken.  Congress and the courts have both confirmed that the adjustments listed in section 1677(6) are the only permissible offsets.  *See* S. Rep. Np. 249, 96th Cong., 1st Sess., at 86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 472 ("The list is narrowly drawn and is all inclusive."); *Kajara Iron Castings Pvt. Ltd*, *v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) (observing that "19 U.S.C. § 1677(6) provides the exclusive list of permissible offsets"); *Geneva Steel v. United States*, 914 F. Supp. 563, 609-10 (Ct. Int'l Trade 1996) (holding that section 1677(6) contains "an exclusive list of offsets that may be deducted from the amount of a gross subsidy") (citations omitted).  Accordingly, irrespective of Marmen's and the GOQ's interpretation of 19 C.F.R. § 351.509(a)(1), the statute does not permit the adjustment they seek.

The GOQ claims that it is not advocating for an "adjustment, but rather a calculation of benefit that is consistent {with} Commerce's regulation by taking into account the total effect of the tax program."  GOQ Br. 25.  What the GOQ seeks, however, is that Commerce adjust the gross period of investigation tax *credit* that Marmen received by the separate tax *burden* that Marmen incurred from receipt of tax credits in previous years.  Despite the GOQ's contentions, and regardless of whether it is called an adjustment, offset, or something else, this falls under 19 U.S.C. § 1677(6) because section 1677(6) describes what Commerce "may subtract from the gross countervailable subsidy"— exactly the situation in this case.  *See, e.g.*, Marmen Br. 29 (providing illustration of Marmen's approach, which includes subtracting additional taxes paid on Marmen's year-2016 tax credit from credit Marmen claimed for tax-year 2017).  Therefore, because 19 U.S.C. § 1677(6) does not permit Commerce to subtract Marmen's additional income taxes from its gross tax credit, Commerce appropriately relied on the entire amount of the tax

credit in determining Marmen's benefit under the program during the investigation period.

Marmen's and the GOQ's argument that 19 C.F.R. § 351.503(e) does not apply is also misplaced. Commerce explained that 19 C.F.R. § 351.503(e), which requires that Commerce "will not consider the tax consequences of the benefit," does not contravene 19 C.F.R. § 351.509(a)(1). IDM at 54. As Commerce explained, "{t}his rule simply provides direction in assessing how the program results in a benefit in the year at issue (the POI), with no regard to any consequences from the prior year's benefit." *Id.* There is nothing in section 351.509(a)(1) that requires Commerce to determine the total benefit, net of offsets from prior years, and nothing to suggest that it is incompatible with 19 C.F.R. § 351.503(e). As such, the GOQ's argument that "benefit for tax programs must be determined based on 19 C.F.R. § 351.509(a)(1) alone" is not supported by the regulations. *See* GOQ Br. 26. There is also nothing in 19 C.F.R. § 351.509(a)(1) to suggest that tax programs are to be treated differently than other subsidy programs with respect to the tax consequences of the programs. Indeed, following Marmen's and the GOQ's reasoning would carve out tax programs as the one and only type of subsidy program for which Commerce would permit offsets based on the subsidy's increase to taxable income. If Commerce had intended to treat tax programs differently in its regulations in this regard, it could have done so explicitly. Instead, Marmen and the GOQ rely on strained interpretations of Commerce's regulations that are contradicted by the statute. For these reasons, Commerce acted in accordance with law in determining Marmen's benefit under the GASPÉTC tax program, and Marmen's and the GOQ's claims to the contrary should be denied.

## IV.   Commerce's Determination That Québec's Tax Credit For On-The-Job Training Is *De Facto* Specific Is Supported By Substantial Evidence And Otherwise Lawful

Commerce determines that a countervailable subsidy exists in circumstances when an "authority" provides a "financial contribution" that results in a "benefit conferred" and the

PUBLIC VERSION
BPI Bracketing Final

subsidy is "specific."  19 U.S.C. § 1677(5).  A subsidy will satisfy the specificity requirement

when, among other factors, "{t}he actual recipients of the subsidy, whether considered on an

enterprise or industry basis, are limited in number."  19 U.S.C. § 1677(5A)(D)(iii)(I).  Commerce

"is not required to determine whether there are shared characteristics among the enterprises or

industries that are eligible for, or actually receiv{ing}, a subsidy," 19 C.F.R. § 351.502(b), but

rather reviews only whether they are, in fact, "limited in number."  19 U.S.C. § 1677(5A)(D)(iii).

      In this case, Commerce determined that Québec's tax credit for on-the-job training

program is *de facto* specific, pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I), because recipients of

the subsidy were, indeed, limited in number.  *See* IDM at 56.  Commerce described the program

as allowing a "corporation that hires a student or an apprentice who is enrolled in a qualified

training program {to} claim a tax credit at a rate of 24 percent for:  (1) the salary or wages paid

to the student or apprentice; and/or (2) the salary or wages paid to an employee for the hours they

devote to supervision of the students and apprentices."  PDM at 15 (citing GOQ IQR at Ex. QC-

C09-A (P.R. 132; C.R. 60)).  Commerce further explained that "{i}ndividuals engaged in

business activities can also claim the tax credit but the tax credit rates for individuals are reduced

by 50 percent{.}"  *Id.*  Based on this understanding of the program, Commerce determined that,

"{g}iven the nature of this tax program, it is reasonable to compare the actual number of

companies that received the tax credit in 2018 to the total number of tax filers, inclusive of

corporations and individuals in business, within Québec for 2018, to determine whether the

program is limited in number and, therefore, *de facto* specific under {19 U.S.C.

§ 1677(5A)(D)(iii)(I)}."  IDM at 56.

      Accordingly, Commerce examined program usage information and found that "{t}he

figures, reported by the GOQ, indicate that the actual number of recipients that benefitted from

the tax credit during the POI relative to the total number of tax filers during the POI are limited in number on an enterprise basis." *Id.* (citing GOQ IQR at Ex. QC-C09-17 (P.R. 132; C.R. 63)). Therefore, because Commerce reasonably determined based on the record evidence that the actual recipients of the tax credit are limited in number on an enterprise basis, consistent with 19 U.S.C. § 1677(5A)(D)(iii)(I), Commerce's determination that Québec's tax credit for on-the-job training program is *de facto* specific is supported by substantial evidence and otherwise lawful.

The GOQ's and GOC's challenge to Commerce's *de facto* specificity finding lacks merit. Specifically, the GOQ and the GOC argue that Commerce erred in finding that recipients under Québec's tax credit for on-the-job training program are limited in number because the program has thousands of recipients spread across a wide variety of industries in Québec. *See* GOQ Br. 21; GOC Br. 25-26. The GOC also asserts that Commerce erred by finding the program limited in number through the application of a "simplistic percentage or ratio test," comparing the number of users to the total eligible users in Québec. *See* GOC Br. 24. Both the GOQ and the GOC also argue that Commerce's determination amounts to a finding whereby any subsidy not used by *every* eligible recipient could be considered *de facto* specific. *See* GOQ Br. 20, 22; GOC Br. 25, 27. Their disagreement with Commerce's approach does not alter the fact that Commerce's finding is supported by substantial evidence and lawful.

As an initial matter, the GOQ and the GOC conflate the factors Commerce considers in determining whether a subsidy is *de facto* specific. Section 1677(5A)(D)(iii) states:

> (iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if *one or more of the following factors exist*:
>
> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii) (emphasis added).  In this case, Commerce found that the program is specific under the first factor because the recipients of the subsidy are limited on an enterprise basis—and that is all that the statute requires.  *See* IDM at 56.  Therefore, the GOQ's argument that Commerce must consider "whether any industry or company received a predominant or disproportionate amount in the context of the business that the company is involved for an affirmative specificity finding," is misplaced because Commerce considers predominant users and disproportionate use under the second and third factors, respectively.  *See* GOQ Br. 21.  As the GOQ acknowledges, Commerce makes its determination "sequentially in order of their appearance," and that, "{i}f a single factor warrants a finding of specificity, Commerce will not undertake further analysis."  *Id.* at 10 (citing 19 C.F.R. § 351.502(a); *CVD Preamble*, 63 Fed. Reg. at 65,355).  Therefore, because Commerce determined that the actual recipients of the subsidy are limited in number on an enterprise basis, Commerce acted consistently with law when it did not consider whether an enterprise or industry is a predominant user or receives a disproportionately large amount of the subsidy.

Additionally, as we established above, Commerce made its specificity finding on an enterprise basis, not an industry basis.  *See* IDM at 56.  Thus, the GOQ and GOC's arguments concerning the broad variety of industries and sectors that used the program are misplaced and unavailing.  *See* GOQ Br. 17-18, 21-22; GOC Br. 25.

23

Regarding the limitation on an enterprise basis, the GOQ and GOC argue that Commerce's determination is unsupported because of the number of recipients under the program.  Specifically, the GOQ asserts that Commerce must examine whether "only a few companies or industries participated."  GOQ Br. 21.  The GOC, for its part, argues that Commerce's examination of the number of recipients relative to the number of eligible enterprises is inconsistent with the statute because the statute requires Commerce to determine whether use is limited in number, not limited in percentage.  *See* GOC Br. 24.  Contrary to these arguments, Commerce's analysis was reasonable and consistent with its statutory obligations.

As an initial matter, although the GOQ cites the Court's decisions in *Bethlehem Steel* and *Archer Daniels Midland* in asserting that Commerce must examine whether "only a few" companies or industries participated, this "only a few" standard appears nowhere in either opinion, nor does either opinion explain or limit how Commerce must conduct its examination of whether a subsidy's recipients are limited in number.  *See* GOQ Br. 15, 21 (citing *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d. 1354, 1369 (Ct. Int'l Trade 2001); *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1272 (Ct. Int'l Trade 2014)).  The decisions do demonstrate, however, that Commerce, in exercising its technical expertise as "master" of the antidumping and countervailing duty laws, knows how to find a subsidy non-specific when appropriate.  *See Fujitsu*, 88 F.3d at 1039 (discussing "tremendous deference" when Commerce exercises its technical expertise to select and apply methodologies to implement trade statute); *Torrington*, 68 F.3d at 1351 (recognizing Commerce as "master" of antidumping laws).[1]

---

[1] The GOQ's reliance on *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1350 (Ct. Int'l Trade 2016), in equally misplaced because, as the GOQ acknowledges, that case involved Commerce's failure to make requisite factual findings regarding specificity in the context of applying adverse facts available to the respondents.  *See id.*; GOQ Br. 15.  In this case, by contrast, Commerce made the requisite finding and the GOQ and GOC merely disagree.  *See Haixing Jingmei*, 335 F. Supp. 3d at 1346 ("mere disagreement" insufficient).

Moreover, Commerce's analysis comparing the number of actual recipients to the number of tax filers is reasonable.  The Statement of Administrative Action states that "{t}he specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 926 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 (SAA) (emphasis in original); GOQ Br. 11 (quoting same).  The analysis that the GOQ and GOC advocate would require Commerce to look only at whether the absolute number of recipients is large.  But to determine whether a subsidy's use is widespread to the point that it is spread throughout the economy necessarily requires some consideration of the number of possible recipients.  If the number of possible recipients is exceedingly large, it would logically need to be used by more enterprises to be considered spread throughout the economy than if the number of possible recipients is small.

In this case, although the GOQ emphasizes that the number of companies receiving the tax credit was [       ] for tax year 2015, [       ] for tax year 2016, [       ] for tax year 2017, and [       ] for tax year 2018, the number of companies that filed tax returns for the same years was [                                               ], respectively.  *See* GOQ IQR at Ex. QC-C09-A at 13 (P.R. 132; C.R. 60).  As these numbers demonstrate, although many used the program, use was not so widespread to be considered "spread throughout the economy," and Commerce's determination that the number of recipients is limited is supported by substantial evidence.

The GOQ also argues that Commerce unreasonably considered the "total number of corporate *and* individual tax filers in Québec."  GOQ Br. 9, 21.  However, as the numbers above show, even if Commerce considered only the number of recipients relative to the number of

25

companies that filed tax returns, Commerce's conclusion is reasonable.  Further, Commerce's

consideration of individual tax filers was also reasonable because individuals in business can

likewise claim the credit.  *See* IDM at 56; GOQ IQR at Ex. QC-C09-A at 8 (P.R. 132; C.R. 60).

Consequently, Commerce's determination that the number of recipients is limited on an

enterprise basis is supported by substantial evidence, otherwise lawful, and should be sustained.

**V.    Commerce's Determination That The Additional Depreciation For Certain Class 1 Assets Conferred A Financial Contribution And Countervailable Benefit Is Supported By Substantial Evidence And Otherwise Lawful**

Commerce reasonably determined that the GOC's and GOQ's provision of additional

depreciation for certain Class 1 assets under their tax systems confers countervailable benefits to

Marmen in the form of revenue forgone.  *See* IDM at 22-23, 24-26.  Contrary to the plaintiffs'

claims that this program does not confer a financial contribution or benefit because it merely

reflects appropriate depreciation, Commerce explained that the program provides a departure

from the standard Class 1 asset depreciation rate that Marmen would otherwise apply, and

therefore does amount to a financial contribution conferring a countervailable benefit.  *See id.*

Commerce explained that, under Canada's tax system, the standard depreciation rate for

Class 1 assets is four percent.  *See* IDM at 22, 24 (citing GOC First Supplemental Questionnaire

Response at 37 and Exs. GOC-SUPP1-CRA-CLASS1-1 (Nov. 8, 2019) (P.R. 266-67; C.R. 224-

25) (GOC First SQR); GOQ IQR at Ex. QC-CCAB-A (P.R. 132; C.R. 60)).  Indeed, in the

GOC's own words, "{c}lass 1 assets include most buildings acquired after 1987 (unless they

specifically belong in another class . . . ." and "{p}ursuant to subparagraph 1100(1)(a)(i) of the

{Income Tax Regulations (ITR)}, buildings that are classified as assets under Class 1 . . . are

PUBLIC VERSION
BPI Bracketing Final

normally depreciated at a {depreciation} rate of 4% ({*i.e.*}, basic rate)."  IDM at 24 (quoting

GOC First SQR at 37 and Ex. GOC-SUPP1-CRA-CLASS1-1 (P.R. 266-67; C.R. 224-25)).[2]

Notwithstanding this "normal" depreciation rate, however, for a certain subset of Class 1

assets "eligible non-residential buildings acquired after March 18, 2007, qualify for an additional

allowance of six percent (for a total of ten percent) if at least 90 percent of the floor space of the

eligible non-residential building is used for manufacturing and processing operations."  IDM at

22, 24 (citing GOC First SQR at 37-38 and Ex. GOC-SUPP1-CRA-CLASS1-1 (P.R. 266-67;

C.R. 224-25); GOQ IQR at Ex. QC-CCAB-A (P.R. 132; C.R. 60)).[3]  Further, in order to receive

the additional deduction, a taxpayer needs to file an "election" by submitting a particular form

with its income tax return—otherwise, the taxpayer does not receive the additional six percent

deduction and instead receives the basic four percent in depreciation.  *See* IDM at 25 (citing

GOC First SQR at 38 and Ex. GOC-SUPP1-CRA-CLASS1-1 (P.R. 266-67; C.R. 224-25)).  It is

undisputed that Marmen used the accelerated depreciation under this program to reduce its

taxable income during the investigation period.  *See* IDM at 23 (citations omitted).

The manner in which the additional depreciation program functions matches Commerce's

countervailing duty regulations.  Section 351.509(a)(1) of Commerce's regulations states that

"{i}n the case of a program that provides for a full or partial exemption or remission of a direct

tax (e.g., an income tax), or reduction in the base used to calculate a direct tax, a benefit exists to

the extent that the tax paid by a firm as a result of the program is less than the tax the firm would

---

[2] Marmen and the GOC criticize Commerce for using the term "normal" to describe the standard four percent Class 1 depreciation rate, but that is the language that the GOC itself used on the record in its questionnaire response.  *See* Marmen Br. 26; GOC Br. 15.

[3] Likewise, even absent the 10 percent depreciation, a building may qualify for an additional allowance of two percent (for a total of six percent) if the building's floor space is at least 90 percent used for a non-residential use.  *See* IDM at 22-23 (citing same record evidence).

PUBLIC VERSION
BPI Bracketing Final

have paid in the absence of the program."  19 C.F.R. § 351.509(a)(1) ("Identification and

Measurement of Countervailable Subsidies").  That provision applies in this case because, absent

the additional depreciation for certain Class 1 assets, Marmen would have paid more taxes using

the normal four percent rate for Class 1 assets.  *See* IDM at 25.

Thus, as Commerce explained, the Additional Depreciation for Certain Class 1 Assets

program provides a countervailable benefit because it affords "a tax reduction in the amount of

the difference between the tax the company paid and the tax the company would have paid

absent the tax reduction, as provided in 19 C.F.R. § 351.509(a)(1)."  IDM at 24.  As Commerce

elaborated, "taxpayers qualify for the additional deduction for a certain Class 1 asset (*i.e.*, an

'eligible non-residential building') that is: (1) included in Class 1 and used for manufacturing

and processing operations within the meaning of the {Income Tax Regulations} or (2) included

in Class 1 and used for non-residential use."  *Id.* at 25.  Indeed, as we established above, a

taxpayer must submit a special form to qualify for the additional deduction, and otherwise pays

the standard four percent rate generally applicable to all Class 1 assets.  Commerce consequently

concluded that, "{b}ecause Marmen was able to pay less than the tax it would have paid due to

the additional {depreciation rate} in place, the appropriate benefit for Commerce to measure is

the tax savings of the difference between the deduction calculated using the basic rate of

depreciation and the deduction calculated using the total depreciation rate, including the

additional {depreciation} rate, that Marmen used."  *Id.*

Marmen, the GOC, and the GOQ each challenge Commerce's determination, asserting

that Commerce's determination is not supported by substantial evidence or in accordance with

law because there was no financial contribution or benefit under the program.  *See* Marmen Br.

25-28; GOC Br. 13-23; GOQ Br. 30-31.  More specifically, they assert that there is no financial

PUBLIC VERSION
BPI Bracketing Final

contribution or benefit in the form of forgone tax revenue because the additional depreciation for

buildings used for manufacturing is intended to reflect the actual faster depreciation in value of

the buildings.  *See id.*  Therefore, they argue, the faster depreciation rate for such buildings is

simply the normal depreciation rate for a certain class of buildings, namely, buildings used for

manufacturing.  *See id.*  These arguments lack merit because they fail to account for the way in

which the additional depreciation program functions as an exception to the otherwise applicable

tax rate with respect to a defined subset of assets.

As an initial matter, there is no merit to the argument that the Governments of Canada

and Québec do not forego revenue by authorizing a company like Marmen to take 10 percent

depreciation on its assets, rather than four percent depreciation.  Regardless of the plaintiffs'

assertions regarding what a correct or appropriate depreciation rate would be for manufacturing

facilities, under the structure of this additional depreciation program, the GOC and GOQ are

identifying assets that would be subject to the basic four percent rate and instead granting them a

10 percent rate.  *See* IDM at 25.  Indeed, the beneficial rate is not automatic; companies with

eligible facilities who do not submit the required election form receive the lower rate.  *Id.*  The

GOC and GOQ are thus foregoing tax revenue that they would otherwise receive if Marmen

were required to use the standard depreciation rate in the program's absence.  *See id.* at 26.

Regarding the plaintiffs' contentions more broadly, Commerce explained that "the record

shows that among all taxpayers, only those that meet the eligibility for certain Class 1 assets,

stipulated in the {Income Tax Regulations}, can file for, and subsequently receive, the additional

{depreciation}.  Otherwise, the normal rate for Class 1 assets is four percent in accordance with

the Schedule II of the {Income Tax Regulations}."  IDM at 25 (citation omitted).  Thus, absent

the additional depreciation rate under this program, Marmen would apply the standard

depreciation rate of four percent, irrespective of the actual useful life of its buildings. This constitutes a benefit stemming from the "tax reduction in the amount of the difference between the tax the company paid and the tax the company would have paid absent the tax reduction, as provided in 19 C.F.R. § 351.509(a)(1)." *Id.* at 24.

Moreover, the assertion that the additional depreciation does not amount to a financial contribution because there is no "norm" for depreciation with which to compare it is contradicted by the record evidence. *See* GOC Br. 22-23. As Commerce explained, the GOC states in its questionnaire responses that an eligible non-residential building "may qualify for an *additional* {depreciation} deduction." IDM at 24 (quoting GOC First SQR at 37-38 (P.R. 266; C.R. 224) (emphasis in IDM)). Commerce likewise explained that, pursuant to the Income Tax Regulations, "an eligible non-residential building 'means a taxpayer's building . . . that is located in Canada, that is *included in Class 1*{.}'" *Id.* (quoting GOC First SQR at Ex. GOC-SUPP1-CRA-CLASS1-1 (P.R. 267; C.R. 2245) (emphasis in IDM)). In other words, the record establishes that the accelerated depreciation Marmen received for its assets is in addition to the base rate that apples to these and other Class 1 assets.

For similar reasons, the GOC's argument that, "{i}f buildings primarily used in manufacturing and other non-residential buildings had been placed into separate {depreciation} classes, {Commerce's} purported justification for its decision would disappear" is misplaced. *See* GOC Br. 16; GOQ Br. 31 (making similar argument). The argument relies on a hypothetical that does not exist in this case. Instead, the evidence shows that such buildings *are* included as Class 1 assets, and that the base depreciation for Class 1 assets is four percent. *See* IDM at 22, 24. Taxpayers—even if they own eligible buildings—do not receive a different rate unless they apply for it under the program. *See id.* at 25. Accordingly, Commerce appropriately considered

PUBLIC VERSION
BPI Bracketing Final

the additional depreciation beyond the four percent base as a financial contribution in the form of forgone revenue. *See id.* at 25-26.

To the extent that Marmen, the GOC, and the GOQ separately argue that the additional depreciation for Class 1 assets does not result in a benefit to Marmen, that argument similarly lacks merit. As Commerce's regulations provide, the benefit under a tax program "exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a)(1). The program at issue in this case is the additional depreciation for Class 1 assets. Absent the program, Marmen would be able to claim depreciation on its manufacturing buildings at the normal four percent rate, as it did before the program's inception. Therefore, by participating in the program, Marmen paid less tax than it otherwise would have paid. Commerce's regulations do not direct it to consider whether a tax program's benefit to a respondent is outweighed by other costs to the company, *e.g.*, in the form of actual depreciation. Instead, Commerce reasonably determined based on the record evidence that, in the absence of the program, Marmen would have had to claim depreciation on its manufacturing buildings at the base rate of four percent. Consequently, Commerce's determination is supported by substantial evidence and otherwise lawful.

## VI. Commerce's Determination Not To Revise Marmen's Total Sales Denominator Based On An Auditor's Adjustment That Commerce Was Unable To Verify Is Supported By Substantial Evidence And Otherwise Lawful

In its final results, Commerce, as facts available pursuant to 19 U.S.C. § 1677e(a)(2)(D), relied on Marmen's sales information as recorded in Marmen's own general ledger to determine Marmen's total sales. *See* IDM at 43. Commerce explained that this was necessary because it found Marmen's late-breaking auditor's adjustment to convert U.S. dollar (USD)-denominated sales to Canadian dollars (CAD) to be unverified and unreliable upon finding multiple errors in

PUBLIC VERSION
BPI Bracketing Final

the adjustment when spot-checking it at verification.  *See* IDM at 40-44.  Contrary to Marmen's claims, Commerce's determination is both lawful and supported by substantial evidence.

By way of background, Commerce explained that, following Commerce's supplemental request for a reconciliation of Marmen's sales information, Marmen in its third supplemental questionnaire response included an auditor's adjustment to its sales figures stemming from currency conversion issues.  *See* IDM at 41.  Although Marmen provided minimal explanation at the time, Marmen ultimately reported that it had recorded USD-denominated sales in its general ledger without converting the figures to Canadian dollars.  Hence, according to Marmen, an adjustment was needed to make the conversion.  *See id.*  Specifically, Marmen officials explained to Commerce that Marmen "recorded all foreign currency sales on a one-to-one basis in the sales account and used the auditor's adjustment to make currency conversions at the end of the year based on a single annual average exchange rate."  *Id.* at 42 (citation omitted).

Commerce sought to verify the auditor's adjustment at verification, but found multiple errors in the adjustment that led Commerce to determine that the adjustment was not accurate or reliable.  *See* IDM at 43.  In particular, Commerce explained that it "found multiple improperly identified and improperly converted euro and CAD values in the calculation of the auditor's adjustment at verification{.}"  *Id.* at 43.  This stemmed from the fact that Commerce officials had "found that Marmen's auditor's adjustment included sales denominated in non-USD foreign currencies, as well as CAD-denominated sales which were recorded as USD sales."  *Id.* at 42.  These sales "would have been erroneously converted by the auditor's adjustment using the single annual average USD-CAD exchange rate."  *Id.* (citing Verification Report at 2, 26-27 (P.R. 374; C.R. 309); Verification Exhibits at VE-12, pp. 2, 3, 29-54, 116-134 (Feb. 27, 2020) (P.R. 367; C.R. 306)).  Commerce elaborated that it "reviewed the calculation of the auditor's adjustment,

PUBLIC VERSION
BPI Bracketing Final

finding five sales treated as USD sales that were recorded as euro sales in Marmen's general ledger sales accounts." *Id.* (also citing Verification Exhibits at VE-13, pp. 77-78 (P.R. 367; C.R. 306)). In reviewing documents related to these "euro" sales, Commerce discovered that two of them were actually CAD sales. *Id.* Commerce also explained that, in some cases, "the errors came from Marmen's general ledger sales accounts in Marmen's electronic financial accounting system themselves, as these sales accounts contained sales for which the currency of the sale was wrongly identified." *Id.*

Additionally, Commerce found at verification that "Marmen's 2007-2015 total sales figures and Marmen's 2007-2015 net-of-intercompany sales figures were also reported in mixed currencies and that Marmen made no accounting adjustments in the reporting of Marmen's audited financial statements to account for the un-converted foreign currencies recorded in the companies' general ledger sales account for those years." *Id.* at 42 (citing Verification Report at 23 (P.R. 374; C.R. 309)). Thus, although the figures for those years reflect the effect of mixed currencies, they are consistent with Marmen's audited financial statements for those years. *Id.*

The statute at 19 U.S.C. § 1677e(a)(2)(D) directs Commerce to use "the facts otherwise available" if an interested party provides information that Commerce has requested but the information "cannot be verified as provided in {19 U.S.C. § 1677m(i)}." In this case, based on the errors Commerce identified at verification, Commerce reasonably found that the auditor's adjustment was unverified and unreliable. *See* IDM at 43. Commerce explained that the purpose of its verification was to "sample and spot check the transactions in Marmen's books and records to determine whether Marmen's auditor's adjustment was accurate and reliable{.}" *Id.*; *see also id.* at 42 ("Commerce officials discovered these currency identification and conversion errors as a result of spot-checking Marmen's records during verification." (citations omitted)). This is

33

significant because errors identified in a spot-check undermine the reliability of the data more broadly.  At the same time, Commerce further explained that "the vast majority of the sales-related and other tests Commerce performed throughout the verification uncovered no other errors."  *Id.*  Therefore, although Commerce found the auditor's adjustment unreliable, Commerce found it could rely on Marmen's reported information without the auditor's adjustment, as facts available pursuant to 19 U.S.C. § 1677e(a)(2)(D).  Because Commerce identified legitimate reliability concerns at verification regarding Marmen's auditor's adjustment, Commerce's finding that the auditor's adjustment could not be verified is supported by substantial evidence and lawful.

Marmen nonetheless argues that Commerce has not applied the appropriate standard for determining the reliability of Marmen's audited financial statements.  Specifically, Marmen claims that Commerce has a practice of "rel{ying} on an independent auditor's opinion concerning the respondent's financial statements unless 'compelling evidence' shows that the auditor is not in good standing."  Marmen Br. 14.  Marmen's argument lacks merit because it fails to account for the fact that Commerce independently found Marmen's data unreliable as a result of the multiple errors that Commerce identified at verification.

As an initial matter, Marmen's reliance on *SeAH Steel VINA Corp. v. United States* is misplaced.  *See* Marmen Br. 15 (citing *SeAH Steel VINA Corp. v. United States*, 269 F. Supp. 3d 1335, 1352 (Ct. Int'l Trade 2017)).  Marmen cites *SeAH Steel* to support the proposition that "{i}t is unusual for Commerce to reject a respondent's audited financial statements."  *Id.* Marmen fails to recognize, however, that *SeAH Steel* concerned Commerce's selection of *surrogate* financial statements.  *See* 269 F. Supp. 3d at 1349-52.  Specifically, in *SeAH Steel* the Court sustained Commerce's selection of one set of surrogate financial statements over another

in part because one set "included an audit opinion and provided the auditor's name with a registration number" while the other did not. *Id.* at 1351-52. Notably, neither set of financial statements belonged to the respondent in that case. *See id.* The distinction is important because, when selecting surrogate financial statements, Commerce selects the best information available, and the court in *SeAH Steel* acknowledged that "Commerce faced imperfect options, and 'no superior options.'" *Id.* at 1350. Moreover, when selecting surrogate financial statements, the surrogate company is not a party to the proceeding, and Commerce does not necessarily have access to the books and records of the surrogate company or conduct verification of the financial statements with the surrogate company pursuant to 19 U.S.C. § 1677m(i). *Cf. Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) ("The process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise."). In this case, by contrast, Commerce examined Marmen's books and records, and had an independent obligation to verify the information with Marmen pursuant to 19 U.S.C. § 1677m(i).

The only other proceedings that Marmen cites to establish Commerce's practice regarding auditor reports are a series of administrative reviews concerning certain stainless steel butt-weld pipe fittings from Taiwan that are referenced in *SeAH Steel*. *See* Marmen Br. 15. In those reviews, Commerce accepted the respondent's audited financial statements as reliable in the face of allegations from the petitioner that the respondent had failed to disclose certain affiliations. Two points are significant. First, the petitioner's allegation in those proceedings concerned the alleged failure to disclose certain affiliations. Commerce explained that, "in the context of assessing disclosures of affiliated parties in a financial statement prepared in accordance with financial accounting standards, a judgment as to whether or not a relationship

35

PUBLIC VERSION
BPI Bracketing Final

should have been disclosed does not depend upon a factual finding, but rather opinions as to whether the auditors' decisions about disclosure were reasonable." *Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67,098 (Dep't of Commerce Nov. 20, 2006) (final admin. review), at IDM Cmt. 1 (*Butt-Weld Pipe Fittings 04-05*).  Accordingly, the nature of the issue involved some level of judgment from the independent auditor, unlike this case, in which the auditor's adjustment is a calculation to convert currencies.

Second, in the butt-weld pipe fittings cases, Commerce found no evidence undermining the independent auditor's conclusions.  *See, e.g.*, *Butt-Weld Pipe Fittings 04-05* at IDM Cmt. 1 ("Petitioners have not shown that information relevant to our analysis was excluded from either TCI's or the consolidated financial statements."); *Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 73 Fed. Reg. 1,202 (Dep't of Commerce Jan. 7, 2008) (final admin. review), at IDM Cmt. 1 ("{Commerce} notes that there has been little or no evidence of transactions between Ta Chen and those entities alleged by petitioners to be undisclosed affiliates.").  In this case, by contrast, Commerce observed specific instances of discrepancies relating to the auditor's adjustment as applied to Marmen's sales information.  *See* IDM at 42-43.

Additionally, Commerce's examination of the auditor's adjustment at verification was reasonable given the record evidence.  Notably, Marmen did not include an auditor's adjustment when reporting its sales in its initial questionnaire response, nor did Marmen provide any details or explanation about its sales being reported in mixed currencies.  Marmen's first reporting of the auditor's adjustment was not until Marmen's third supplemental questionnaire response, in response to a question from Commerce asking Marmen to reconcile its reported sales to its financial statements.  In Marmen's reconciliation, Marmen included the line item, "Year End auditor adjustment in GL 40000 for Gain(loss) exchange rate," but provided no explanation of

the nature or reason for the adjustment, nor any explanation of how it was determined. *See* IDM at 41 (citation omitted). Marmen's reconciliation also contained no indication that the "Total Sales" rows were inappropriate for determining Marmen's total sales denominator. *See id.* Indeed, it was not until after Commerce's preliminary determination that Marmen first argued that "the sales denominator used in the subsidy rate calculation must incorporate the auditor's exchange rate adjustment, so that the denominator is expressed entirely in Canadian dollars{.}" Marmen Prelim. Ministerial Error Allegation at 2 (Dec. 18, 2019) (P.R. 318; C.R. 271). Accordingly, Commerce's verification of the requested adjustment was reasonable given the record evidence, regardless of whether an independent auditor provided the adjustment.

Moreover, even if the cases that Marmen cites established Commerce's practice, they would not supersede Commerce's independent statutory obligations to verify information, pursuant to 19 U.S.C. § 1677m(i), or to rely on the facts otherwise available when information cannot be verified, pursuant to 19 U.S.C. § 1677e(a). Commerce's determination in this case that Marmen's adjustment was unverifiable (and thus unreliable) is supported by substantial evidence because Commerce found multiple errors when it sought to spot-check the adjustment at verification. *See* IDM at 42. Therefore, because Commerce determined, based on substantial record evidence, that Marmen's auditor's adjustment could not be verified, Commerce's reliance on Marmen's originally submitted sales information as facts otherwise available is lawful.

Notwithstanding this record support, Marmen next argues that Commerce's decision not to rely on the auditor adjustment is unsupported by substantial evidence. *See* Marmen Br. 17-24. In particular, Marmen asserts that Commerce's verification report contradicts Commerce's conclusions in its final determination. *See id.* at 17, 19. This argument lacks merit because Marmen's argument misconstrues the nature of Commerce's verification report. Specifically,

PUBLIC VERSION
BPI Bracketing Final

Marmen asserts that "Commerce did not cite any concerns with Deloitte's exchange rate adjustments in the 'Summary of Findings' section of the Verification Report." *Id.* Commerce's verification report specifically explains, however, that its summary of findings is "an illustrative list of issues and factual observations that arose during the course of our verification, which may require further consideration by Commerce." Verification Report at 2 (P.R. 374; C.R. 309). Correspondingly, because it is a summary of *factual* findings, Commerce does not reach conclusions regarding such findings in the verification report. Moreover, the verification report states that "this list is not all inclusive, as all items included within this report are subject to comment and further consideration." *Id.* A review of the discussion of the sales reconciliation within the verification report reveals that Commerce did describe the errors it relied upon in the final results in finding the auditor's adjustment unverifiable. *See id.* at 26-27.

Further arguing that Commerce's verification report refutes the notion that additional spot-checking might have revealed additional errors, Marmen emphasizes that Commerce "reviewed all of the sales accounts and confirmed there were no additional Euro coded sales." Marmen Br. 20 (citing Verification Report at 26-27 (P.R. 374; C.R. 309)). That Commerce confirmed that there were no additional Euro coded sales in the sales accounts, however, does not mean that Commerce confirmed that there were no additional errors. Indeed, the errors that Commerce identified were not merely that sales were miscoded as Euro. Commerce explained, for example, that "{t}wo of these sales, which were reported as USD . . . were actually paid in CAD, and should have been reported as CAD instead of USD." Verification Report at 26-27 (P.R. 374; C.R. 309). The error of reporting sales as USD that were actually paid in CAD is not directly related to their being coded as Euro. And given that some sales were coded incorrectly, the fact that no further sales were coded as Euro does not establish that there were no further

Euro sales or coding errors.  Therefore, regardless of whether Commerce confirmed that there

were no additional Euro coded sales, Commerce identified errors in the reported currencies that

undermined the reliability of the auditor's adjustment.  *See* IDM at 42.

Marmen further argues that Commerce "rejected the exchange rate applied to Marmen

Énergie's USD sales revenue despite failing to identify a single error in the calculation."

Marmen Br. 20-21.  In other words, Marmen argues that the errors identified were confined to

Marmen Inc., and therefore Marmen Energie's auditor's adjustment was not affected.

Commerce explained, however, that the errors it identified were part of spot checks, and

therefore Commerce could not be confident that the auditor's adjustment was reliable overall.

*See* IDM at 42, 43.  Because the auditor's adjustment was applied to Marmen Énergie's sales for

the same reasons and in the same manner as Marmen Inc.'s sales, Commerce's decision to rely

on the originally reported combined total sales for both companies was reasonable.

Finally, there is no evidence to support Marmen's assertion that "certain mistaken

findings clouded Commerce's judgment."  Marmen Br. 22-24.  Marmen argues that a ministerial

error in Commerce's calculation of intercompany sales and Commerce's belief that Marmen's

financial statements were not on the record contributed to Commerce's finding the auditor's

adjustment unreliable.  *See id.*  Marmen is mistaken.  Commerce stated, "{a}s Commerce found

multiple improperly identified and improperly converted euro and CAD values in the calculation

of the auditor's adjustment at verification, we find that the auditor's adjustment is unverified and

unreliable."  IDM at 43.  Thus, the errors concerning the auditor's adjustment, not the issues with

intercompany sales or the availability of Marmen's restated financial statements, led to

Commerce's conclusion that the auditor's adjustment could not be verified.  Accordingly,

Marmen's argument lacks merit. and Commerce's determination should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions and

enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Reginald T. Blades, Jr.
Assistant Director

/s/ Joshua E. Kurland

OF COUNSEL:                                     JOSHUA E, KURLAND
PAUL K. KEITH                                   Trial Attorney
Attorney                                        U.S. Department of Justice
Office of the Chief Counsel                     Civil Division
for Trade Enforcement and Compliance            Commercial Litigation Branch
U.S. Department of Commerce                      P.O. Box 480, Ben Franklin Station
Washington, D.C.                                 Washington, D.C. 20044
                                                Tel: (202) 616-0477
                                                Email: Joshua.E.Kurland@usdoj.gov

June 11, 2020                                    *Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation set forth in the Court's January 21, 2021 scheduling order and contains approximately 12,001 words, excluding parts of the brief that the Court exempts from such word limitations.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Joshua E. Kurland</u>