## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| THE GOVERNMENT OF QUÉBEC,<br><br>　　　Plaintiff,<br><br>MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,<br><br>　　　Consolidated Plaintiffs,<br><br>　　　and<br><br>THE GOVERNMENT OF CANADA,<br><br>　　　Plaintiff-Intervenor,<br><br>　　　v.<br><br>THE UNITED STATES,<br><br>　　　Defendant,<br><br>　　　and<br><br>WIND TOWER TRADE COALITION,<br><br>　　　Defendant-Intervenor,<br><br>　　　and<br><br>THE GOVERNMENT OF ONTARIO,<br><br>　　　Defendant-Intervenor. | Consolidated Court No. 20-00168\<br><br># NON-CONFIDENTIAL<br><br>**Business Proprietary Information has been deleted from Pages 4, 7 and 20.** |

## CONSOLIDATED PLAINTIFFS' RESPONSE BRIEF

Jay C. Campbell
Ting-Ting Kao
Ron Kendler
Allison J.G. Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

June 10, 2021

## TABLE OF CONTENTS

I.  STATEMENT PURSUANT TO USCIT R. 56.2(c)............................................................1

    A.   Administrative Determination Sought to Be Reviewed...........................................1

    B.   Question Presented and Summary of Argument.......................................................1

         1.   Did Commerce reasonably determine, based on substantial evidence
              and in accordance with law, that wind turbine manufacturers'
              purchases of wind towers from Marmen in connection with Québec
              local content requirements were "recurring" in nature? ..............................1

II.  STATEMENT OF FACTS ...........................................................................................2

III. STANDARD OF REVIEW ..........................................................................................9

IV.  ARGUMENT:  COMMERCE REASONABLY AND LAWFULLY
     DETERMINED THAT MARMEN'S SALES MADE IN CONNECTION WITH
     QUÉBEC LOCAL CONTENT REQUIREMENTS WERE RECURRING IN
     NATURE ..................................................................................................................10

     A.   Legal Background.................................................................................................11

     B.   Commerce Determined that Marmen Made LCR Sales on an Ongoing
          Basis from Year to Year Based on Substantial Evidence in the Record ...............12

     C.   Commerce Determined that Marmen's LCR Sales Did Not Require the
          Government's Express Authorization or Approval Based on Substantial
          Evidence in the Record .......................................................................................15

     D.   Commerce Determined that Turbine OEMs' Purchases Were Not Provided
          for, or Tied to, Marmen's Capital Structure or Capital Assets Based on
          Substantial Evidence in the Record ....................................................................18

V.   CONCLUSION AND RELIEF SOUGHT ...................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States,*
    112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ...........................................................9

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962)...................................................................................................9

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1996).......................................................................................9, 17, 21

*Downhole Pipe & Equip., L.P. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015)..................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).....................................................................................................10

*NMB Sing. Ltd. v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009)...........................................................................10, 15

*Trent Tube Div. v. Avesta Sandvik Tube AB,*
    975 F.2d 807 (Fed. Cir. 1992)...................................................................................9

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951)...................................................................................................9

*Wilmar Trading PTE Ltd. v. United States,*
    466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) .........................................................11

## STATUTES AND REGULATIONS

19 U.S.C. § (5A)(D).............................................................................................................11

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................8, 9, 12, 14

19 U.S.C. § 1677(5)(A)........................................................................................................11

19 U.S.C. § 1677(5)(B)........................................................................................................11

19 U.S.C. § 1677(5)(B)(iii)............................................................................................11, 12

19 U.S.C. § 1677(5)(D)........................................................................................................11

19 U.S.C. § 1677(5)(E)........................................................................................................11

19 U.S.C. § 1677(5)(E)(iv) ................................................................................11

19 U.S.C. § 1677(5A)(C)...................................................................................12

19 C.F.R. § 351.524(c)........................................................................................8

19 C.F.R. § 351.524(c)(1)..................................................................................20

19 C.F.R. § 351.524(c)(2)....................................................................................1

19 C.F.R. § 351.524(c)(2)(ii).............................................................................15

19 C.F.R. § 351.524(c)(2)(iii)............................................................................18

## ADMINISTRATIVE DETERMINATIONS

*Certain Cold-Rolled Carbon Steel Flat Products from Brazil*,
    67 Fed. Reg. 62128 (Dep't Commerce Oct. 3, 2002)..............................12

*Certain Cut-to-Length Carbon-Quality Steel Plate from Italy*,
    64 Fed. Reg. 73244, 73256 (Dep't Commerce Dec. 29, 1999) ..............19

*Certain New Pneumatic Off-the-Road Tires from China*,
    73 Fed. Reg. 40480 (Dep't Commerce July 15, 2008),
    and accompanying Issues & Decision Memorandum............................19

*Certain Pasta from Italy*,
    80 Fed. Reg. 11172 (Dep't Commerce Mar. 2, 2015),
    and accompanying Issues & Decision Memorandum............................19

*Certain Softwood Lumber Products from Canada*,
    82 Fed. Reg. 19657 (Dep't Commerce Apr. 28, 2017),
    and accompanying Preliminary Decision Memorandum.......................20

*Certain Softwood Lumber Products from Canada*,
    82 Fed. Reg. 51814 (Dep't Commerce Nov. 8, 2017) ................11, 13, 20

*Certain Uncoated Groundwood Paper from Canada*,
    83 Fed. Reg. 39414 (Dep't Commerce Aug. 9, 2018) ...........................11

*Citric Acid and Certain Citrate Salts from The People's Republic of China*,
    79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) ................................12

*Countervailing Duties*,
    63 Fed. Reg. 65348 (Dep't Commerce Nov. 25, 1998)...............18, 19, 20

*Utility Scale Wind Towers from Canada*,
    84 Fed. Reg. 68126 (Dep't Commerce Dec. 13, 2019),
    and accompanying Issues & Decision Memorandum.........................7, 8

*Utility Scale Wind Towers from Canada*,
85 Fed. Reg. 40245 (Dep't Commerce July 6, 2020) (final CVD determ.),
and accompanying Issues and Decision Memorandum .................................................... passim

*Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*,
84 Fed. Reg. 38126 (Dep't Commerce Aug. 6, 2019) (PR 52) ................................................7

*Wire Decking from China*,
75 Fed. Reg. 32902 (Dep't Commerce June 10, 2010),
and accompanying Issues & Decision Memorandum........................................................12, 19

## I.   STATEMENT PURSUANT TO USCIT R. 56.2(C)

### A.   Administrative Determination Sought to Be Reviewed

Consolidated Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen") respond to the Wind Tower Trade Coalition's ("Petitioner") Memorandum in Support of its Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 36, 37) ("Petr.'s Br."), and in support of certain aspects of the final countervailing duty ("CVD") determination issued by the International Trade Administration of the Department of Commerce ("Commerce") in the CVD investigation of utility scale wind towers ("wind towers") from Canada (Case No. C-122-868).   The period of investigation ("POI") was calendar year 2018. Notice of the final determination was published in the *Federal Register* on July 6, 2020.  *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40245 (Dep't Commerce July 6, 2020) (final CVD determ.) (PR 401)[1] ("*Final CVD Determination*"); *see also* accompanying *Issues and Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada* (June 29, 2020) (PR 399) ("*Final Decision Memo*").

### B.   Question Presented and Summary of Argument

**1.**   **Did Commerce reasonably determine, based on substantial evidence and in accordance with law, that wind turbine manufacturers' purchases of wind towers from Marmen in connection with Québec local content requirements were "recurring" in nature?**

Yes.   Commerce's practice is to treat government purchases of goods as "recurring." Moreover, in accordance with 19 C.F.R. § 351.524(c)(2), Commerce reasonably determined that wind turbine manufacturers' purchases of wind towers from Marmen in connection with Québec local content requirements were "recurring" in nature based on substantial evidence that such

---

[1]  We assign the prefix "PR" (for "public record") to public documents on the administrative record and assign the prefix "CR" (for "confidential record") to confidential documents on the administrative record, followed by the reference number for the document.

purchases (1) were numerous and made throughout the 12-year average-life-period examined (until the Québec program expired); (2) did not require the Government of Québec's ("GOQ") express authorization or approval; and (3) could only be said to relate *indirectly* and *retroactively* to Marmen's capital assets.

## II.     STATEMENT OF FACTS

Marmen is a family-owned manufacturer of wind towers for the wind industry with three tower facilities:  two located in Québec, Canada (Trois-Rivières and Matane) and one located in South Dakota (Brandon).  *See* Response of Marmen to the "General Questions" & "Program-Specific Questions" Portions of Section III of the Countervailing Duty Questionnaire (C-122-868) (Oct. 9, 2019) at MARMEN-1 (CR 141-67; PR 212-22) ("Marmen Initial CVD Response"). Wind towers are tubular steel structures – consisting of two or more sections – used to support other major components of a wind turbine (*i.e.*, rotor blades and the nacelle, which houses the primary electrical generating components).  *See* Petition Vol. I: Common Issues and Injury Petition (C-122-868) (July 9, 2019) at 7, 10-11 (CR 2-8; PR 2-8) ("Petition Vol. I").

Tower manufacturers such as Marmen produce and sell wind towers to manufacturers of wind turbines ("turbine OEMs"), which, in turn, supply wind turbines to wind farm developers. *See* Petition Vol. I at 18, 24-25; Marmen Response to Local Content Requirement Questions (C-122-868) (Oct. 15, 2019) at Exhibit LCQ-01 (Standard Questions Appendix at 1) (CR 168-202; PR 225-27) ("Marmen LCR Response").  Marmen does not have any contractual relationship with the wind farm developer.  Rather, "Marmen's role is limited to supplying wind towers to the OEM selected by the wind farm developer to produce wind turbines for the project."  Marmen LCR Response at Exhibit LCQ-01 (Standard Questions Appendix at 1).

**NON-CONFIDENTIAL VERSION**

Originally established in 1972 as a machining business, Marmen began producing wind towers in 2002, after exploring opportunities in the wind business and constructing a wind tower facility in Trois-Rivières, Québec.  *See* Memorandum to the File, Verification of Questionnaire Responses of Marmen Inc., Marmen Énergie Inc., and Gestion Marmen (C-122-868) (Apr. 16, 2020) (CR 309; PR 374) at 18 ("Verification Report"); Marmen LCR Response at LCONTENT-3; Verification Report at 18.   At that time, General Electric ("GE"), which produced wind turbines, was Marmen's primary customer.  *See id.*

In response to GOQ decrees, Hydro-Québec Distribution ("Hydro-Québec"), which is owned by the GOQ, issued four calls for tender ("CFTs") for the purchase of wind-generated energy from 2003 to 2013.  *See* Marmen LCR Response at LCONTENT-3 to -4; GOQ Response to Section II of the CVD Questionnaire (C-122-868) (Oct. 9, 2019) at 32-33, 38 (CR 29-68; PR 113-41) ("GOQ Section II Response").  Hydro-Québec issued the first CFT on May 12, 2003 ("*2003 Tender*").  *See* GOQ Section II Response at Exhibit QC-LC-9.  The *2003 Tender* included a local content requirement ("LCR"), specifying that at least 40% to 60% of the wind farm project's total costs had to be incurred in the "Eligible Region," defined as the City of Matane or the administrative region of Gaspésie-Îles-del-law-Madeleine.  *See id.* at §§ 1.1 & 2.7; *see also* GOQ Response to the Second Supplemental Questionnaire (C-122-868) (Nov. 22, 2019) at Exhibit QC-LC-6 (Revised CFR Summary Table) ("GOQ 2nd Supp. Response") (PR 302).

Because Marmen already had a tower facility in Trois-Rivières, the company initially opposed the LCR and met with politicians to inquire whether the requirements could be changed.  *See* Verification Report at 19.  Marmen would have preferred to continue producing wind towers for Québec projects at its Trois-Rivières facility, from which it would have had a competitive advantage due to the shorter shipping distances to wind farm sites in Québec.  *See* Petitions for

**NON-CONFIDENTIAL VERSION**

the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended; Volume VI: Canada Countervailing Duty Petition (C-122-868) (July 9, 2019) at Exhibit VI-52 (National Wind Watch, *Local Content Rules Stir Debate*, Sept. 8, 2007 ("Asked by The Gazette in 2005 about his new $25-million factory, company president Patrick Pellerin bristled. 'We could have done (in Trois-Rivières) what we'll be doing in Matane,' he said then.") (CR 9-15; PR 9-15) ("Petition Vol. VI"); *see also* Marmen LCR Response at Exhibit LCQ-01 (Standard Questions Appendix at 1-3).

Hydro-Québec received 32 bids from wind farm developers in response to the *2003 Tender*, and awarded eight contracts for wind projects to generate the required wattage of wind power.  *See* GOQ 2nd Supp. Response at Exhibit QC-LC-6.  In turn, the winning bidders (*i.e.*, wind farm developers) selected GE for the supply of wind turbines.  *See* Marmen LCR Response at LCONTENT-3.  In April 2005, GE concluded an agreement with Marmen for the supply of wind towers for GE's production of wind turbines in connection with the wind farm developers' satisfaction of the LCRs.  *See id.* at LCONTENT-3 & Exhibit LCQ-04.  Under the agreement, GE [                                                        ] wind tower facility in Matane, which is located within the Eligible Region.  *See id.* at Exhibit LCQ-04 (GE-Marmen Supply Agreement at Section 2).  Only GE and Marmen were parties to this agreement. Although Marmen initially had opposed constructing a tower facility in Matane, Marmen changed its mind for a number of reasons, including [                          ] and its awareness that other companies were considering building tower facilities in Matane.  *See* Verification Report at 19.

Hydro-Québec also issued CFTs in October 2005, April 2009, and December 2013 (the "*2005 Tender*," "*2009 Tender*," and "*2013 Tender*").  *See* Marmen LCR Response at

**NON-CONFIDENTIAL VERSION**

LCONTENT-3 & -4; GOQ Section II Response at Exhibits QC-LC-11, QC-LC-13 & QC-LC-15); GOQ 2nd Supp. Response at Exhibit QC-LC-6 (CFT Summary).  These CFTs included LCRs for both the Eligible Region and Québec proper.  *See id.*  The *2005 Tender* and *2009 Tender* both specified that 30% of the wind turbine cost must be incurred in the Eligible Region, while 60% of the overall cost of the bidder's wind farm must be incurred in Québec.  *See* GOQ Section II Response at Exhibit QC-LC-11 (*2005 Tender* at § 2.7) & Exhibit QC-LC-13 (*2009 Tender* at § 1.5); *see also* GOQ 2nd Supp. Response at Exhibit QC-LC-6 (CFT Summary).  The regional and Québec LCRs of the *2013 Tender* mirrored those of the 2005 and 2009 tenders, except that 35% of the wind turbine cost had to be incurred in the Eligible Region.  *See* GOQ Section II Response at Exhibit QC-LC-15 (*2013 Tender* at § 1.5); *see also* GOQ 2nd Supp. Response at Exhibit QC-LC-6 (CFT Summary).  Use of wind towers manufactured in the Eligible Region was one way – but not the only way – for the bidding wind farm developer to demonstrate that the regional LCR was satisfied.  The bidder could use other locally manufactured wind turbine components, such as the nacelle and blades, to satisfy the regional LCR.  *See* GOQ Section II Response at Exhibit QC-LC-09.

Each of Hydro-Québec's CFTs was subject to an open, competitive bidding process for which "the lowest total price" was one of the evaluation criteria.  *See* GOQ Section II Response at 34, 36, 41.  Upon conclusion of each procurement process, Hydro-Québec entered into contracts with the winning bidders for the purchase of wind power.  *See id.* at 38.  Studies conducted by an independent consulting firm, Merrimack Energy, confirmed that the C$/MWh contract prices obtained by Hydro-Québec through the calls for tender were consistent with competitive market prices for wind power.  *See id.* at Exhibit QC-LC-9 (Merrimack Energy Group, Inc., *The Competitive Cost of Wind Power*, March 2005 at 5; Exhibit QC-LC-11

(Merrimack Energy Group, Inc., *Assessment of Hydro-Quebec Distribution's Call for Tenders Process for the Purchase of Wind-Generated Electricity for a Total of 2,000 MW of Installed Capacity*, July 2008 at 20); and Exhibit QC-LC-15 (Merrimack Energy Group, Inc., *Assessment of Hydro-Quebec Distribution's Call for Tenders Process for the Purchase of Wind-Generated Electricity for a Total of 450 MW of Installed Capacity*, Feb. 2015 at Section IV.2).

Neither Hydro-Québec nor the GOQ was involved in the transactions or agreements between (1) the wind farm developers and the turbine OEMs or (2) the turbine OEMs and their subcontractors, including the manufacturers of wind towers, blades, nacelles, and other components of the wind turbine. *See id.* at 30-31, 39, 45 & 46 ("Québec and Hydro-Québec are not parties to the private, commercial contracts entered into by wind farm developers and OEMs and therefore cannot comment on the process by which they were negotiated nor on their terms.").

For the four CFTs, the winning bidders (wind farm developers) awarded contracts to five different turbine OEMs:  ENERCON (17 contracts), GE (9 contracts), Senvion (10 contracts), Siemens (1 contract), and Vestas (1 contract). *See* GOQ 2nd Supp. Response at Exhibit QC-LC-6 (CFT Summary).  The turbine OEMs, in turn, selected Marmen as the tower supplier for most, but not all, of these contracts. *See* Marmen Response to the Fourth Supplemental Questionnaire (C-122-868) (Nov. 22, 2019) at 2 (CR 262-68; PR 303-04) ("Marmen 4th Supp. Response"). ENERCON, the turbine manufacturer awarded the most contracts, also "built a facility in Matane at which it produced **concrete** wind towers with a steel top section."  Marmen LCR Response at LCONTENT-4.  Consequently, Marmen competed for Québec LCR wind tower business with ENERCON, and also competed with other suppliers of steel top sections to ENERCON, such as Fabrication Delta. *See* Marmen LCR Response at LCONTENT-4; Marmen 4th Supp. Response

**NON-CONFIDENTIAL VERSION**

at 2; Marmen First Supplemental Questionnaire Response (C-122-868) (Oct. 2, 2019) at 4 (PR 104-07) ("Marmen 1st Supp. Response"); Petition Vol. I at Exhibit I-16.

From 2007 through 2017, Marmen sold thousands of wind towers and wind tower sections to turbine OEMs in connection with wind farm developers' satisfaction of Québec LCRs, issuing over 2,000 invoices during this timeframe covered by [   ] separate purchase orders.  *See* Marmen 4th Supp. Response at Reformatted Wind Towers Sales Template.  Hydro-Québec issued its last tender for wind-generated electricity in 2013 – the *2013 Tender* – and Marmen's last sale of a wind tower contributing to a wind farm developer's satisfaction of Québec LCRs occurred in 2017.  *See id.*; *see also* Marmen LCR Response at Exhibit LCQ-01 at 4.

On July 9, 2019, the Wind Tower Trade Coalition ("Petitioner") filed a petition for the imposition of countervailing duties on imports of wind towers from Canada, challenging Québec's LCRs, among other allegations.  *See* Petition Vol. VI at 43-57.  Petitioner alleged that Québec's LCRs were countervailable either as "import substitution subsidies" or the purchase of goods (wind towers) for more than adequate remuneration ("MTAR").  *See id.* at 51, 54.

Commerce initiated a CVD investigation of wind towers from Canada on July 29, 2019. *See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam*, 84 Fed. Reg. 38126 (Dep't Commerce Aug. 6, 2019) (initiation CVD investigations) (PR 52). Commerce selected Marmen Inc. and Marmen Énergie as mandatory respondents for Canada.

In the preliminary CVD determination, Commerce noted that, "{b}ecause the alleged program involves the purchases of goods{,} . . . {Commerce} examined whether benefits under this program were provided for MTAR."  *Utility Scale Wind Towers from Canada*, 84 Fed. Reg. 68126 (Dep't Commerce Dec. 13, 2019) (prelim. CVD determ.) (PR 359), accompanying

**NON-CONFIDENTIAL VERSION**

*Decision Memorandum for the Preliminary Determination of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada* (Dec. 6, 2019) ("*Preliminary Decision Memo*") at 20 (PR 308).  Commerce also noted its practice to treat purchases of goods for MTAR as "recurring" benefits under 19 C.F.R. § 351.524(c).  *See id.*  "Following that practice, because Marmen did not make sales of wind towers in Québec during the POI {(calendar year 2018)}, {Commerce} preliminarily determined{d} that this program did not confer any benefit on Marmen, and, therefore, was not used by Marmen."  *Id.*  Consequently, Commerce found it "unnecessary . . . to make a preliminary determination as to the countervailibility" of Québec LCRs in the preliminary determination.  *Id.*

In its case brief to Commerce, Petitioner argued, among other things, that Commerce should have treated Québec's LCRs as "nonrecurring" benefits, a decision that would have required an examination of Marmen's sales contributing to wind farm developers' satisfaction of Québec LCRs made during the 11-year period **preceding** the POI (*i.e.*, the average-useful-life ("AUL") period).  *See* Petitioner Case Br. (C-122-868) (May 6, 2020) (CR 312; PR 381) ("Petr. Case Br.").  In response, Marmen demonstrated that Commerce correctly treated Marmen's sales – more than 2,000 transactions spanning an 11-year period – as "recurring" in nature in accordance with 19 C.F.R. § 351.524(c)(2) and Commerce's practice.  *See* Marmen Rebuttal Br. (C-122-868) (May 13, 2020) at 7-13 (CR 316; PR 387) ("Marmen Rebuttal Br.").

Commerce issued the final CVD determination on June 29, 2020.  *See Final Decision Memo*.  Commerce "continue{d} to find that the Quebec LCR program provided recurring benefits and, thus, that this program was not used by Marmen during the POI."  *Id.* at 36.  In doing so, Commerce applied the three-prong test under 19 C.F.R. § 351.524(c)(2) for determining whether benefits are recurring or non-recurring, and explained why each criterion

demonstrated that Marmen's sales made under the Québec LCR program were recurring in nature.  *See id.* at 37-38.  Because Marmen did not use the Québec LCR program during the POI, the question of the program's countervailability was moot.

## III.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in a countervailing duty proceeding, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951).  For a determination to be supported by substantial evidence, there must be a rational connection between the facts on the record and the choice made by Commerce.  *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).  The possibility of drawing inconsistent conclusions does not render Commerce's findings unsupported by substantial evidence, *see Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996), and the court may not "reweigh the evidence or . . . reconsider questions of fact anew."  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)).

"In reviewing Commerce's factual determinations under the substantial evidence standard, the agency is 'presumed . . . to have considered all pertinent information sought to be brought to its attention'" and "there is no statutory requirement that the Department explicitly discuss every piece of record evidence that is put before it in an investigation."  *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000) (citations

omitted).   Thus, the Court will uphold Commerce's determination as supported by substantial evidence, even if it is of "less than ideal clarity" where "the agency's path may reasonably be discerned."   *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

## IV.   ARGUMENT:  COMMERCE REASONABLY AND LAWFULLY DETERMINED THAT MARMEN'S SALES MADE IN CONNECTION WITH QUÉBEC LOCAL CONTENT REQUIREMENTS WERE RECURRING IN NATURE

Commerce reasonably determined, based on substantial evidence, that Marmen's sales of wind towers to private turbine OEMs in connection with Québec LCRs ("LCR Sales") were "recurring" in nature under the three criteria enumerated in 19 C.F.R. § 351.524(c)(2): (1) whether the subsidy is exceptional; (2) whether the subsidy required or received the government's express authorization or approval; and (3) whether the subsidy was provided for, or tied to, the company's capital structure or capital assets.   Contending otherwise, Petitioner argues that Commerce "failed to take into account material record evidence that detracted from its conclusion"; "failed to explain its conclusion adequately"; and failed to recognize "the complexity" of Québec LCRs.   Petr.'s Br. at 9.   In advancing these arguments, however, Petitioner fails to demonstrate that Commerce's findings are unsupported by substantial evidence, and instead merely asks the Court to reweigh the evidence.   Moreover, Petitioner attempts to complicate what is otherwise a straightforward CVD analysis, and makes unsupported factual assertions.   Commerce's determination that Marmen's LCR Sales were recurring in nature is supported by substantial evidence and otherwise in accordance with law.[2]

---

[2] Petitioner mistakenly characterizes Commerce's decision as a finding "that ***the benefits*** received under the Quebec LCR program were recurring . . . ."   Petr.'s Br. at 11 (emphasis added); *see id.* at 12.   This is inaccurate.   Rather, because Marmen's LCR Sales were recurring in nature and Marmen did not make any such sales during the POI, it was unnecessary for Commerce to reach the benefit question under the statute:   *i.e.*, whether Marmen's LCR Sales

**NON-CONFIDENTIAL VERSION**

### A.     Legal Background

Under the statute, a countervailable subsidy exists where a government authority provides a "financial contribution" conferring a "benefit" on a person, and the subsidy is "specific" (which generally means limited in availability or application to a company, industry, or group thereof). 19 U.S.C. § 1677(5)(A), (B) & (5A)(D).  "Although normally the government provides such a contribution directly, a contribution may exist where a government authority 'entrusts or directs a private entity to make {it}' so long as 'providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments.'"  *Wilmar Trading PTE Ltd. v. United States*, 466 F. Supp. 3d 1334, 1342 (Ct. Int'l Trade 2020) (citing 19 U.S.C. § 1677(5)(B)(iii)).

The statute defines "financial contribution" as (1) the direct transfer of funds (such as grants, loans, and equity infusions); (2) forgoing or not collecting revenue that is otherwise due; (3) providing goods or services; or (4) purchasing goods.  19 U.S.C. § 1677(5)(D).  "{I}n the case where goods are purchased," the statute directs that the respondent receives a benefit "if such goods are purchased for more than adequate remuneration" ("MTAR").  19 U.S.C. § 1677(5)(E)(iv). Further, Commerce's practice is to treat any such benefits as "*recurring*" benefits, determining whether the government purchased goods from the respondent for MTAR *during the POI*.  *See, e.g.*, *Certain Uncoated Groundwood Paper from Canada*, 83 Fed. Reg. 39414 (Dep't Commerce Aug. 9, 2018) (final CVD determ.), accompanying Issues & Decision Memorandum at 157 ("find{ing} that the respective government authorities purchased electricity from the respondents for MTAR during the POI"); *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51814, (Dep't Commerce Nov. 8, 2017) (final CVD determ.),

---

were made for more than adequate remuneration.  *See Final Decision Memo* at 36-38; 19 U.S.C. § 1677(5)(E).

accompanying Issues & Decision Memorandum at 166 ("find{ing} that BC Hydro purchased electricity from Tolko and West Fraser for MTAR during the POI").

Here, to satisfy Québec LCRs, ***private*** entities (*i.e.*, turbine OEMs) purchased wind towers manufactured by Marmen in Québec.  Commerce, however, did not need to reach the question of whether the GOQ "entrusted or directed" private turbine OEMs to purchase wind towers from Marmen within the meaning of 19 U.S.C. § 1677(5)(B)(iii), because it found that such purchases were "recurring" in nature under 19 C.F.R. § 351.524(c)(2), and were not made during the POI.[3]

**B.    Commerce Determined that Marmen Made LCR Sales on an Ongoing Basis from Year to Year Based on Substantial Evidence in the Record**

Under 19 C.F.R. § 351.524(c)(2)(i), Commerce considers "{w}hether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year . . . ."  Here Commerce determined that "Marmen's regular, frequent sales of wind towers to its customers (*i.e.*, the OEMs) were not

---

[3] Petitioner mistakenly characterizes Québec LCRs as an import substitution subsidy."  Petr.'s Br. at 9.  Under the statute, "{a}n import substitution subsidy is a subsidy that is contingent upon the use of domestic goods over imported goods, alone or as 1 of 2 or more conditions."  19 U.S.C. § 1677(5A)(C).  In addressing an alleged import substitution subsidy, the question for Commerce is whether the ***respondent*** received a financial contribution conditioned on ***that company's*** "use of domestic over imported goods."  *See*, *e.g.*, *Wire Decking from The People's Republic of China*, 75 Fed. Reg. 32902 (Dep't Commerce June 10, 2010) (final CVD determ.), accompanying Issues & Decision Memorandum at 27 (VAT rebates received by respondent conditioned on the respondent's use of domestic over imported goods); *Citric Acid and Certain Citrate Salts from The People's Republic of China*, 79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) (final results CVD admin. review), accompanying Issues & Decision Memorandum at 19-20 (income tax credits received by respondents were conditioned on respondents' use of domestic over imported goods); *Certain Cold-Rolled Carbon Steel Flat Products from Brazil*, 67 Fed. Reg. 62128 (Dep't Commerce Oct. 3, 2002) (final CVD determ.), accompanying Issues & Decision Memorandum at 19 (government loans received by respondents were only available to finance the purchase of domestically produced equipment).  Here, with respect to Québec LCRs, Marmen did not receive any financial assistance conditioned on Marmen's use of domestic over imported goods.  Consequently, the Québec LCRs are not import substitution subsidies.

**NON-CONFIDENTIAL VERSION**

exceptional events{,}" supporting the conclusion that Marmen's LCR Sales were recurring. *Final Decision Memo* at 37. In arguing that Marmen's LCR Sales were exceptional, Petitioner misidentifies the alleged subsidy, relies on speculation, and baselessly claims that Commerce failed to apply the regulatory standard correctly.

According to Petitioner, "Commerce failed to recognize that the 'subsidy' was conferred by the issuance of four, discrete CFTs, which were not granted regularly, on an ongoing basis, but only four times over the course of eleven years." Petr.'s Br. at 15. This argument lacks merit because Hydro-Québec's CFTs were not the "subsidies" at issue. Rather, the alleged subsidies were private turbine OEMs' purchases from Marmen of wind towers covered by Québec LCRs, each of which is a unique financial contribution. *Cf. Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51814 (Dep't Commerce Nov. 8, 2017) (final CVD determ.), accompanying Issues & Decision Memorandum at 45 ("In a subsidy analysis, a benefit is either conferred or not conferred, and a positive benefit from certain transactions cannot be masked or otherwise offset by 'negative benefits' from other transactions."). Petitioner itself had asserted that the alleged subsidy could be analyzed "as the purchase of wind towers for MTAR." Petition Vol. VI at 54. Based on the record evidence, Commerce concluded:

> Although issued as four discrete tranches, the CFTs were for purchases of wind energy, *i.e.*, electricity, not wind towers. Marmen did not sell wind energy. Instead, it sold wind towers on a regular basis.

*Final Decision Memo* at 37. Commerce's conclusion is reasonable and supported by substantial evidence.

Focusing on Hydro-Québec's tenders for wind-generated energy instead of private turbine OEMs' purchases of wind towers from Marmen, Petitioner also claims that, "*but for* the LCRs in the four-part CFTs{,} . . . Marmen would not have realized the revenue generated from

its production of wind towers."  Petr.'s Br. at 14.  Petitioner's "but for" argument, however, is speculative and contradicted by the record evidence.  To the contrary, Marmen began producing and selling wind towers at the Trois-Rivières facility before Hydro-Québec issued its first call for tender in May 2003 (the "*2003 Tender*").  *See* Marmen LCR Response at Exhibit LCQ-01 at pages 1-2; Verification Report at 18.  The *2003 Tender* mandated a local content requirement only with respect to the "Eligible Region" (defined as the City of Matane or the administrative region of Gaspésie-Îles-de-la-Madeleine). *See* GOQ Section II Response at Exhibit QC-LC-9 (*2003 Tender* at §1.1).  Because Marmen already had a tower facility in Trois-Rivières, the company initially opposed the LCR and met with politicians to inquire whether the requirements could be changed.  *See* Verification Report at 19.  Marmen would have preferred to continue producing wind towers for Québec projects at its Trois-Rivières facility, from which it would have had a competitive advantage due to the shorter shipping distances to wind farm sites in Québec.  *See* Petition Vol. VI at Exhibit VI-52.  Contrary to Petitioner's groundless assertion, Marmen would have been a top choice for wind farm projects in Québec even in the absence of LCRs.  *See* Marmen LCR Response at 2-3.

Lastly, Petitioner baselessly claims that "Commerce deviated from its regulations by failing to address the subsidy recipient's expectations under this first prong – namely, whether the recipient 'cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year.'"  Petr.'s Br. at 15 (citing 19 C.F.R. § 351.524(c)(2)(i)). Contrary to Petitioner's claim, Commerce cited the full text of § 351.524(c)(2)(i), as quoted by Petitioner, and determined that "Marmen's **regular, frequent sales** of wind towers to its customers (*i.e.*, the OEMs) were not exceptional events."  *Final Decision Memo* at 37 (emphasis added).  Although Commerce did not explicitly state that Marmen could have "expect{ed} to

receive additional subsidies {(*i.e.*, make LCR Sales)} under the same program on an ongoing basis from year to year{,}" Commerce's path is reasonably discernible. *See NMB*, 557 F.3d at 1319-20.  From 2007 through 2017, Marmen issued over 2,000 invoices for wind towers covered by Québec LCRs, with the number per year ranging from a low of 85 invoices to a high of 306 invoices.  *See* Marmen 4th Supp. Response at Reformatted Wind Towers Sales Template. Substantial evidence demonstrates that Marmen could have expected to make LCR Sales on an ongoing basis from year to year and, thus, that Marmen's LCR Sales were recurring in nature.

### C.   Commerce Determined that Marmen's LCR Sales Did Not Require the Government's Express Authorization or Approval Based on Substantial Evidence in the Record

Under 19 C.F.R. § 351.524(c)(2)(ii), Commerce considers "{w}hether the subsidy required or received the government's express authorization or approval (*i.e.*, receipt of benefits is not automatic) . . . ."  Here, Commerce reasonably determined consistent with the record evidence that Marmen's LCR Sales did not require the GOQ's express authorization or approval, noting, in response to Petitioner's arguments, that certain Marmen certifications were "product specification, not sales approval, documents."  *Final Decision Memo* at 37.  In arguing that "subsidies from Quebec's LCR program required the government's express authorization or approval," Petitioner continues to misidentify the alleged subsidies and fails to demonstrate that Commerce's conclusion was unreasonable or unsupported by substantial evidence.

Petitioner argues that "each of the CFTs involved significant, project-based compliance requirements with regard to the LCRs{,}" and that the GOQ expressly approved and monitored each and ***every project***."  Petr.'s Br. at 16-17 (emphasis added).  The "projects" to which Petitioner refers, however, are wind farm projects awarded by Hydro-Québec.  In contrast, the alleged subsidies are private turbine OEMs' purchases from Marmen of wind towers made in

connection with Québec LCRs for MTAR.   Consistent with Commerce's determination that
Marmen's LCR Sales did not require the government's express authorization or approval, neither
the GOQ nor Hydro-Québec was involved in the agreements or sales between Marmen and the
turbine OEMs.   *See* GOQ Section II Response at 30-31, 39, 45 ("HQD is not involved in the
transactions between the developers and manufacturers, or between the OEMs and their
subcontractors, including the manufacturers of wind turbine towers, blades, nacelles, cables,
etc.") & 46 ("Québec and Hydro-Québec are not parties to the private, commercial contracts
entered into by wind farm developers and OEMs and therefore cannot comment on the process
by which they were negotiated nor on their terms.").   Marmen's receipt of the alleged benefits –
purchases for MTAR – was automatic upon issuance of each invoice (of which Marmen issued
thousands over an 11-year period).

Petitioner also argues that Commerce "failed to provide an explanation for its factual
conclusion that Marmen's certifications are merely 'product specification' documents."  Petr.'s
Br. at 16.  Petitioner is wrong.  The record reasonably supports Commerce's conclusion that the
certifications were akin to "product specification" documents.   In response to Commerce's
request for references to Québec's LCR in Marmen's sales documents, Marmen reported:

> Typically, the turbine OEM did not require Marmen to furnish a specific
> document confirming that the wind towers were produced in Matane.  Marmen
> Énergie's invoice and the shipping documentation were generally considered
> sufficient for the wind farm developer to establish the origin of the wind towers.
> In addition, for each wind tower section produced, Marmen sends the customer a
> Quality Assurance Report ("QA Report") or similar package of documents, which
> includes a certificate to ensure conformity with the customer's specification, mill
> test certificates from plate suppliers, and inspection reports for the section.  The
> QA Reports issued by Marmen Énergie could also be used by the wind farm
> developer to establish the origin of the wind towers.

Marmen LCR Response at LCONTENT-14 & -15 (citing Exhibits LCQ-03A and LCQ-03B).  In
addition, Marmen reported that certain turbine OEMs required Marmen to provide "Supplier

**NON-CONFIDENTIAL VERSION**

Declaration Letters for Regional and Local Content." *See id.* at LCONTENT-15 & Exhibit LCQ-08 (containing copies of such documents). While affirming that Marmen's towers satisfied Québec LCRs, such documents are analogous to product specification documents, because they provide information about the wind tower products, the towers' components, and the origins of such products and components. *See id.* at Exhibit LCQ-08. Most importantly, none of these documents evinces that the government's express authorization or approval was required for the turbine OEMs' purchases from Marmen. In fact, all such documents were issued *after* Marmen had made the corresponding LCR Sales. *See id.* Exhibits LCQ-03A, -03B & -08. Petitioner also points to references to Québec LCRs in Marmen's contracts with turbine OEMs, *see* Petr.'s Br. at 17-18, but, likewise, such references do not demonstrate that the government's express authorization or approval was required for Marmen's LCR Sales.

In summary, none of the materials cited by Petitioner disproves the reasonableness of Commerce's conclusion that the government's express authorization or approval was not required for Marmen to receive the alleged benefits: turbine OEMs' purchases of wind towers for MTAR. Again, neither the GOQ nor Hydro-Québec was involved in the negotiations or sales between Marmen and the turbine OEMs at all. *See* GOQ Section II Response at 30-31, 39, 45 & 46. That Petitioner takes a different view fails to demonstrate that Commerce's conclusion is unsupported by substantial evidence. *See Consolo*, 383 U.S. at 620 (holding that the possibility of drawing inconsistent conclusions does not render Commerce's findings unsupported by substantial evidence).

**NON-CONFIDENTIAL VERSION**

D.     **Commerce Determined that Turbine OEMs' Purchases Were Not Provided for, or Tied to, Marmen's Capital Structure or Capital Assets Based on Substantial Evidence in the Record**

Under 19 C.F.R. § 351.524(c)(2)(iii), Commerce considers "{w}hether the subsidy was provided for, or tied to, the capital structure or capital assets of the firm."  Here, Commerce applied the regulation consistent with its practice and found "no evidence that Marmen's Quebec LCR sales benefited Marmen's capital structure or assets any more than any sale benefits a company."  *Final Decision Memo* at 37.  In arguing that "subsides from the Quebec LCR program" were provided for, or tied to, Marmen's capital assets, Petitioner continues to misidentify the alleged subsidies, misconstrues agency practice, and otherwise fails to demonstrate that Commerce's conclusion was unreasonable.  Consistent with Commerce's determination, Marmen produced and sold wind towers ***using*** its productive assets – ***not to support*** its productive assets.

Petitioner argues Commerce's determination was inconsistent with the *CVD Preamble*, which indicates that subsidies "provided for, or tied to, the capital structure or capital assets of the company . . . generally benefit the creation, expansion, and/or ***continued existence*** of a firm."  Petr.'s Br. at 22 (emphasis added) (citing *Countervailing Duties*, 63 Fed. Reg. 65348, 65393 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*")).  Here, Petitioner opines that Commerce's

> {A}nalysis failed to consider that the GOQ decrees and regulations that established the process for the four CFTs made clear that the initial CFTs were designed to encourage the construction of facilities for the manufacture of wind turbine components such as wind towers, and that the subsequent CFTs were intended to provide a steady stream of business to utilize Marmen's new capital assets.

**NON-CONFIDENTIAL VERSION**

Petr.'s Br. at 22.   Again, however, Hydro-Québec's CFTs are not the alleged subsidies. Commerce, reasonably and correctly considered the "subsidies" to be private turbine OEMs' purchases of wind towers from Marmen. *See Final Decision Memo* at 37-38.

Moreover, Petitioner's characterization of the *CVD Preamble* fails to reflect Commerce's consistent practice with respect to the § 351.524(c)(2)(iii) criterion.   Commerce explained that its practice is to examine whether "the subsidy involves a government financial contribution that ***directly and/or prospectively*** supports or contributes to a company's capital assets, *e.g.*, import duty exemptions for imported equipment destined for the company's facilities, or tax credits toward the construction of manufacturing facilities."   *Final Decision Memo* at 37 (emphasis added) (citing *Certain Cut-to-Length Carbon-Quality Steel Plate from Italy*, 64 Fed. Reg. 73244, 73256 (Dep't Commerce Dec. 29, 1999) (final CVD determ.); *Certain Pasta from Italy*, 80 Fed. Reg. 11172 (Dep't Commerce Mar. 2, 2015) (final results CVD admin. review), accompanying Issues & Decision Memorandum at 18; *Certain New Pneumatic Off-the-Road Tires from China*, 73 Fed. Reg. 40480 (Dep't Commerce July 15, 2008), accompanying Issues & Decision Memorandum at Comment G6; *Wire Decking from China*, 75 Fed. Reg. 32902 (Dep't Commerce June 10, 2010), accompanying Issues & Decision Memorandum at 27-29); *see also CVD Preamble* at 65393 (citing examples of "a grant expressly for the purchase of an industrial building" and "import duty exemptions tied to major capital equipment purchases").   Furthermore, the *CVD Preamble* states Commerce "will examine whether, ***at the point of bestowal***, the subsidy was provided to, or tied to, the company's capital structure or capital assets."   63 Fed. Reg. at 65393 (emphasis added).

Here, in contrast, the "subsidies" at issue are ***more than 2,000 purchases spanning an eleven-year period***.   Commerce reasoned that "the MTAR benefits from the wind tower sales

can only be said to relate, ***retroactively***, to Marmen's Matane facility in the sense that the wind towers were produced in the facility . . . ." *Final Decision Memo* at 37-38 (emphasis added). Moreover, ***at the point of bestowal***, turbine OEMs did not purchase wind towers from Marmen to benefit the company's capital assets or Matane facility.  Rather, the turbine OEMs purchased wind towers for their own production of wind turbines.  Stated differently, the turbine OEMs purchased the ***output*** of Marmen's productive assets; they did not purchase Marmen's wind towers to benefit "the creation, expansion, and/or continued existence" of Marmen's capital assets themselves.  *CVD Preamble* at 65393.[4]

 Lastly, Petitioner argues that a "[




]."  Petr.'s Br. at 23.  Commerce, however, considered this argument and reasonably determined that this private "agreement does not support finding that the GOQ entrusted or directed GE to subsidize the construction of Marmen's Matane facility or to provide any non-recurring subsidies during the AUL period."  *Final Decision Memo* at 37.   The GOQ was not involved at all, and there is no evidence the GOQ was even aware of the agreement.  Furthermore, citing its consistent practice, Commerce explained that the "provision of funds ***toward the facility***, and ***not the subsequent sales***, . . . would be

---

[4] Notably, a respondent's purchases of inputs from the government (for less-than-adequate-remuneration) are treated as ***recurring*** subsidies under 19 C.F.R. § 351.524(c)(1) – even though such inputs relate to the respondent's production of the merchandise under investigation.  *See, e.g.*, *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 19657 (Dep't Commerce Apr. 28, 2017) (prelim. CVD determ.), accompanying Preliminary Decision Memorandum at 54-57 (treating the government's sales of stumpage as recurring), *unchanged in final*, 82 Fed. Reg. 51814 (Dep't Commerce Nov. 8, 2017).   By analogy, then, government purchases of the merchandise under investigation from a respondent also should be treated as recurring.  *Cf. CVD Preamble* at 65379 ("our intended approach toward the measurement of the adequacy of remuneration {for government purchases of goods} is outlined in detail in § 351.511 (government provision of goods or services)").

**NON-CONFIDENTIAL VERSION**

analogous to the subsidies found to be non-recurring . . . ." *Id.* at 38 (emphasis added).  "In any case, {Commerce concluded,} it seems clear from the record evidence that those funds were provided prior to the AUL and thus, even if they could be considered as countervailable subsidies, they fall squarely outside the scope of our analysis." *Id.*

In summary, Commerce reasonably determined – consistent with its practice and based on substantial evidence – that the private turbine OEMs' purchases of wind towers from Marmen were not provided for, or tied to, the company's capital assets or Matane facility.  Petitioner's mere disagreement is insufficient to demonstrate that Commerce's conclusion is unsupported by substantial evidence.  *See Consolo*, 383 U.S. at 620 (holding that the possibility of drawing inconsistent conclusions does not render Commerce's findings unsupported by substantial evidence).

NON-CONFIDENTIAL VERSION

**V.    CONCLUSION AND RELIEF SOUGHT**

For the reasons discussed above, Marmen respectfully requests that the Court:

1)    Enter judgment in favor of Defendant with respect to the aspects of Commerce's *Final CVD Determination* challenged by Petitioner; and

2)    Hold and declare that the aspects of Commerce's *Final CVD Determination* challenged by Petitioner are supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

WHITE AND CASE LLP

 /s/ Jay C. Campbell
Jay C. Campbell
Ting-Ting Kao
Ron Kendler
Allison J.G. Kepkay

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

Date: June 10, 2021

**PUBLIC VERSION**

CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for Marmen's Response Brief, as computed by the White & Case word processing system (Microsoft Word 2016) and manual tally, is 6,479.


  /s/ Jay C. Campbell
Jay C. Campbell