# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE GOVERNMENT OF QUÉBEC,<br>　　　　　*Plaintiff*,<br>　　and<br>MARMEN INC., MARMEN ÉNERGIE INC.;<br>MARMEN ENERGY CO.,<br>　　　　*Plaintiffs*,<br><br>　　and<br>THE GOVERNMENT OF CANADA,<br>　　　　*Plaintiff-Intervenor*,<br><br>　　v.<br><br>THE UNITED STATES,<br>　　　　　*Defendant,*<br>　　and<br>WIND TOWER TRADE COALITION,<br>　　　*Defendant-Intervenor* | Before: Hon. Gary S. Katzmann,<br>Judge<br><br>Consol. Court No. 20-00168 |

## CONSOLIDATED PLAINTIFF-INTERVENOR GOVERNMENT OF CANADA'S RULE 56.2 REPLY BRIEF

Joanne E. Osendarp
Alan G. Kashdan
Tim Hruby
Conor Gilligan

McDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000
josendarp@mwe.com

*On Behalf of the Government of Canada*

Dated: July 8, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.   The Department's Finding That the 10 Percent Depreciation Rate for Class
     1 Buildings Primarily Used for Manufacturing or Processing Provides a
     Countervailable Financial Contribution and Benefit Is Unsupported by
     Substantial Evidence and Is Otherwise Not in Accordance with Law ............................. 4

II.  The Department's Finding That Québec's Tax Credit for On-the-Job
     Training Is *De Facto* Specific Is Unsupported by Substantial Evidence and
     is Otherwise Not in Accordance with Law ..................................................................... 10

CONCLUSION ......................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
791 F. Supp. 2d 1327 (Ct. Int'l Trade 2011) ............................................................7

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) .................................................18

*Allegheny Ludlum Corp. v United States*,
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) .........................................................12

*Anderson v. United States Sec'y of Agric.*,
30 C.I.T. 1742 (2006) ...........................................................................................19

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
Slip Op. 21-76 (June 17, 2021).............................................................................15

*Bethlehem Steel Corp. v. United States*, 25 C.I.T. 307 (2001) .......................................................17

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020).........................................................................................11

*Burinskas v. NLRB*, 357 F.2d 822 (D.C. Cir. 1966) .........................................................19

*Carlisle Tire & Rubber Co. v. United States*,
564 F. Supp. 834 (Ct. Int'l Trade 1983) ....................................................12, 13, 14

*Changzhou Trina Solar Energy Co. v. United States*,
195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) .....................................................12, 15

*Changzhou Trina Solar Energy Co. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .....................................................15, 16

*Chevron U.S.A., Inc. v. Natural Resources Defense Council. Inc.*,
467 U.S. 837 (1984).......................................................................................10, 11, 15

*DAK Americas LLC v. United States*,
456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) .........................................................19

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997).............................................................................7

*Husteel Co. v. United States*,
471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .........................................................7

*Huzhou Muyun Wood Co. v. United States*,
  324 F. Supp. 3d 1364 (Ct Int'l Trade 2018) ....................................................7

*Industriales de Aceitunas de Mesa v. United States*,
  Slip Op. 21-76 (June 17, 2021)...........................................................................15

*Katunich v. Donovan*,
  599 F. Supp. 985 (Ct. Int'l Trade 1984) ...........................................................19

*Mitsubishi Materials Corp. v. United States*,
  820 F. Supp. 608 (Ct. Int'l Trade 1993) .............................................................7

*NMB Sing. Ltd. v. United States*,
  557 F.3d 1316 (Fed. Cir. 2009)...........................................................................19

*Royal Thai Government v. United States*,
  341 F. Supp. 2d 1315 (Ct. Int'l Trade 2004) ....................................................17

*Royal Thai Government v. United States*, 436 F.3d 1330 (Fed. Cir. 2006)...................................17

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)...............................................................................................7

## Statutes and Regulations

19 U.S.C. § 1677(5)(D)(ii).........................................................................................2

19 U.S.C. §§ 1677(5)(D)(ii) and 1677(5)(E), and (2)....................................................1

19 U.S.C. § 1677(5A)(D)(iii)......................................................................................1

19 U.S.C. § 1677(5A)(D)(iii)(I).........................................................................3, 14, 15

19 U.S.C. § 1677(5A)(D)(iii)(II), (III).................................................................10, 15

19 U.S.C. § 1677(5A)(D)(iii)(II), (III), and (IV) ..................................................10, 14

19 U.S.C. § 1677(5A)(D)(iii)}....................................................................................17

19 U.S.C. § 3512(d) ..................................................................................................12

19 C.F.R. § 351.509(a)(1)..........................................................................................9

Uruguay Round Agreements Act, Statement of Administrative Action,
H.R. Doc. No. 103-316 (1994) ............................................................... *passim*

**Administrative Decisions**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final
   Affirmative Countervailing Duty Determination*,
   81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) .......................................................18

*Certain Fabricated Structural Steel from Mexico,*
   85 Fed. Reg. 5,381 (Dep't Commerce Jan. 30, 2020) ............................................................8

*Certain Oil Country Tubular Goods from the People's Republic of China*,
   74 Fed. Reg. 64,045 (Dep't Commerce Dec. 7, 2009) ...........................................................8

*Certain Refrigeration Compressors from the Republic of Singapore: Final Results
   of Countervailing Duty Administrative Review*,
   61 Fed. Reg. 10,315 (Dep't Commerce Mar. 13, 1996) .......................................................18

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe
   From the People's Republic of China*,
   75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) .........................................................8

*Certain Steel Products from Germany*,
   58 Fed. Reg. 37,315 (Dep't Commerce July 9, 1993) ............................................................8

*Cold-Rolled Carbon Steel Flat-Rolled Products From Korea*,
   49 Fed. Reg. 47,284 (Dep't Commerce Dec. 3, 1984) ...........................................................9

*Final Affirmative Countervailing Duty Determination*,
   81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) .......................................................18

*Stainless Steel Plate in Coils from Belgium*,
   64 Fed. Reg. 15,567, 15,569 (Dep't Commerce Mar. 31, 1999) ..............................................8

*Sugar from Mexico*, 80 Fed. Reg. 57,337 (Dep't Commerce Sept. 23, 2015) ..................................8

## INTRODUCTION

This Reply Brief of Plaintiff-Intervenor Government of Canada addresses two issues raised in the June 10, 2021 Response Briefs of the United States (the "Government") and the Wind Tower Trade Coalition (the "Coalition"):  the Department of Commerce's (the "Department" or "Commerce") findings that (1) the 10% federal Capital Cost Allowance ("CCA") for Class 1 buildings at least 90 percent used for manufacturing or processing constitutes a financial contribution that confers a benefit within the meaning of 19 U.S.C. §§ 1677(5)(D)(ii) and 1677(5)(E), and (2) Québec's tax credit for On-the-Job Training is *de facto* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii).

1. <u>The Capital Cost Allowance Deduction</u>.  As Canada explained in its February 11, 2021 Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record ("Canada's Feb. 11 Brief"), Capital Cost Allowance, or "CCA," is the manner in which Canadian business taxpayers can claim depreciation deductions when calculating their taxable income.  Different categories of assets are covered by different CCA classes, and each class of assets is assigned a depreciation rate based on its actual rate of depreciation.  Class 1 of the Canadian federal CCA depreciation schedules includes three kinds of buildings:  buildings primarily used for residential purposes; non-residential buildings at least 90 percent used for manufacturing or processing of goods ("buildings primarily used in manufacturing or processing"); and other buildings at least 90 percent used for non-residential purposes (e.g., retail establishments).  Each kind of building has its own deprecation rate, which generally tracks the building's actual average useful life.

1

The Department found that the 10 percent CCA rate calculated for buildings primarily used in manufacturing or processing provided a countervailable subsidy to Marmen[1] because it was higher than the 4 percent CCA rate allowed for residential buildings, and calculated a benefit equal to the difference between 10 percent and 4 percent.  As demonstrated in Canada's Feb. 11 Brief, the Department refused to engage with the undisputed record facts that buildings used for manufacturing depreciate at a faster rate than residential buildings, and that the 10 percent rate assigned to buildings used in manufacturing was based on a study that evaluated and determined the applicable rates of actual depreciation for such buildings.  As such, the 10 percent rate provided no preference or benefit to Marmen that differs in any way from the tax advantages offered by any tax depreciation system.  The Department also found that this 6 percent differential constituted a financial contribution in the form of "foregoing revenue … that is otherwise due," within the meaning of 19 U.S.C. § 1677(5)(D)(ii).  Unless the countervailing duty law is applied so as to always find a subsidy in the normal tax depreciation rules of countries that provide for tax depreciation, the Department's decision cannot be accepted as a lawful interpretation of when revenue is foregone "that is otherwise due."

The Response Briefs of the United States and the Coalition fail to address these fundamental errors.  Instead, they focus almost entirely on Schedule 8 of the Canadian tax forms and the process used by Canadian taxpayers when claiming the 10 percent CCA Class 1 depreciation deduction, arguing that these somehow demonstrate that there is a countervailable preference here.  Not only is their focus on how Canadian taxpayers claim depreciation

---

[1] As in its February 11, 2021 Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record, Canada here refers to Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. collectively as "Marmen."

deductions a red herring; their description of the process is wrong.  In fact, Schedule 8 is used to claim any CCA depreciation deduction under Canadian tax law.

       2.    <u>Québec's Tax Credit for On-The-Job Training</u>.  The purpose of Québec's Tax Credit for On-The-Job Training is to encourage businesses to employ trainees and improve the skills of young workers.  As the Government of Québec has demonstrated, the credit is widely available and widely used, and thus should have been found to be non-specific and non-countervailable.  The Department nevertheless found that the credit was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I), based on the Department's conclusion that the actual users of the tax credit were "limited in number."  This finding was based on an impermissible and inflexible methodology that simply compared the number of companies claiming the credit to the total number of tax filers in Québec—a methodology all but guaranteed to find specificity, and one that is plainly unsupported by law.

       The Government's defense of its position boils down to two points – it was permissible to look solely at the number of taxpayers using the program, without considering their distribution across Québec's economy, and that in looking only at whether that number was limited, it was appropriate to compare the number of users with the total number of tax filers in Québec.  As demonstrated in Canada's Feb. 11 Brief and further below, both positions reflect an erroneous and legally untenable interpretation of the statutory standard for *de facto* specificity.

## ARGUMENT

       The Government of Canada endorses the arguments presented by the Government of Québec and Marmen in their motions and briefs.

I.      **The Department's Finding That the 10 Percent Depreciation Rate for Class 1 Buildings Primarily Used for Manufacturing or Processing Provides a Countervailable Financial Contribution and Benefit Is Unsupported by Substantial Evidence and Is Otherwise Not in Accordance with Law**

The 10 percent depreciation rate allowed under CCA Class 1 for buildings primarily used in manufacturing or processing was based on a 2007 empirical study conducted by Statistics Canada, Canada's official government statistics agency.  This study found that a 10 percent depreciation rate would more accurately capture the rate at which such buildings actually depreciated than did the existing 4 percent rate for all buildings under Class 1.  Because the 10 percent rate for manufacturing buildings captures the actual useful lives of such buildings, there could be no financial contribution or benefit from the 10 percent rate within the meaning of the U.S. countervailing duty law.[2]

Neither the Government nor the Coalition disputes the 10 percent depreciation rate.  That alone should be dispositive.  Nor has the Department ever, to our knowledge, attempted to countervail a tax depreciation deduction that is based on the actual useful life of the asset being depreciated.  As discussed below, the Department countervails depreciation that is *accelerated*, or that is limited to taxpayers in specific geographic areas.  Here, however, the Government and the Coalition posit that the *manner* in which a taxpayer must claim the 10 percent rate for such buildings demonstrates the existence of a countervailable financial contribution and benefit.  In particular, they argue that a taxpayer must specifically claim the 10 percent rate or else will receive the 4 percent rate; that the taxpayer can only receive the 10 percent rate by using a "special form" called a Schedule 8; and that the 10 percent rate is a special "benefit" above the

---

[2] *Id*. at 13-23.

4

"normal" "base" rate of 4 percent.  U.S. Br. at 27–29, Coalition Br. at 25–27.  These arguments reflect an erroneous understanding of how the Canadian tax filing system works.

*How* a Canadian taxpayer claims a particular tax deduction, and the forms it must complete, is of no relevance whatsoever to assessing whether the deduction constitutes a countervailable tax depreciation deduction.  Even if there were a special form unique to each kind of CCA deduction, that would still not be relevant to determining whether a particular deduction provides a financial contribution and benefit.  Instead, the only relevant issue, which the Government and the Coalition do not discuss, is the record evidence that demonstrates that the 10 percent deduction in fact is based on the actual useful lives of the covered assets.

Regarding the process arguments, Canadian taxpayers are not required to make *any* claims for *any* allowance that would reduce their tax liability.  In that sense, all claims for all tax deductions must be "elected" by the taxpayer.  Thus, for example, a taxpayer eligible for the 4 percent Class 1 deduction for residential buildings and a taxpayer eligible for the 10 percent deduction for a manufacturing or processing building must each claim that deduction, and if no claim is made, the taxpayer gets no deduction.

Second, Schedule 8 is used in claims for *any* CCA tax depreciation deduction.[3]  This applies equally to Class 1 buildings eligible for the 4 percent, 6 percent, or 10 percent rates, or to assets under any other CCA Class.  Thus, contrary to the Government's and the Coalition's

---

[3] *See* Canada's November 8, 2019 Response to the First Supplemental Questionnaire ("Canada's First Supplemental Response"), P.R. 267, at Exhibit GOC-SUPP1-CRA-CLASS1-2; *see also* October 10, 2019 Initial Questionnaire Response of Marmen, Exhibit CCA1-04 and Exhibit CCA1-05, CR 141-67; PR 212-22) ("Marmen Initial CVD Response").

characterizations, there is thus nothing special or unique about Schedule 8 for claiming tax depreciation deductions in Canada.

The Government similarly characterizes the 10 percent rate as something that must be specifically applied for and approved by the Government of Canada, and that this process somehow sets the 10 percent deduction apart from the 4 percent deduction for residential buildings.  U.S. Br. at 30.  That is also not correct.  As Canada explained,[4] a taxpayer identifies the 10 percent rate, as it would the 4 percent rate or 6 percent rate for different kinds of buildings, or depreciation under any other CCA class, by filing the Schedule 8 with its tax return. Unless a subsequent risk-based audit is conducted, the deduction applies *automatically*; the CRA does not need to review or affirmatively approve the claim.

The Government also attaches talismanic importance to the words "normal" and "base," implying that the 10 percent rate is not the "normal" rate, and that the 4 percent "base" rate is thus the benchmark to quantify the benefit of the "preferential" 10 percent rate.  These arguments fail completely, however, to account for or even acknowledge that buildings used primarily for manufacturing or processing are not the same kind of asset as buildings used primarily for residential purposes, that empirical record evidence substantiates the factual basis for a different rate of depreciation for buildings primarily used in manufacturing or processing, and that there is no evidence contrary to the factually determined 10 percent rate.

---

[4] *See* Canada's First Supplemental Response at 43.  *See also* Marmen's actual Schedule 8, referred to in note 2 above.

The Government and the Coalition also characterize the 10 percent rate as an accelerated depreciation measure.  (U.S. Br. at 27, 30; see also Coalition Br. at 6, 25, 27[5]).  This too is not correct.  The depreciation rate for *residential* buildings is 4 percent; the rate for *buildings primarily used for manufacturing processing* is 10 percent. These rates are based on empirical evidence of the actual useful lives of the buildings.  The 10 percent rate is not an accelerated rate. Acceleration implies an allowance for an asset to be depreciated at a faster rate than the actual useful life of the building.  Claiming that the 10 percent rate is accelerated assumes, in the face of undisputed record evidence to the contrary, that buildings primarily used for manufacturing or processing in Canada actually depreciate at a 4 percent rate.  The record evidence, with which the Government never engages, conclusively establishes the contrary.

The Department's decision thus remains unsupported by substantial evidence.  The substantial evidence standard requires that the Department have considered all the evidence on the record, including evidence that detracts from its findings.[6]  The Department, however, failed

---

[5] The two cases cited by the Coalition at p. 27 do not support the Coalition's position.  The *Supercalendered Paper* case found a subsidy in a measure that did accelerate the rate of depreciation for a class of assets at a faster rate than would have applied to *the same kind of assets* absent the acceleration.  That is not the case here.  The *Fabricated Structural Steel* case involved the same Class 1 measure, but the record of that case did not include the evidence presented in this case regarding the Statistics Canada study.  Rather, the only issue regarding the Class 1 CCA that was raised in *Fabricated Structural Steel* involved the specificity of the measure, an issue not raised here.

[6] *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); G*erald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997); *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) ("Because Commerce failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence."); *Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1362 (Ct. Int'l Trade 2020) (Commerce "determinations must be supported by substantial evidence, such that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence."); *Huzhou Muyun Wood Co. v. United States*, 324 F. Supp. 3d 1364, 1373 (Ct Int'l

to account at all for the empirical study undertaken by Statistics Canada that was the predicate for the introduction of the 10 percent and 6 percent CCA rates.  That study determined, as a matter *of fact,* that non-residential buildings in Canada depreciate at a faster rate than residential buildings.  This is uncontested.  There is no evidence that the 10 percent rate was intended to confer a differential and more favorable rate compared to a comparably situated taxpayer.

In that regard, every other case of which we are aware where DOC has countervailed a tax depreciation measure involved some actual preference, involving either a geographic preference or an acceleration of the normal depreciation allowance that would otherwise apply.[7] Neither is present here.

---

Trade 2018) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.  This includes contradictory evidence or evidence from which conflicting inferences could be drawn." (quotation marks and internal citations omitted)).

[7] *See, e.g.*, *Certain Oil Country Tubular Goods from the People's Republic of China*, 74 Fed. Reg. 64,045 (Dep't Commerce Dec. 7, 2009) (final determination), and accompanying Issues and Decision Memorandum at 19–20 (countervailing a respondent's tax deduction stemming from the accelerated depreciation rate it received for investing in a specific region); *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the People's Republic of China*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) (final determination), and accompanying Issues and Decision Memorandum at 20–21 (countervailing a respondent's tax deduction stemming from the accelerated depreciation rate it received for investing in a specific region); *Stainless Steel Plate in Coils from Belgium*, 64 Fed. Reg. 15,567, 15,569 (Dep't Commerce Mar. 31, 1999) (final determination) (countervailing accelerated depreciation provided for assets acquired using grants bestowed under law designed to benefit disadvantaged regions); *Certain Steel Products from Germany*, 58 Fed. Reg. 37,315, 37,318 (Dep't Commerce July 9, 1993) (final determination) (countervailing accelerated depreciation provided for assets located in disadvantaged region); *Certain Fabricated Structural Steel from Mexico,* 85 Fed. Reg. 5,381 (Dep't Commerce Jan. 30, 2020) (final determination), and accompanying Issues and Decision Memorandum at 30–31 (countervailing a program that allowed "companies to depreciate, in one year, 100 percent of their investments in machinery and equipment for the generation of energy from renewable energy or from efficient systems"); *Sugar from Mexico*, 80 Fed. Reg. 57,337 (Dep't Commerce Sept. 23, 2015) (final determination), and accompanying Issues and Decision Memorandum at 22, 62–64 (countervailing a program that allowed companies "to depreciate 100 percent of a qualifying renewable energy-related investment in a single exercise"); *Cold-Rolled Carbon Steel Flat-Rolled Products From Korea*, 49 Fed. Reg.

Nor does the Government's citation to Commerce' regulation at 19 C.F.R.

§ 351.509(a)(1) advance its position (U.S. Br. at 27–28, 31).  The relevant provision provides:

> In the case of a program that provides for a full or partial exemption or remission of a direct tax (e.g., an income tax), or a reduction in the base used to calculate a direct tax, a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program.

This begs the question, however, of what is the tax that the firm "would have paid" without the 10 percent rate.  If the 10 percent CCA depreciation allowance can be considered to cause the Government of Canada to collect less in taxes, and the taxpayer to receive a "benefit" in the form of lower tax liability, then the same could be said of every tax deduction in every tax system.  Unless all depreciation deductions are to be countervailable, there must be a way to distinguish between the standard, non-preferential tax deductions in the country being investigated, and measures that provide a special advantage beyond the non-preferential base.

The proper approach to determining what Marmen would have paid, as Canada demonstrated in its Feb. 11 Brief, is to ask whether Canada has foregone revenue that was *otherwise due*.  The Government appears to accept the proposition that a determination of what is otherwise due must be made in the context of the norms of the country in question's own tax system (U.S. Br. at 30), but goes on to argue that the norm here is the 4 percent rate for residential buildings.  In fact, however, under Canada's current tax system, the norm is a rate based on the actual useful life of the asset, here, the 10 percent rate for manufacturing buildings. For all the reasons addressed here and in Canada's February 11, 2021 Brief, it is the 10 percent,

---

47,284, 47,288 (Dep't Commerce Dec. 3, 1984) (final determination) (countervailing accelerated depreciation rate provided for "important industries").

not 4 percent, rate that would apply.  There simply is no countervailable preference, despite the use of the word "base" to describe the 4 percent rate.[8]

In sum, neither the Government nor the Coalition have offered any relevant argument or evidence to support the Department's position, and the issue should thus be remanded.

## II.   The Department's Finding That Québec's Tax Credit for On-the-Job Training Is De Facto Specific Is Unsupported by Substantial Evidence and is Otherwise Not in Accordance with Law

Broadly put, the Department's approach to specificity is based on an erroneous interpretation of the Tariff Act that, as a practical matter, would require near *universal* availability and use of a tax program before a tax measure could be found to be non-specific.  If Commerce instead had applied the correct *widespread* availability and use test contemplated by Congress, and considered all the relevant facts showing the actual widespread use of the credit throughout the Québec economy as required by 19 U.S.C. § 1677(5A)(D)(iii)(II) and (III) and the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act ("URAA"), (including the broad usage of the measure across different industries in Québec), it could not have found the Québec measure to be *de facto* specific.

---

[8] The Coalition for its part barely acknowledges that the 10 percent rate in question reflects the actual depreciation rate for manufacturing buildings, instead referring to it only as an "alleged fact."  Coalition Br. at 25.  The Coalition does not address or attempt to refute this fact, however—which it could not do, as there is no record evidence to controvert this fact.  Rather, it argues that the existence of a subsidy is demonstrated by the fact that buildings used in certain activities that are not manufacturing ("including those that extract minerals, process certain ores and process electrical energy") cannot use the 10 percent rate.  Coalition Br. at 25.  Apart from the fact that there is no evidence of what the depreciation rate might be for buildings used in such activities, assuming arguendo that extracting minerals or processing electrical energy could be even considered "manufacturing," the Coalition's argument only goes to whether the Class 1 CCA is specific within the meaning of the countervailing duty law, an issue that is not before this Court on appeal.  Further, as Canada explained in its February 11 Brief, Canada does not concede that the CCA for Class 1 assets is specific.

Under the principles first outlined in *Chevron U.S.A., Inc. v. Natural Resources Defense Council. Inc.*, this Court must ascertain the plain meaning of the requirements of the Tariff Act, using the traditional tools of statutory interpretation in this task, and no deference is owed to an agency's interpretations if the meaning of a statutory provision is clear.[9]  Even if a provision's meaning is ambiguous after exhausting the tools for statutory interpretation, an agency's interpretation may be upheld only if it is reasonable[10]—not because, as the Government here claims, Commerce is the "master" of the countervailing duty laws "and knows how to find a subsidy non-specific when appropriate."[11]  As demonstrated below, Commerce's interpretation of the specificity test as applied in this case was contrary to the statute's plain meaning, and thus is unlawful and therefore owed no deference by this Court.

Substantial and important guidance on the intent underlying the statute's specificity requirements and on how Commerce is required to implement them is provided in the SAA, which added the current articulation of the specificity standard to the law.  The SAA's guidance is particularly relevant as it is not a typical piece of legislative history.  The Tariff Act specifies that the SAA "shall be regarded as an authoritative expression by the United States concerning

---

[9] 467 U.S. 837, 843 n.9 (1984). ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." (citations omitted)); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.").

[10] *Chevron*, 467 U.S. at 844.

[11] U.S. Br. at 24.

the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."[12]

The SAA explains the purpose of having a specificity requirement in the law—as a filter to exclude Government-provided benefits that are widely available in an economy.  In particular, the specificity test is meant "to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy."[13]  The SAA confirms that the test for specificity is whether the subsidy

---

[12] 19 U.S.C. § 3512(d).

[13] SAA at 930 (emphasis in original).  The SAA further states:

> The Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy.  In the leading case of *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983), Judge Maletz explained that all Governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results.  Judge Maletz stated:
>
>> Thus, included in Carlisle's category of countervailable benefits would be such things as public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sectors.  * * *  To suggest, as Carlisle implicitly does here, that almost every import entering the stream of American commerce be countervailed simply defies reason.
>
> 564 F. Supp. at 838.

SAA at 929–30.  *See also Changzhou Trina Solar Energy Co. v. United States,* 195 F. Supp. 3d 1334, 1348–49 (Ct. Int'l Trade 2016) ("Because 'all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results,' the specificity test is meant to exclude foreign subsidies that 'are broadly available and widely used throughout an economy.'" (quoting SAA at 929 (citing *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (1983)); *see also Allegheny Ludlum Corp. v United States*, 112 F. Supp. 2d 1141, 1152 n.15 (Ct. Int'l Trade 2000)  (quoting the SAA, the Court noted, "{c}onsistent with longstanding U.S. practice,

is broadly available and widely used throughout an economy, not whether the subsidy is universal or has near universal availability and usage.

When discussing the first *de facto* specificity factor—whether the users of the subsidy are "limited in number"—the SAA consistently and repeatedly equates the meaning of the term "limited" to concepts of "small" and "large":

> "…where the number of users of a subsidy is very *large*, the predominant use and disproportionality factors would have to be assessed…"

> "…if the actual users of the subsidy are too *large* in number to reasonably be considered as a specific group,…"

> "…with respect to economic diversification, in determining whether the number of industries using a subsidy is *small* or *large*,…"

> "Where the users of a new subsidy program appear to be *small* in number due to the recent introduction of the program,…"[14]

Applying the traditional tools of statutory interpretation, as this Court must, the proper interpretation of "limited in number" is not whether the program is universally available to and used by *all* or nearly all enterprises and industries.  Rather, consistent with the widespread availability test set out in *Carlisle Tire & Rubber Co. v. United States*[15] as discussed in the SAA, analysis of whether the users of a program are "limited in number" must be based on whether the group of users is large or small.  The SAA in fact provides the question that should be asked

---

government assistance that is both generally available and widely and evenly distributed throughout the jurisdiction of the subsidizing authority is not an actionable subsidy.").

[14] SAA at 931–32 (emphases added).

[15] 564 F. Supp. 834 (Ct. Int'l Trade 1983).

when analyzing the first factor:  are "the actual users of the subsidy {…} *too large in number* to reasonably be considered as a specific group*?"*[16]

The Government first argues that under its hierarchical approach to evaluating *de facto* specificity, if it finds under 19 U.S.C. § 1677(5A)(D)((iii)(I) that the actual recipients of a subsidy, whether considered on an enterprise or industry basis, is limited in number, it need not consider the extent to which the recipients are spread across the economy of the country in question under 19 U.S.C. § 1677(5A)(D)(iii)(II), (III), and (IV).  However, when Commerce claims that the hierarchical approach does not require it to engage with information relevant to the other factors, its reading of the law is inconsistent with the authoritative language in the SAA.  In particular, the SAA directs the Department to "seek and consider information relevant to *all* of {the four} factors."[17]  This, together with the SAA's admonition that "the specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the subsidy is spread throughout an economy,"[18] mandate that facts relevant to the other factors be taken into account.

By comparing the number of users of a tax program with the total number of tax return filers, and taking no other factors into account, the Department replaces the statutorily required inquiry into the "number" of enterprises using a program with an inquiry that focused solely on

---

[16] SAA at 931 (emphasis added).

[17] *Id.* at 931 (emphasis added).  Under the predominant and disproportionate use factors, the Department necessarily must consider the relative use and distribution of a measure across all industries in the country in question.

[18] *Id.* at 930.

the *percentage* of enterprises using a program.  Yet, 19 U.S.C. § 1677(5A)(D)(iii)(I) requires the Department to determine whether the users of a program are "limited in number," not "limited in percentage."[19]  While the second and third statutory test for *de facto* specificity—predominant or disproportionate use of a subsidy—clearly do envision some form of percentage comparison,[20] the limited in number test does not.

The Government asserts, however, that it is appropriate to confine its analysis to the number of users, and to assess whether that number is limited by simply comparing it to the number of possible recipients.  This argument has two glaring defects.

First, as this Court has noted, "{i}t is nonsensical to simply count the number of proffered industries, regardless of their composition, in order to determine specificity.  Such a cursory test would allow gamesmanship in specificity determinations by allowing a respondent to simply recharacterize what is in fact a limited number of industries as numerous industries in order to avoid such a finding."[21]  It is equally nonsensical and susceptible to "gamesmanship" for the Department to simply proffer a percentage and claim specificity, without regard to the number of enterprises and the breadth of industries that do use the program.  Indeed, in the same case, this Court explained that when applying 19 U.S.C. § 1677(5A)(D)(iii)(I) to consider the number of industries or enterprises using a program, "Commerce is under an obligation to

---

[19] Under *Chevron*, the statutory reference to number of enterprises should be taken for the plain meaning of the phrase, not some construct based on percentage language that is not actually included in the statute.  As this Court recently explained in *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, Slip Op. 21-76 (June 17, 2021) at 12–13, where there is no ambiguity, the plain language controls.

[20] 19 U.S.C. § 1677(5A)(D)(iii)(II), (III).

[21] *Changzhou Trina Solar Energy Co. v. United States,* 352 F. Supp. 3d 1316, 1331 (Ct. Int'l Trade 2018).

compare the industries receiving the subsidy to the industry makeup of the country at issue as a whole.  This is a necessary step in the analysis in order to 'avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy.'"[22]

Second, assuming that some version of a percentage approach might be justified, the Department's approach fails to explain why the entire number of tax filers would be the appropriate comparator.  For example, why should tax filers who pay no tax at all in a particular period be included in the denominator?  Why is it appropriate to assume that every enterprise that might use the credit would use it every year?  Or, why should enterprises be included that do not produce goods subject to the countervailing duty law?

The Government claims that prior Commerce decisions demonstrate that Commerce "knows how to find a subsidy non-specific when appropriate."  U.S. Br. at 24.  We are not aware of any instance, however, in which the Department has found a measure *not* to be *de facto* specific where it limited its analysis to comparing the total number of users of the measure to the much larger universe of tax filers or business entities in the jurisdiction in question.  Rather, the cases of which we are aware in which the Department found a measure to be *de facto* non-specific have involved more probing analyses by the Department beyond simply one number as a percentage of another, to consider the number of users in the larger context of distribution of the measure through the country's economy.

For example, in *Royal Thai Government v. United States*, the court upheld the Department's finding that a program that prioritized 351 companies for debt restructuring was

---

[22] *Id.* at 1330–31 (emphasis removed) (quoting the SAA at 930–931).

not *de facto* specific, "given the numerous and diverse industries represented on the 351 list."[23] In upholding the Department's finding, the court explained the relevant legal framework as follows:  "The specificity test {of 19 U.S.C. § 1677(5A)(D)(iii)} was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy."[24]  The court continued:

> {T}he companies named on the 351 list as priorities for debt restructuring represented a wide spectrum of companies and industries, containing { } distinct industries, as classified by their International Standard of Industrial Classification Code…. Further, only 32 of the 351 companies on the list are in the primary metal production sector. Given the numerous and diverse  industries represented on the 351 list, the Court finds that Commerce did not err in its finding that the 351 list was not limited in number based on industry or enterprise.[25]

Other cases where the Department found *de facto* non-specificity with a much smaller number of users than with the Québec credit include:

- In *Bethlehem Steel Corp. v. United States*, this Court upheld the Department's finding that a Korean voluntary electricity curtailment program, in which 190 customers representing sixteen industries participated, was not *de facto* specific.[26]

- In *AK Steel Corp. v. United States*, this Court, and, subsequently, the Court of Appeals for the Federal Circuit, reviewed a Korean program under which any company newly listed on the Korean Stock Exchange in 1987 or 1988 could revalue its assets.[27]  The Department had found this not *de facto* specific because 316

---

[23] 341 F. Supp. 2d 1315, 1319 (Ct. Int'l Trade 2004), *aff'd. in part, rev'd in part on other grounds & remanded*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (affirming the Department's determination that debt-restructuring scheme was not *de facto* specific).

[24] *Id.* (alteration in original).

[25] *Id.* (internal citations omitted).

[26] 25 C.I.T. 307, 321– (2001).

[27] 192 F.3d 1367, 1382–85 (Fed. Cir. 1999).

companies were eligible, and 207 used the program.[28]  Both this Court and the
Federal Circuit upheld the Department's findings as supported by substantial
evidence.[29]

In contrast, in cases where the Department has found that a limited number of users constituted

*de facto* specificity, the numbers were far smaller than the thousands using the Québec measure

here, and had limited distribution across the economy.[30]

The percentage approach thus overturns, without explanation, the Department's

longstanding prior practice of considering the number of users in the context of how widely the

subsidy is used across the economy.  In that regard, the Department has "a responsibility to

administer {its} statutorily accorded powers fairly and rationally, which includes not 'treat{ing}

similar situations in dissimilar ways.'"[31]  That is yet another reason why the decision should be

remanded.[32]

---

[28] *Id.* at 1383.

[29] *Id.* at 1385.

[30] *See, e.g.*, *Certain Refrigeration Compressors from the Republic of Singapore: Final Results of
Countervailing Duty Administrative Review*, 61 Fed. Reg. 10,315, 10,316 (Dep't Commerce
Mar. 13, 1996) (final determination) (finding that, given the large number of companies and
industries in the Singaporean economy, the fact that only ten companies and five industries
received benefits was enough to support finding of *de facto* specificity);  *Certain Cold-Rolled
Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty
Determination*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final determination), and
accompanying Issues and Decision Memo at 20–21 (finding a tax provision allowing companies
that use their own resources to explore and extract minerals to pay a reduced rate of extraction
taxes to be *de facto* specific because only 47–64 taxpayers benefitted from the reduction in any
particular year).

[31] *Anderson v. United States Sec'y of Agric.*, 30 C.I.T. 1742, 1749 (2006) (quoting *Burinskas v.
NLRB*, 357 F.2d 822, 827 (D.C. Cir. 1966)) (second alteration in original).

[32] Commerce's failure to explain its deviation from prior decisions is thus another basis not to
sustain the percentage approach.  *See, e.g.*, *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328
(Fed. Cir. 2009) (remanding to Commerce and explaining that "{o}nce Commerce establishes a
course of action . . . Commerce is obliged to follow it until Commerce provides a sufficient,

In sum, the Department's percentage of tax filers approach does away with the legally required case-by-case examination of all the relevant facts of each case.  Had the Department applied this more thorough method of analyzing the Québec On-the-Job Tax Credit, it could only have concluded that the measure is not *de facto* specific.

## CONCLUSION

For all the foregoing reasons, the Government of Canada respectfully requests that this Court decline to uphold the Department's findings regarding the countervailabilty of Canada's Capital Cost Allowance for Class 1 assets primarily used in manufacturing and Québec's tax credit for On-the-Job Training, and remand to the Department to correct the Department's errors.

---

reasoned analysis explaining why a change is necessary"); *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1346 (Ct. Int'l Trade 2020) ("Consistency promotes fairness between parties, predictability that is critical to the administration of justice, and protects against arbitrary and capricious conduct by the institutions that issue determinations and decide disputes."); *Katunich v. Donovan*, 599 F. Supp. 985, 986 (Ct. Int'l Trade 1984), ("It is a sound principle of administrative law that an administrative agency must either follow or adhere to existing policies and precedents or explain its noncompliance or deviation.")

Respectfully submitted,


_/s/ Joanne E. Osendarp_____
Joanne E. Osendarp
Alan G. Kashdan
Tim Hruby
Conor Gilligan

McDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000
josendarp@mwe.com

*On Behalf of the Government of Canada*


Dated:  July 8, 2021

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at McDermott Will & Emery LLP hereby certify that Consolidated Plaintiff-Intervenor's Reply Brief Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record dated July 8, 2021, complies with the word-count limitation set forth in the Court's January 21, 2021 Scheduling Order.  The memorandum of law contains 6,208 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

 _/s/ Joanne E. Osendarp_
Joanne E. Osendarp
McDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000
josendarp@mwe.com

*On Behalf of the Government of Canada*

Dated:  July 8, 2021